EXHIBIT H



Boston Sports Medicine, Inc. )
)
)
(Complainant) )
)
v. )
)
Boston Sports Medicine and )
Research Institute, LLC )
)
(Respondent) )
)

**Domain Names In Dispute:**
*bostonsportsmedicine.com*

**Case Number:**
FA2106001949788

# RESPONSE

[1.] Respondent Boston Sports Medicine and Research Institute, LLC ("Respondent") received a Written Notice of Complaint and Commencement of Administrative Proceeding on June 9, 2021 (the "Complaint"). The Notification stated that Complainant Boston Sports Medicine, Inc. ("Complainant") had submitted the Complaint for decision in accordance with the Uniform Domain Name Dispute Resolution Policy, adopted by the Internet Corporation for Assigned Names and Numbers ("ICANN") on August 26, 1999 and approved by ICANN on October 24, 1999 ("Policy"), and the Rules for Uniform Domain Name Dispute Resolution Policy ("UDRP Rules"), effective July 31, 2015, and the FORUM Supplemental Rules ("Supp. Rules"), effective July 31, 2015. UDRP Rule 4.

[2.] **RESPONDENT INFORMATION**

[a.] Name: Boston Sports Medicine and Research Institute, LLC
[b.] Address: 40 Allied Drive, Dedham, MA 02026-6146
[c.] Telephone: (781) 251-3535
[d.] Fax: (781) 251-3532
[e.] E-Mail: tgill@partners.org

## [3.] RESPONDENT AUTHORIZED REPRESENTATIVE, IF ANY

    [a.]    Name:    H. Straat Tenney
                                Locke Lord LLP
    [b.]    Address:    Brookfield Place
                                200 Vesey Street, 20th Floor
                                New York, NY 10281
    [c.]    Telephone:    (212) 912-2915
    [d.]    Fax:    (888) 325-9217
    [e.]    E-Mail:    trademark@lockelord.com, straat.tenney@lockelord.com

UDRP Rule 5(b)(ii).

Respondent's preferred contact person for correspondence relating to this case:

    [a.]    Contact Name(s): H. Straat Tenney, Locke Lord LLP
    [b.]    Contact Emails(s): trademark@lockelord.com, straat.tenney@lockelord.com

UDRP Rule 5(b)(iii).

The Respondent chooses to have this dispute heard before a (check one):

    _X_ single-member administrative panel; ____ three-member administrative panel.

UDRP Rule 5(b)(iv).

## [4.] RESPONSE TO FACTUAL AND LEGAL ALLEGATIONS MADE IN COMPLAINT

This Response specifically responds to the statements and allegations contained in the Complaint and includes any and all bases for the Respondent to retain registration and use of the disputed domain name. UDRP Rule 5(b)(i). The Complaint must be denied because Complainant has failed to establish any of the required three elements. First, Complainant has no rights in the descriptive "Boston Sports Medicine" mark, and has failed to prove acquired distinctiveness. Second, as Complainant concedes, Respondent is using the <bostonsportsmedicine.com> domain name (the "Domain Name") to advertise its sports medicine services and to communicate medical information to patients. And, finally, Respondent first learned of Complainant's use in 2015—over a year after it registered the geographically descriptive Doman Name—and Complainant has acquiesced to Respondent's use since 2018. Therefore, the Domain Name was registered, and is being used, in good faith.

[a.] **Material Facts**

[i.] *Decades of Experience in Boston Sports Medicine*

Respondent has provided its patients with high-quality and innovative services in the evaluation, treatment, and rehabilitation of sports-related injuries since 2014. (Annex A, Declaration of Thomas J. Gill, IV, M.D. ("Gill Decl."), ¶ 3.) Respondent was formed by Thomas J. Gill, IV, M.D. ("Dr. Gill"). (*Id*., ¶ 21.) Dr. Gill is an Orthopedic Surgeon specializing in the field of sports medicine. (*Id*., ¶ 4.) He was born and raised in Boston, Massachusetts, and graduated from Harvard College and Medical School in Boston. (*Id*.) Since 1998, Dr. Gill has worked in the sports medicine field in Greater Boston. (*Id*.) In addition to serving as the Director of Respondent, Dr. Gill is the Chairman of the Department of Orthopedics at St. Elizabeth's Hospital Medical Center ("St. Elizabeth's Hospital"), the Chairman of Orthopedic Surgery of Steward Healthcare System, and a Professor of Orthopedic Surgery at Tufts University School of Medicine. (*Id*., ¶ 5.) Dr. Gill serves two roles at the New England Baptist Hospital ("New England Baptist")—he is the Director of Education of the Sports Medicine Service and the Fellowship Director of the Sports Medicine Fellowship. (*Id*.) Dr. Gill and Respondent have been recognized most every year since 2014 as one of the "Best Doctors in America" by Best Doctors, Inc. and one of the "Top Doctors in Boston" in the field of "Sports Medicine" by Boston Magazine. (*Id*., ¶ 17.) Dr. Gill has served as the primary physician for the New England Patriots (NFL), Boston Red Sox (MLB), Boston Breakers (NWSL), the Boston Ballet, and as the Boston-area Medical Director for men's and women's World Cup and CONCACAF Gold Cup. (*Id*., ¶ 11.) Dr. Gill was profiled in the book *Men of Massachusetts: Bay State Contributions to American Society* in the chapter on "Sports and the Quality of the Myth." (*Id*.)

Dr. Gill has been associated with sports medicine for years. For example, in 1997, years before Complainant started using its purported mark, Dr. Gill was a fellow in *Sports Medicine* and Shoulder Surgery at the Steadman-Hawkins Clinic in Vail, Colorado. (*Id*., ¶ 8.) Next, Dr. Gill started working as a surgeon at Massachusetts General Hospital ("Mass General") in Boston. (*Id*., ¶ 10.) In the years leading up to registering the Domain Name, Dr. Gill served as the Director of the *Sports Medicine* Fellowship at Mass General, the Medical Director of Mass General's *Sports Medicine* Center, and the Chief of its *Sports Medicine* Services. The year he registered the Domain Name, Dr. Gill was the Chief of *Sports Medicine* for all of Mass General.

3

(*Id*.) In 2013, Dr. Gill received a Certificate of Added Qualification in *Sports Medicine* by the American Orthopaedic Society for *Sports Medicine*. (*Id*., ¶ 9.)

Dr. Gill has headlined conferences, taught programs and led seminars, many of which use the descriptive "sports medicine" phrase. (*Id*., ¶ 17.) Dr. Gill has been a member of American Orthopaedic Society for *Sports Medicine* since 1999, and became a member of the Thomas B. Quigley Society for the Advancement of *Sports Medicine* two years later. (*Id*., ¶ 12.) Before he started Respondent, Dr. Gill was an active member in the American Society for *Sports Medicine*. (*Id*., ¶ 13.) Since 1998, Dr. Gill served as a reviewer for the *Journal of Sports Medicine*. (*Id*., ¶ 19.)

In 1998, New England Baptist starting hosting its annual "*Boston Sports Medicine* Symposium." (*Id*., ¶ 16.) Now in its 25th year, the "*Boston Sports Medicine* Symposium" features panels, seminars and networks opportunities in the sports medicine field. (*Id*., ¶ 16, Ex. 3.) Dr. Gill has been actively involved in the "*Boston Sports Medicine* Symposium" since 2014. (*Id*.) Mass General also hosted a "*Sports Medicine* Conference" in Boston, where Dr. Gill was a featured presenter from 1998 to 2014. (*Id*.)

### [ii.] *Forming Respondent and Registering Domain Name*

Respondent was formed in January 2014. (*Id*., ¶ 21.) Dr. Gill chose the name "Boston Sports Medicine and Research Institute" because it describes his expertise and Respondent's commercial focus. (*Id*., ¶ 22.) Dr. Gill registered the Domain Name in March 2014. (*Id*., ¶ 26.) Dr. Gill chose the Domain Name because it was available and a domain name for Respondent's full name was too long. (*Id*.) When Dr. Gill formed Respondent and registered the Domain Name, he had never heard of Complainant. (*Id*., ¶ 25.) Dr. Gill always understood the phrase "Boston sports medicine" to refers to the medical practice of sports medicine in Greater Boston. (*Id*.) Dr. Gill never wanted to register the Domain Name to suggest an affiliation with Complainant. (*Id*., ¶ 26.)

The Domain Name is a considerable asset to Respondent and its patients. (*Id*., ¶ 27) Respondent's website provides information to patients, their physical therapists and their doctors, and serves as a portal for patients to access necessary medical records, handle insurance issues, and communicate with Respondent. (*Id*., ¶¶ 28-29, 34, Ex. 4.) For example, Respondent provides its patients with information for Pre- and Post-Operation procedures, Informational Videos, and Injury Prevention Tips, as well as injury-specific Rehabilitation Protocols. (*Id*., ¶ 34) Its patients find it convenient and useful to have this information on Respondent's website so

4

that they can access the information from anywhere and so that patients can easily share information with physical therapists and other sports medicine professionals. (*Id*.) Any disruption to the website will lead to adverse medical, business, and professional consequences and will sow confusion among Respondent's patients, affiliated doctors, and other sports medicine professionals who rely on Respondent's services. (*Id*., ¶ 28.)

Respondent does not offer physical therapy services and Complainant does not offer surgical services. (*Id*., ¶ 31.) The parties do not compete. To the contrary, Respondent refers patients to qualified physical therapists. (*Id*., ¶¶ 35-36.) Respondent only works with the best physical therapists. (*Id*.) When referring patients, Respondent's decisions are guided by the medical needs of its patients. (*Id*.) Patients often want to be referred to physical therapists that are close to the patient's work or home. (*Id*.) Respondent does not have an official list of pre-approved physical therapists. (*Id*.)

### [iii.] *Complainant's Conduct*

Respondent was first contacted by Complainant in July 2015. (*Id*., ¶ 37.) This was the first time Respondent learned of Complainant's purported rights. (*Id*.) Respondent responded to Complainant's demands, noting that Complainant holds no rights to the descriptive phrase "Boston sports medicine" and denied any wrongdoing. (Resp., Annex 11.) The parties then traded letters, without budging, until, February 2015 when Complainant filed a complaint for trademark infringement and cybersquatting with the U.S. District Court, District of Massachusetts. (*Id*., Annex 12.) Respondent answered complaint, denying the substantive allegations, and the parties engaged in settlement discussions. (Annex B, Declaration of H. Straat Tenney ("Tenney Decl."), Ex. 1.) Neither Respondent nor Dr. Gill ever brokered an agreement surrounding the demands in Complainant's May 23, 2016 letter. (Gill Decl., ¶ 40.) After Respondent refused the demands outlined in the May 23 Letter, the discussions shifted to a possible business venture where Respondent would continue to provide the evaluation, treatment, and rehabilitation services and Complainant would provide physical therapy services. (*Id*.) At no point did Respondent agree to transfer the Domain Name or agree to stop using the Domain Name in connection with its business. (*Id*.) This arrangement is supported by contemporaneous court filings and the parties' conduct since the lawsuit was dismissed on December 2, 2017. (*See id*.; Tenney Decl., Exs. 2, 3.)

5

### [c.] Complainant Owns No Rights in Descriptive Phrase "Boston Sports Medicine"

Complainant focuses much of the Complaint on Respondent's alleged knowledge of Complainant's descriptive mark, the parties' litigation, and an alleged verbal agreement. (Resp. 3-7.) Complainant glosses over the first element of this action—its alleged rights in the "Boston sports medicine" phrase. (*Id*. at 8.) Complainant's mark is primarily geographically descriptive and Respondent cannot demonstrate acquired distinctiveness. Complainant bears the burden of demonstrating its rights. It decided, however, not to provide evidence substantiating those alleged rights. This decision dooms the Complaint.

The phrase "Boston sports medicine" primarily identifies "Boston," the largest city in Massachusetts, where Complainant offers its services. (Tenney Decl., Ex. 4.) The addition of the generic phrase "sports medicine" only describes Complainant's services. (*Id*., Ex. 5.) The combination of the "Boston" and "sports medicine" elements does not detract from the primary geographic significance of the mark. Complainant's sports medicine services originate in Boston, so the public associates those services with Boston, and not exclusively with Complainant. Therefore, Complainant has no right to the phrase "Boston sports medicine."

Complainant relies on a state registration for a color design mark, a federal registration for the same design mark with "sports medicine" disclaimed, and a Supplemental Register word mark registration for the descriptive phrase "Boston Sports Medicine." In 2017, Complainant tried to register the word mark "Boston Sports Medicine" on the Principal Register. (Tenney Decl., Ex. 6.) The U.S. Patent and Trademark Office (the "USPTO") refused the application, concluding that the phrase is primarily geographically descriptive of the origin of Complainant's services and Complainant's evidence of acquired distinctiveness—which consisted solely of a statement that it had been using the mark for over five years—is insufficient. (Tenney Decl., Ex. 6 at 2-3.) Complainant amended the application to the Supplemental Register without trying to establish acquired distinctiveness. (*Id*., Ex. 7.) A supplemental registration issued on October 2, 2018 with a disclaimer of "sports medicine." (Resp., Annex 2.)

Due to its status on the Supplement Register, the registration carries no presumption of validity, ownership, and exclusive right to the mark. 15 U.S.C. § 1094; 4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 4:12 at 4-24 (5th ed. 2019) ("[A] designation on the Supplemental Register is not a true 'trademark' at all.") (citation omitted). A supplemental registration is an implied admission that the phrase is primarily geographically

6

descriptive at the time of registration. *See, e.g.*, *Integrated Print Solutions, Inc. v. Davidson*, No. D2013-0219 (WIPO Apr. 3, 2013) (citing *McCarthy on Trademarks*, § 19:43 at 19-159. It should therefore be presumed that the phrase "Boston sports medicine" was primarily geographically descriptive in October 2018—over four years after Respondent registered the Domain Name. Unless Complainant can prove that it has acquired distinctiveness in the phrase, it owns no rights in the descriptive phrase when Respondent registered the Domain Name. *See, e.g.*, *Kip Cashmore v. URLPro*, No. D2004-1023 (WIPO Mar. 14, 2005) (denying complaint where respondent "has not demonstrated that it has rights in a protectable trademark").

Complainant presents no credible evidence establishing acquired distinctiveness. It merely concludes that it "acquired all right title and interest" in the phrase "Boston Sports Medicine" on January 1, 2001, and states that it has been using the mark since this date. (Compl. at 3). The USPTO already determined that this conclusory statement falls short of demonstrating rights and is insufficient to establish acquired distinctiveness in the descriptive phrase. (*See* Tenney Decl., Ex. 6 at 2-3.) The *Kip Cashmore* decision is instructive. In *Kip Cashmore*, the complainant asserted right in a supplemental registration for "USA Cash Services." *Id*. The complainant tried to establish acquired distinctiveness by submitting a declaration attesting to millions of dollars in advertising and sales over multiples years. *Id*. The Panel denied the complaint because the record was devoid of substantive evidence showing acquired distinctiveness. *Id*. Here, Complainant relies solely on a self-serving declaration and a blanket statement that it owns rights. The complainant in *Kip Cashmore* provided *more* proof of its rights than Complainant. Like in *Kip Cashmore*, "[t]his evidence does not rise to the level for establishing acquired distinctiveness." *Id*.

Complainant's registrations for its design mark are insufficient to establish rights in "Boston sports medicine." These registrations cover a dominant design mark showing an athlete kicking a ball with the term "sports" in a large red font and "Boston" and "medicine" in a smaller blue font.[1] (Compl., Annexes 1, 3). When a complainant relies on a design mark, the Policy requires consideration of the significance of what is left when one ignores the graphical stylization. *Ville de Paris v. Salient Properties LLC*, No. D2009-1279 (WIPO Dec. 3, 2009) (denying complaint where complainant's design registration was insufficient to establish right in primarily geographic term "Paris"). Here, Complainant claims ownership of a phrase that features the geographic term "Boston" and the generic phrase "sports medicine." Like in *Ville de*

---

[1] It is undisputed that Respondent never used a similar design logo. (Gill Decl., ¶ 37.)

7

92878377v.1

*Paris*, Complainant cannot claim the exclusive right to use the name of the city where it provides its "sports medicine" services.

Finally, the Massachusetts registration is not persuasive evidence of Complainant's rights. First, as discussed above, it is a complex design mark with a geographically descriptive term, and not a distinctive word mark, and secondly, UDRP panels often give little weight to state registrations that have not undergone a substantive examination process. *See, e.g.*, *Win Kelly Chevrolet LLC v. PrivacyProtect.org /Tech Domain Svcs. Pvt. Ltd.*, No. D2013-2018 (WIPO Jan. 13, 2014) (giving a Maryland state registration little weight where it was approved registration with little to no examination). Here, Complainant filed its state application on Friday, October 15, 2004, and a registration issued two business days later on Tuesday, October 19, 2004. (Compl., Annex 3 at 2.) This provides for no substantive examination of the phrase.

Respondent is aware of multiple unaffiliated third parties using the phrase "Boston sports medicine" in connection with services in the field of sports medicine. For example, in 1998, New England Baptist started hosting the annual "Boston Sports Medicine Symposium"—two years before Complainant started using the phrase—and is celebrating its 25th annual conference next year. (Gill Decl., ¶ 16, Ex. 3.) There are more: the Boston Sports Medicine and Performance Group offers seminars in sports medicine and Boston Magazine advertises doctors (including Dr. Gill) under the heading "Boston Sports Medicine." (*Id*., ¶¶ 17, 23, 24, Exs. 5-6.) Like Complainant, each of these companies are using "Boston sports medicine" to describe the geographic place where sports medicine services are provided.

The USPTO's examination was thorough and its determination sound—the phrase "Boston sports medicine" is primarily geographically descriptive and Complainant's conclusory statement of rights is insufficient to prove acquired distinctiveness. The Complaint must therefore be denied.

**[d.] Respondent Has Rights and Legitimate Interests in the Domain Name.**

Complainant concedes that Respondent uses the Domain Name to "advertise and administer" its Boston-based sports medicine services on its website. (Resp. at 4.) Respondent treats a wide variety of sports-related injuries and its staff specializes in surgical procedures for sports injuries. (Gill Decl., ¶ 3.) Respondent treats over 5,000 patients annually and Respondent's Director Dr. Gill performs about 850 surgical procedures a year. (*Id*., ¶ 4.) Respondent's staff of doctors, nurses and other sports medicine professionals have a variety of specialties, which helps to evaluate and treat its patient's athletic injuries. (*Id*., ¶ 32.) Respondent

8

uses an interactive website to showcase its services and provide patients and doctors information to help guide patients through recovery. (*Id*., ¶ 34.) Complainant cannot reasonably dispute the fact that Respondent provides orthopedic surgery services, and therefore has rights or legitimate interests in the use of the Domain Name. *See, e.g.*, *Integrated Print Solutions, Inc. v. Davidson*, No. D2013-0219 (denying complaint where complainant conceded second element). Accordingly, Complainant fails to meet its burden of showing that Respondent has no rights or legitimate interests in the Domain Name.

Complainant wants the Panel to ignore Respondent's bona fide use of the Domain Name in connection with its sports medicine practice. Complainant instead argues that Respondent should have known about Complainant when it registered the Domain Name and, therefore, any subsequent—albeit legitimate—use is irrelevant. (Resp. at 8-9.) The Panel decisions that Respondent cites do not stand for this proposition. Importantly, in each case, the respondent used the relevant disputed domain name to divert users to a website that offered competing products. *See Joe Gregory and The Brake Squad, Inc. v. Newman*, No. FA1707001740457 (Forum Aug. 24, 2017) (finding no rights where disputed <brakesquad.com> domain name directs "users to Respondent's website <brakemasters.net>, which provides identical services to Complainant's business") *Anytime Fitness, LLC v. Clintenaragona*, No. FA1210001467318 (Forum Dec. 4, 2012) ("Respondent uses the disputed domain name to directly compete with the health and fitness club services that are legitimately offered by Complainant."); *Coryn Group, Inc. v. Media Insight,* No. FA0310000198959 (Forum Dec. 3, 2003) ("Respondent uses the names to divert Internet users to its website that offers competing services."); *Chip Merchant, Inc. v. Blue Star Elec.*, No. D2000-0474 (WIPO Aug. 21, 2000) (finding no rights where respondent used disputed domain name to divert uses to its competing website).

Respondent does not provide physical therapy services and Complainant does not perform surgery. (Gill Decl., ¶ 31.) The parties do not compete. (*Id*.) Respondent evaluates and treats its patient's athletic injuries. Respondent provides information to assist patients, their doctors and other sports medicine professionals, to help in the rehabilitation process. (*Id*., ¶ 34) "Common words and descriptive terms are legitimately subject to registration as domain names on a 'first-come, first-served' basis." *Zero Int'l Holding v. Beyonet Servs.*, No. D2000-0161 (WIPO May 12, 2000); *see also Russell v. Batrice*, No. D2004-0906 (WIPO Dec. 13, 2004) ("The intent of paragraph 4(c)(ii) is to allow business entities with bona fide offering of goods and services the opportunity to register domain names related to their businesses."). Respondent

9

has rights and legitimate interests to use the primarily geographically descriptive Domain Name in connection with its sports medicine practice in Boston. The Complaint fails to establish the second element.

**[e] Respondent Registered and is Using the Domain Name in Good Faith.**

Respondent did not acquire the Domain Name for the purpose of selling it to Complainant or to disrupt Complainant's business. (Gill Decl., ¶ 26.) Respondent did not acquire its rights to prevent, block, or disrupt Complainant from reflecting its alleged trademarks in a domain name (and, it is worth noting, Complainant is using <bostonsportsmed.com>). (*Id*.) To the contrary, Respondent acquired the Domain Name to promote its Boston-focused sports medicine services. (*Id*.)

Complainant must prove the Domain Name "has been registered *and* is being used in bad faith." Policy 4(a)(iii) (emphasis added). Bad faith cannot be found if the domain name was registered before complainant acquired trademark rights. *Dreamgirls, Inc. v. Dreamgirls Entm't*, D2006-0609 (WIPO Aug. 10, 2006). By virtue of its supplement registration, as discussed herein, Complainant owns no protectable rights in the primarily geographically descriptive "Boston sport medicine" phrase.

The Complainant argues that Responded registered the Domain Name in bad faith because Respondent should have known about Complainant's use. (Resp. at 10.) There is no evidence that Respondent or Dr. Gill had actual knowledge of Complainant or its purported mark. Complainant instead claims that it referred patients the orthopedic department of St. Elizabeth's Hospital, and Dr. Gill in turn treated a handful of these patients. (Resp., Annex 5 (Velsmid Decl.), ¶¶ 39, 44-45; Ex. H.) Complainant offers copies of eight patient records.[2] (*Id*., Ex. H.) However, six of the patients were referred *after* Respondent registered the Domain Name, so these instances cannot demonstrate bad faith. (*Id*., Ex. H.)

The remaining two patients were allegedly referred to Dr. Gill before March 2014. (*See id*., Ex. H at pp. 102-105 (record dated Oct. 5 2011), pp. 115-121 (same patient, two records dated Oct. 3, 2007 and Nov. 9, 2007). The records for these patients do not bear Dr. Gill's signature or any indication that he actually read the documents, much less recognized Complainant's use of the descriptive phrase "Boston sports medicine." Dr. Gill evaluates and treats thousands of patients a year. (Gill Decl., ¶ 4.) In 2007 and 2011, in addition to his duties at

10

St. Elizabeth's Hospital, Dr. Gill was teaching at Harvard Medical School, and serving as the head physician for multiple Boston professional sports teams.[3] (*Id.*, ¶¶ 4, 11.) It is unreasonable to conclude that Respondent should have known Complainant was using the descriptive phrase on non-competing services based on two patient referrals over a 13-year period. Even if Dr. Gill recognized the name (he didn't), Complainant does not use a ® or ™ symbol or any other indication that Complainant owned the alleged mark.

The decisions Complainant cites are inapposite. The panel in *Steelcase Inc. v. DNS Admin/Nokta Internet Techs.*, No. FA1709001749849 (Forum Oct. 6, 2017) determined that the respondent had actual knowledge because the disputed domain name was identical to complainant's distinctive mark and the domain name was resolving to a website that linked to the complainant's competitors. Here, Complainant owns no rights in the descriptive phrase "Boston sports medicine" and Respondent has never specifically targeted or sought to compete against Complainant. The decision in *Univision Comm'cns Inc. v. Norte*, No. FA0706001000079 (Forum Aug. 16, 2007) is entirely irrelevant because the respondent admitted that he knew of the complainant before registering the disputed domain name.

Multiple pages of the Complaint are devoted to an alleged verbal agreement between the parties. The Complaint must be denied because this is the improper forum to adjudicate the existence of a verbal agreement. *Luvilon Indus. NV v. Top Serve Tennis Pty Ltd.*, No. DAU2005-0004 (WIPO Sept. 6, 2005) ("[The Policy's purpose is to] combat abusive domain name registrations and not to provide a prescriptive code for resolving more complex trade mark disputes."). The "Panel is not a general domain name court, and the Policy is not designed to adjudicate all disputes of any kind that relate in any way to domain names. Rather, the Policy is narrowly crafted to apply to a particular type of abusive cybersquatting." *The Thread.com, LLC v. Poploff*, No. D2000-1470 (Jan. 5, 2001).

Further, neither Respondent nor Dr. Gill entered into any agreement—verbal or written— concerning Respondent's use of the Domain Name. (Gill Decl., ¶ 41.) Complainant refuses to list the specific terms of the alleged agreement or when Respondent actually agreed to these unstated terms. Complainant provides no documentary evidence that the parties reach an agreement.

---

[2] Complainant submitted non-redacted medical records with detailed, and presumably, confidential patient medical information. To protect the confidentiality of the patients, Respondent discusses these document generally without divulging sensitive information.
[3] More specifically, in October 2007, Dr. Gill was the Head Physician for the Boston Red Sox, who would go on to win the World Series on October 28, 2007. (*See* Tenney Decl., Ex. 8.) Needless to say, Dr. Gill had a busy October 2007 and did not notice Complainant's name on this solidary record.

Complainant instead relies on the self-serving and unsupported statement by its president that the parties "brokered an agreement surrounding the demands in our letter dated May 23, 2016." (Compl., Annex 5, ¶ 15, Exh. D (the "May 23 Letter")). This is false. Yet, Complainant argues that the agreement is "plainly evinced in letters between counsel" and in a voicemail message from Dr. Gill. (*Id*. at 10.)

The May 23 Letter is in fact a counteroffer from Complainant that subsequently Respondent refused. (Gill Decl., ¶¶ 40-43.) Respondent neither signed nor agreed to Respondent's demands and is not bound by the letter whatsoever. Moreover, the last letter from Respondent's counsel that Complainant cites, dated November 12, 2015, concludes that Respondent was "well within his rights to continue to use its name and web address," which does not substantiate any agreement whatsoever. (Compl., Annex 11.)

Even if the Panel decides to explore the basis of Complainant's unsupported allegations, the parties filed multiple motions in the lawsuit that describes the general parameters of the parties' negotiations. (Tenney Decl. Ex. 2.) For example, on October 20, 2017, after the Court gave the parties multiples extensions, and indicated that there would be no further delay, the parties reported that they "are continuing to finalize a business plan that would result in a mutually beneficial collaboration between the Parties' businesses and resolve the litigation." (Tenney Decl. Ex. 2.) The parties never reached an agreement, but on December 2 dismissed the action after multiple prompts by the court to finalize settlement. (*Id*., Ex. 3.)

The May 23 Letter never mentions a collaborative effort. Rather, it is a one-sided demand for an unsustainable and possibly illegal referral scheme. Respondent only refers its patients to qualified physical therapists. (Gill Decl., ¶ 35.) When referring patients, Respondent's decision is guided by the medical needs of the patient. (*Id*., ¶ 35.) The deciding factor for many patients is location; patients generally want physical therapists to be close to their work or home. (*Id*.) Complainant finally argues that Respondent has acted in bad faith because it has not complied with the (possibly illegal) referral arrangement outlined in the March 23 Letter. (Resp. 11.) The fact Respondent has refused to comply with an unlawful referral scheme is not evidence that Respondent has registered or used the Domain Name in bad faith.

[4.] **OTHER LEGAL PROCEEDINGS**

*Boston Sports Medicine, Inc. v. Boston Sports Medicine and Research Institute, LLC*, No. 1:16-cv-10143 (D. Mass.) Filed on Feb. 2, 2016. Stipulation of Dismissal filed on Dec. 2, 2017. Rule 5(b)(vi).

[5.]    **RESPONSE TRANSMISSION**

A copy of the Response, as prescribed by FORUM's Supplemental Rules, has been sent or transmitted to the Complainant, in accordance with UDRP Rule 2(b). UDRP Rule 5(b)(vii); FORUM Supp. UDRP Rule 5.

[6.]    The Respondent respectfully requests that the Administrative Panel denies the remedy requested by the Complainant.

[7.]    **CERTIFICATION**

Respondent certifies that the information contained in this Response, is to the best of Respondent's knowledge, complete and accurate, that this Response is not being presented for any improper purpose, such as to harass, and that the assertions in this Response are warranted under these Rules and under applicable law, as it now exists or as it may be extended by a good-faith and reasonable argument.

Respectfully Submitted,

*[signature]*

H. Straat Tenney
Locke Lord, LLP
200 Vesey Street, 20th Floor
New York, New York 10281
Tel. 212-912-2915
straat.tenney@lockelord.com
