EXHIBIT Y



**NATIONAL ARBITRATION**
**FORUM**

| | |
|---|---|
| Boston Sports Medicine, Inc. ) | |
| 1 Braintree Street, ) | |
| Alston MA 02134 ) | |
| ) | |
| **(Complainant)** ) | |
| ) | |
| v. ) | **Domain Name In Dispute:** |
| ) | |
| boston sports medicine and ) | |
| research institute ) | bostonsportsmedicine.com |
| ) | |
| ) | |
| ) | |
| **(Respondent)** ) | |
| ————————————————— ) | |

### COMPLAINT IN ACCORDANCE WITH
### THE UNIFORM DOMAIN NAME DISPUTE RESOLUTION POLICY

**[1.]**    This Complaint is hereby submitted for decision in accordance with the Uniform Domain Name Dispute Resolution Policy (UDRP), adopted by the Internet Corporation for Assigned Names and Numbers (ICANN) on August 26, 1999 and approved by ICANN on October 24, 1999, and the Rules for Uniform Domain Name Dispute Resolution Policy (UDRP Rules), with an effective date of March 1, 2010, and the National Arbitration Forum (FORUM) Supplemental Rules (Supp. Rules). UDRP Rule 3(b)(i).

**[2.]**    **COMPLAINANT INFORMATION**

|   |   |   |
|---|---|---|
| [a.] | Name: | Boston Sports Medicine, Inc. |
| [b.] | Address: | 1 Braintree Street, Alston MA 02134 |
| [c.] | Telephone: | (617) 787-8700 |
| [d.] | Fax: | (617) 242-7074 |
| [e.] | E-Mail: | mvelsmid@bostonsportsmed.com |

**[3.]**    **COMPLAINANT AUTHORIZED REPRESENTATIVE INFORMATION**

|   |   |   |
|---|---|---|
| [a.] | Name: | Adam J. Bruno, Bay State IP, LLC |
| [b.] | Address: | 10 Post Office Square, 800 South, Boston, MA 02109 |
| [c.] | Telephone: | (617) 439-3200 |
| [d.] | Fax: | (617) 507-0757 |
| [e.] | E-Mail: | trademarks@baystatepatent.com |

Complainant's preferred contact person for correspondence relating to this case:

**Electronic-Only Material**

| | | |
|---|---|---|
| [a.] | Method: | email |
| [b.] | Address: | trademarks@baystatepatent.com |
| [c.] | Contact: | Adam J. Bruno, George S. MacInnis |

**Material Including Hard Copy**

| | | |
|---|---|---|
| [a.] | Method: | fax |
| [b.] | Address/Fax: | (617) 507-0757 |
| [c.] | Contact: | Adam J. Bruno, George S. MacInnis |

The Complainant chooses to have this dispute heard before a (check one):

 _X_  single-member administrative panel; ____ three-member administrative panel].

## [4.]   RESPONDENT INFORMATION

| | | |
|---|---|---|
| [a.] | Name: | boston sports medicine and research institute |
| [b.] | Address: | 8 HAWTHORNE PL STE 110, BOSTON, MA 02114-2335 |
| [c.] | Telephone: | 617 726 7797 |
| [d.] | Fax: | 781-251-3532 |
| [e.] | E-Mail: | tgill@partners.org |

## [5.]   RESPONDENT AUTHORIZED REPRESENTATIVE, IF KNOWN

| | | |
|---|---|---|
| [a.] | Name: | **Not Currently Known** |
| [b.] | Address: | |
| [c.] | Telephone: | |
| [d.] | Fax: | |
| [e.] | E-Mail: | |

## [6.]   DISPUTED DOMAIN NAME(S)

[a.]   The following domain name(s) is/are the subject of this Complaint:

bostonsportsmedicine.com

[b.]   Registrar Information:

[i.]   Registrar's Name:   Network Solutions, LLC.

[ii.]   Registrar Address:   Perfect Privacy, LLC
5335 Gate Parkway c/o Network Solutions
PO Box 459, Jacksonville, FL 32256

[iii.]   Telephone Number:   (570) 708-8780
[iv.]   E-Mail Address:         dn3xc3a87dy@networksolutionsprivateregistration.com


[c.]   Complainant's Trademark/Service Mark Information:

Applicable U.S. Trademarks owned by Complainant:

US Registration No:   4746612        BOSTON SPORTS MEDICINE Medical, physical rehabilitation and physical therapy services. (Annex 1).

US Registration No:   5577543        BOSTON SPORTS MEDICINE Medical, physical rehabilitation and physical therapy services. (Annex 2).

MA State Reg. No:   64931        BOSTON SPORTS MEDICINE Medical, physical rehabilitation and physical therapy services. (Annex 3).


**[7.]   FACTUAL AND LEGAL GROUNDS**

This Complaint as it pertains to bostonsportsmedicine.com is based on the following factual and legal grounds under UDRP Rule 3(b)(ix):

Background: Complainant is a Massachusetts based physical therapy company possessing both an online presence and numerous brick and mortar establishments. Complainant also owns the domain name <bostonsportsmed.com>, from which a person can access and utilize information and techniques regarding physical therapy, and also schedule in person appointments at Complainant's brick and mortar offices.  As further described below, Complainant acquired all rights title and interest in the trademark BOSTON SPORTS MEDICINE® (the "BOSTON SPORTS MEDICINE® Mark" or "Complainant's Mark") on or about January 1, 2001. That same month, Complainant established and incorporated BOSTON SPORTS MEDICINE, INC. in Alston, Massachusetts. (Annex 4).  Complainant's website, bostonsportsmed.com, doing business under the name Boston Sports Medicine, was launched on June 30, 2003, which corresponded with Complainant's Mark.  Respondent is a Massachusetts based orthopedic care and physical therapy center.

Complainant was known to the orthopedic department at Saint Elizabeth's Hospital in Boston, MA (hereinafter known as St. Elizabeth's) as early as 2001.  (Annex 5, at ¶8).  At that time Complainant regularly referred cases to attending doctors at St. Elizabeth's. One of the referring doctors to which Complainant regularly referred patients was Dr. Thomas J. Gill, M.D. ("Dr. Gill"), the founder and resident agent for Respondent.  (Annex 5, at ¶10).  In the referral process, Complainant regularly submitted hundreds of copies of medical records to those referring doctors, including Dr. Gill. (Annex 5, at ¶11).  At all applicable times during these referrals, corporate name Boston Sports Medicine was prominently displayed on the medical records of the referred patients (Annex 5, at ¶12).

Therefore, Complainant herein asserts that as early as 2001, Respondent was on notice of Complainant's name Boston Sports Medicine which constitutes the entirety of the

3

bostonsportsmedicine.com (hereinafter the "Disputed Domain") (Annex 5, at ¶13). According to publicly available information, Respondent registered the Disputed Domain on March 18, 2014 and renewed it on March 27, 2020 and since commencing operation for the Disputed Domain offered competing medical services. *See* http://www.bostonsportsmedicine.com (Annex 6).

In or around June of 2014, Dr. Velsmid and the clinic director of Boston Sports Medicine, Dr. Erin Looney discovered that Dr. Thomas J. Gill, M.D. ("Gill") had opened Boston Sports Medicine & Research Institute, in Boston, Massachusetts. (Annex 5, at ¶2). Dr. Velsmid and Dr. Looney immediately realized that Boston Sports Medicine & Research Institute was a virtually identical clinic to Boston Sports Medicine, and thus an entity that infringed upon the Boston Sports Medicine Mark and unfairly competes with Boston Sports Medicine by using a confusingly similar name in the area where Boston Sports Medicine is known and uses the Boston Sports Medicine Mark. (Annex 5, at ¶2). In or around June of 2014, Dr. Looney informed Dr. Velsmid that Boston Sports Medicine, received a fax intended for the "Boston Sports Medicine & Research Institute." (Annex 5, at ¶3). The "Boston Sports Medicine & Research Institute" name is strikingly similar and nearly identical to the Boston Sports Medicine Mark and incorporates the Boston Sports Medicine® Mark in the entirety. There is no material difference in the sight, sound, and meaning between the trade names.

After further investigation, in or around June of 2014, Dr. Velsmid discovered that Boston Sports Medicine & Research Institute had also registered the Disputed Domain to advertise and administer its services on the Boston Sports Medicine & Research Institute web site (hereinafter referred to as the "BSMRI site") (Annex 5, at ¶4). In or around February 2015, while browsing the Boston Sports Medicine & Research Institute's website, Dr. Velsmid recognized that both clinics offer physical therapy services. (Annex 5, at ¶5). Specifically, the Boston Sports Medicine & Research Institute website possessed a "Physical Therapy" tab highlighting different physical therapy protocols. (Annex 5, at ¶6). Further, upon clicking the "Physical Therapy" tab, Dr. Velsmid was directed to a more specific Physical Therapy webpage, wherein physical therapy services were advertised. (Annex 5, at ¶7).

Having learned of the extent of the Boston Sports Medicine & Research Institute infringement on the Boston Sports Medicine® Mark, along with the actual customer confusion caused by Respondent's infringement, (discussed herein below), Boston Sports Medicine served a Cease and Desist letter upon Boston Sports Medicine & Research Institute and Gill on July 6, 2015. (Annex 7). In the initial letter, Complainant voiced its objections to Respondent's use of the BOSTON SPORTS MEDICINE® Mark, particularly in conjunction with the Disputed Domain. (Annex 7).

This initial Cease and Desist letter expressly informed and furnished formal notice to Respondent that the Boston Sports Medicine® Mark was a registered word mark that Respondent was infringing. (Annex 7). The letter additionally highlighted the customer confusion that the name Boston Sports Medicine & Research Institute was causing and would continue to cause, and placed Respondent on notice of Boston Sports Medicine's intention to enforce the Boston Sports Medicine Mark. (Annex 7). Moreover, the initial Cease and Desist letter additionally requested that Respondent provide written assurances by July 15, 2015 that Respondent cease and desist from using the name Boston Sports Medicine and to immediately transfer and assign any domain names that consist of the Boston Sports

Medicine Mark, including, without limitation, the www.bostonsportsmedicine.com domain name. (Annex 7).

On July 27, 2015, Respondent responded to the initial Cease and Desist letter (Annex 8). In the reply letter, Respondent asserted that the use of the Boston Sports Medicine & Research Institute name will not cause confusion, mistake, or deception among consumers in the marketplace. (Annex 8).  Despite offering services in the same medical field as Complainant, and also despite featuring competing physical therapy service providers on the BSMRI site, Respondent also asserted that Respondent did not offer services which are similar to those as Boston Sports Medicine and that a sophisticated consumer carefully choosing medical care would not mistake Boston Sports Medicine and Boston Sports Medicine & Research Institute. (Annex 8).

After receiving the response from Boston Sports Medicine & Research Institute, Dr. Velsmid continued to receive phone calls from confused consumers and in or around August of 2015, "JrEagleGirlsHockey" (@jr_eagle_girls on Twitter) mistakenly sent a "tweet" to the Twitter handle of Complainant, (@BostonSportsMed) thanking Dr. Gill for helping a patient recover from an injury.  (Annex 5, at ¶8).  Additionally, several other individuals favorited this Tweet and "re-tweeted" it ("kaleigh donnelly", "Gayle Norcross", "Jake peters") thanking Dr. Gill.  (Annex 5, at ¶9).

On or about August of 2015, while once again browsing the Boston Sports Medicine & Research Institute website, Dr. Velsmid noticed that the "Physical Therapy" tab was removed from the website and replaced with a "Rehab Protocols" tab.  (Annex 5, at ¶10). The new tab illustrated the exact same list of protocols as the "Physical Therapy" tab but was now renamed to "Rehab Protocols."  (Annex 5, at ¶10). Furthermore, despite the curious removal of the tab, Respondent continues to offer physical therapy services as evidenced by their "Important Contact Information." (Annex 9).

Boston Sports Medicine sent Respondent a second Cease and Desist letter on September 29, 2015, that reiterated the demand that Respondent discontinue its infringing and deceptive conduct and this second Cease and Desist letter also informed Respondent of the specific instances of consumer confusion (Annex 10). A true and accurate copy of this September 29, 2015 Cease and Desist letter is attached hereto as Exhibit J.  In the second Cease and Desist, Boston Sports Medicine reasserted that, although Respondent claimed that the services offered by the two companies were substantially different, both Boston Sports Medicine and Respondent offer physical therapy and post-surgical rehabilitation and recovery, as well as preoperative services, and that patients have continued to be confused by Respondent. (Annex 10).

On October 1, 2015 Dr. Velsmid was notified by patient Juan Gali ("Gali") that Gali had been referred to Dr. Velsmid by another patient, David Serpa ("Serpa"), and that upon trying to contact Dr. Velsmid, Gali experienced difficulty trying to locate Dr. Velsmid because he was confused with Boston Sports Medicine & Research Institute.  (Annex 5, at ¶11). Gali needed to re-contact Serpa in order to gain clarification on which Boston Sports Medicine to contact. (Annex 5, at ¶11).

On November 5, 2015, Dr. Velsmid was also notified by one of his employees, Michelle Perry ("Perry") that while attending a conference, Perry was approached by a representative of DONJOY/DJO Global who believed they were affiliated with Boston Sports Medicine & Research Institute.  (Annex 5, at ¶12). Perry clarified that she in fact was associated with Boston Sports Medicine and not Boston Sports Medicine & Research Institute and Perry then reported this incident to Dr. Velsmid (Annex 5, at ¶12).

Respondent responded to the second Cease and Desist letter on November 12, 2015 and despite Complainant's compelling evidence to the contrary, Respondent reasserted that there was no evidence of actual confusion and that consumers are not likely to be confused. (Annex 11). The confused inquiries lodged by numerous patients and illustrated by Complainant to Respondent regarding Boston Sports Medicine & Research Institute should have made it clear to Respondent that ongoing consumer confusion was building as to whether Boston Sports Medicine & Research Institute was affiliated with or sponsored by Boston Sports Medicine. Nonetheless, Respondent refused to cease infringing and turn the Disputed Domain over to Complainant.

Thus, on February 1, 2016, Complainant filed a federal court complaint (hereinafter Federal Complaint in the United States District Court, District of Massachusetts, for, inter alia, trademark infringement.  Complainant attempted to settle the dispute through a meeting with Respondent, in the company of respective counsels for Complainant and Respondent. (Annex 5, at ¶13) (Annex 12). Subsequent to this meeting, Complainant and Respondent engaged in discussions and meetings, sans counsel, and Complainant and Respondent brokered an agreement despite failing to generate a written memorialization of the terms. (Annex 5, at ¶15). The parameters of the agreement, and particularly Respondent's desire to conform and cease infringement, in consideration for dismissal of the Federal Complaint, were plainly evinced in letters between counsel and even in recorded messages from Respondent. (Annex 5, at ¶¶14, 42, 43; Exhibit D attached to Annex 5).  Under the agreement, Respondent was bound to cease using the Disputed Domain entirely after a reasonable period for changeover to a new domain and was also bound to prominently feature Complainant as a "preferred provider" of physical therapy services on the Disputed Domain and increase referrals to Complainant a recompense for years of willful and illicit infringement. (Annex 5, at ¶16). Due to the verbal agreement, Complainant dismissed the federal court complaint with prejudice and Complainant and Respondent agreed to move forward as professional associates. (Annex 5, at ¶17).

During the time period subsequent to the agreement, Complainant accepted and did not question the veracity of Respondent representations that Respondent was complying with the directives of the agreement which included moving away from use of the Disputed Domain and referring enough patients to Boston Sports Medicine to compensate for Respondent's years of willful infringement of the Boston Sports Medicine mark. (Annex 5, at ¶18).  However, recently Complainant made the realization that Respondent had feigned compliance with the agreement and instead of conforming and moving away from use of the Disputed Domain, Respondent has continued use of the Disputed Domain. (Annex 5, at ¶19). Upon recognition of being hoodwinked by Respondent's specious activities, Complainant began to study referral trends and realized the once very lucrative stream of referrals from St. Elizabeth's Hospital had begun to decline. (Annex 5, at ¶20). Moreover, Complainant is now able to pin-point the beginning of the decline to the exact period when Complainant dismissed the Federal court complaint against Respondent. (Annex 5, at ¶21). Little wonder as Respondent's continued use of the website

currently associated with the Disputed Domain offers directly competing services to those of Complainant. Even more telling, Respondent originally worked under the umbrella of St. Elizabeth's Hospital, and thus it is no stretch to make the connection regarding the decline in referrals.

Additionally, in the midst of discovering the dearth of promised referrals from Respondent, Complainant reached out to Respondent in an attempt to investigate the low volume of patient referrals and to prompt Respondent to increase the number of referrals as agreed upon in the settlement upon which dismissal of the Federal Complaint was predicated. (Annex 5, at ¶22). In return Complainant received a somewhat vexing response as Dr. Gill requested some business cards and brochures from Complainant for handing out to his patients. (Annex 5, at ¶23). Upon receiving this curious response, Complainant realized that Complainant had apparently fallen from the ranks of "preferred provider" of physical therapy services and was instead a forgotten entity. (Annex 5, at ¶24). Complainant's review of the contents of Respondent's web site would astonishingly verify that, and more, as Complainant was nowhere to be found on the site, let alone in a physical therapy referral environment. (Annex 5, at ¶25). What's more, there is no mention of Complainant as a "preferred provider" of physical therapy services and instead other physical therapy professionals are mentioned in utter defiance of the agreement. (Annex 5, at ¶25).

The services offered by Respondent on Respondent's web site under the Disputed Domain are identical to the services offered under the Boston Sports Medicine Mark as both clinics offer physical therapy and rehabilitation services. Respondent was never authorized, licensed, or granted permission to use the Boston Sports Medicine Mark in connection with medical, physical rehabilitation and physical therapy services. (Annex 5, at ¶26). To the greater extent, it is incontrovertible that prospective customers, for whom Boston Sports Medicine and Boston Sports Medicine & Research Institute compete, reside in the same market and the same geographical area. Thus, these customers have mistakenly, and will continue to mistakenly, believe that Boston Sports Medicine & Research Institute is authorized, licensed, endorsed, or sponsored by Boston Sports Medicine. As no privity exists between Complainant and Respondent, the confusion created by allowing Respondent to offer virtually identical services, without allowing Complainant to conduct any quality control measures, creates a grave risk of tarnishment to the Boston Sports Medicine Mark and Complainant itself.

Respondent's continued use of the Boston Sports Medicine Mark and obdurate failure to comply with the settlement agreement has caused, and is likely to continue to cause further confusion among consumers and to deceive consumers as to the source, quality, and nature of Respondent's goods and services. Currently then, with express knowledge as to Boston Sports Medicine's trademark rights, Respondent continues to use the confusing name "Boston Sports Medicine & Research Institute" they selected in an attempt to cause confusion in the marketplace and capitalize on the goodwill and reputation that has been developed by and is associated with "Boston Sports Medicine."

Respondent's misappropriation of Complainant's name, infringement of the Boston Sports Medicine Mark and unfairly competitive activity have caused and continue to cause significant damages and irreparable harm to Complainant. Thus, Complainant has exhausted

all avenues including cease and desist letters, settlement meetings with and without counsel present and even a federal complaint.

> a. *Specify the manner in which the domain name(s) is/are identical or confusingly similar to a trademark or service mark in which the Complainant has rights. UDRP Rule 3(b)(ix)(1); UDRP Policy ¶ 4(a)(i).*

On October 19, 2004, Boston Sports Medicine, obtained a Commonwealth of Massachusetts trademark registration for the mark "BOSTON SPORTS MEDICINE" for physical therapy, muscular therapy, and massage therapy medical care (hereinafter referred to as the "Boston Sports Medicine State Mark" and the state trademark was renewed on September 3, 2014 and July 2, 2019. (Annex 3).   On June 2, 2015, the United States Patent and Trademark Office ("USPTO") granted registration of "BOSTON SPORTS MEDICINE" with registration number 4,746,612 for medical, physical rehabilitation and physical therapy services, in Class 044 (hereinafter referred to as the "Boston Sports Medicine Logo Mark").   (Annex 1).   On October 2, 2018 the United States Patent and Trademark Office ("USPTO") granted registration of "BOSTON SPORTS MEDICINE" with registration number 5,577,543 for medical, physical rehabilitation and physical therapy services, in Class 044 (hereinafter referred to as the "Boston Sports Medicine Word Mark") (Annex 3).   (The Boston Sports Medicine State Mark, The Boston Sports Medicine Logo Mark and The Boston Sports Medicine Word Mark hereinafter are collectively referred to as the "Boston Sports Medicine Marks").

Complainant's Mark has been in continuous use since at least June 30, 2003 as reflected on its registration of June 2, 2015, the USPTO acknowledged Complainant's Section 15 declaration of incontestability (Annex 1). These facts serve to establish Complainant's rights in Complainant's Mark. *See Home Depot Product Authority, LLC v. Samy Yosef / Express Transporting, FA* 1738124 (FORUM July 28, 2017) (finding that registration with the USPTO was sufficient to establish the complainant's rights in the HOME DEPOT mark).

The Disputed Domain is identical to and thus confusingly similar to Complainant's Mark. Based on the foregoing, Complainant has met its burden under Policy ¶ 4(a)(i) by showing that it has rights in Complainant's Mark, and that the Disputed Domain is confusingly similar to Complainant's Mark.

> b. *Specify why the Respondent (domain-name holder) should be considered as having no rights or legitimate interests in respect of the domain name(s) that is/are the subject of the complaint. UDRP Rule 3(b)(ix)(2); UDRP Policy ¶ 4(a)(ii). The Panel may consider any relevant aspects included in, but not limited to UDRP Policy ¶ 4(c).*

UDRP Rule 3(b)(ix)(2) requires the Complainant to establish a *prima facie* case that Respondent lacks rights and legitimate interests in the Disputed Domain.

Respondent is not affiliated with and has no relationship with Complainant as Respondent has continually rejected Complainant's overtures to craft a relationship that would vitiate the current wrongful and infringing activities. Complainant has recently learned that despite Complainant's good faith efforts, Respondent has feigned compliance and instead has greatly increased use of the Disputed Domain without regard for Complainant's rights.  As such,

8

Respondent has no legal right to use Complainant's Mark by license or other authorized use. Complainant is unaware of any evidence establishing that Respondent was commonly known as, or conducted business under a name identical to, Complainant's Mark, prior to Complainant providing referral work to Respondent.   Along those lines, in or around the year 2001, Complainant began conducting business, part of which included sending patient referrals to Dr. Gill, Respondent's founder.   At the time, upon information and belief, Dr. Gill was a staff physician at St. Elizabeth's Hospital under the name of Dr. Gill, with no corporate entity formed. Thus, at that point in time, Dr. Gill was conducting business as a staff physician and thus Dr. Gill's corporate identity in no manner resembled Complainant's Mark.   Thus, it was greater than a decade after this period of indisputable knowledge of Complainant's Mark that Respondent decided to illicitly initiate conducting business under the Disputed Domain and the Boston Sports Medicine and Research Institute name.   Therefore, Respondent's use of Complainant's service mark as a domain name for services substantially identical to Complainant's is unauthorized and not in connection with a bona fide offering of goods or services.

As described above, Respondent is using the Disputed Domain to direct internet users to Respondent's own website, <bostonsportsmedicine.com> through which Respondent offers a host of medical rehabilitation services, and particularly physical therapy services identical to those provided by Complainant under Complainant's Mark. It is well settled that the use of a domain name to divert Internet users to a website that offers goods and services which compete directly with those offered by the complainant under its marks does not constitute a legitimate noncommercial or fair use of the domain. *Joe Gregory and The Brake Squad, Inc. v. Stephen Newman*, FA1707001740457 (FORUM Aug. 24, 2017) (use of domain name to offer brake services that compete directly with the services offered by trademark holder held not to constitute a legitimate noncommercial or fair use of the domain); *Anytime Fitness, LLC v. Clintenaragona*, FA1210001467318 (FORUM Dec. 4, 2012); (respondent's use of a disputed domain name to direct Internet user to a website that promotes a health and fitness club that competes directly with complainant's club is not a *bona fide* offering of goods or services under Policy ¶ 4(c)(i) or a legitimate noncommercial or fair use under Policy ¶ 4(c)(iii)); *Coryn Group, Inc. v. Media Insight*, FA 198959 (FORUM Dec. 5, 2003) (finding that the respondent was not using the domain names for a *bona fide* offering of goods or services nor a legitimate noncommercial or fair use because the respondent used the names to divert Internet users to a website that offered services that competed with those offered by the complainant under its marks) *Chip Merch., Inc. v. Blue Star Elec.*, D2000-0474 (WIPO Aug. 21, 2000) (holding that since respondent knew of complainant's competing business before it registered and starting using the disputed domain to offer competing goods, respondent's use of the domain was illegitimate and not a bona fide offering of goods).

Therefore, Respondent's use of the Disputed Domain was long subsequent to Complainant's use and Respondent had first-hand knowledge of Complainant's use of the Boston Sports Medicine name, said knowledge gleaned through direct business dealings and awareness of Complainant's commercial success. Plainly then, Respondent is not making a legitimate non-commercial or fair use of the domain name(s), and Respondent's sole intent is to use the domain name(s) for commercial gain and to misleadingly divert consumers from Complainant.

Based on the foregoing, Complainant has made a *prima facie* showing under Policy ¶4(a)(ii) that Respondent lacks rights to or legitimate interests in the Disputed Domain.

c. *Specify why the domain name(s) should be considered as having been registered and being used in bad faith. UDRP Rule 3(b)(ix)(3); UDRP Policy ¶ 4(a)(iii). The Panel may consider any relevant aspects included in, but not limited to UDRP Policy ¶ 4(b).*

UDRP Rule 3(b)(ix)(3) requires the Complainant to set forth why the Disputed Domain should be considered as having been registered and being used in bad faith. UDRP Policy ¶ 4(b) lists the factors that are indicative of bad faith, which include: (a) evidence that Respondent has registered the domain name primarily for the purpose of disrupting the business of a competitor; and/or (b) evidence of Respondent's intent to attract, for commercial gain, Internet users to Respondent's website or other on-line location, by creating a likelihood of confusion with the Complainant's Mark.  As illustrated herein, long prior to registering the Disputed Domain, Respondent willing participated in a lucrative business affiliation with Complainant wherein Complainant referred patients to Respondent.  Thus, due to Respondent's knowledge of Complainant's use of the name Boston Sports Medicine, long prior to Respondent's registration of the Disputed Domain, it is incontrovertible that Respondent originally registered and is currently using the Disputed Domain in bad faith.

As discussed herein, Complainant began marketing Complainant's physical therapy company using its BOSTON SPORTS MEDICINE® federally registered Mark in or around January 2001 through brick-and-mortar establishments. By January of 2003, due to the success of Complainant's brick-and-mortar establishments Complainant saw fit to purchase the domain <bostonsportsmed.com> and launch its Boston Sports Medicine website under that domain. Boston Sports Medicine was known to the orthopedic department at Saint Elizabeth's Hospital in Boston, Massachusetts since being incorporated in 2001.  On or around March 18, 2014, Respondent registered the Disputed Domain, which is identical to the BOSTON SPORTS MEDICINE® Mark, and, soon after, began offering its competing physical therapy services. From 2001 through the January 15, 2014 incorporation of BSMRI and March 18, 2014 purchase of the Disputed Domain, Boston Sports Medicine had submitted hundreds of copies medical records to those referring doctors, including Dr. Gill, founder of Respondent. (Annex 5, at ¶38 - 42).  Every set of medical records provided to Saint Elizabeth's, ergo Dr. Gill, possessed the Boston Sports Medicine® business name. (Annex 5, at ¶38 - 42).

On or about July 27, 2015, Complainant served Respondent with a cease and desist wherein Complainant voiced its objections to Respondent's use of the words BOSTON SPORTS MEDICINE® to identify Respondent's services. In February of 2016, Complainant filed a complaint in the United States District Court, District of Massachusetts, for, inter alia, trademark infringement.  Respondent attempted to settle the action out of court and Complainant agreed to resolve the matter amicably, as was always the desire of Complainant.  The principals of Complainant and Respondent met with counsel, and then without counsel and came to an agreement on the parties' differences, which included Respondent's promise to move away from using, and eventually entirely refrain from using, the Disputed Domain.

Recently, in light of expansion, upon inquiring about promised patient referrals to Respondent and receiving insufficient responses, Complainant began to scrutinize the status of the stream of referrals from Respondent (Annex 5, at ¶18 - 25). Upon conducting analysis, Complainant discovered that the referral numbers were in no manner commensurate with

agreement between the parties which led to dismissal of the Federal Complaint (Annex 5, at ¶18 - 25).   Complainant next began to investigate referral trends and realized the once very lucrative stream of referrals from St. Elizabeth's had drastically decline (Annex 5, at ¶18 - 25). Moreover, Complainant is now able to pin-point the beginning of the decline to the exact period when Complainant dismissed the Federal Complaint against Respondent (Annex 5, at ¶21). All of this prompted Complainant to investigate Respondent's website and it is here that Complainant recognized Respondent's specious web site activities under the Disputed Domain, including listing a competing company for services identical to those of Complainant (Annex 5, at ¶25). As (Annex 5, at ¶`16).

Thus, Complainant has presently discovered that Respondent feigned compliance and agreed to move away from use of, and eventually entirely refrain from using the Disputed Domain.   Nonetheless, the website currently associated with the Disputed Domain still offers the same competing services.   Under these circumstances, it can be fairly inferred that Respondent was aware of Complainant's Mark at the time the Disputed Domain was registered to market a competing physical therapy services. *Steelcase Inc. v. DNS Admin/Nokta Internet Technologies*, FA1709001749849 (FORUM Oct. 6, 2017) (finding that respondent had actual knowledge of Complainant's rights in the mark prior to registering the disputed domain name and that actual knowledge evinces bad faith under Policy ¶ 4(a)(iii)); *Univision Comm'cns Inc. v. Norte*, FA 1000079 (FORUM Aug. 16, 2007) (rejecting the respondent's contention that it did not register the disputed domain name in bad faith since the panel found that the respondent had knowledge of the complainant's rights in the UNIVISION mark when registering the disputed domain name).

Further, there is direct evidence of continued bad faith use of the Disputed Domain in a manner that caused disruption to Complainant's business and that was intended to attract users searching the Internet for Complainant's company as there has been a recent uptick in confused and angry customers using the numbers listed on the respective web sites and getting the wrong entities revealed (Annex 5, at ¶27). In fact, the regularity of these occurrences factored in on Complainant's decision to undertake extensive research into what has transpired with Respondent in the past few years and lead to the filing of the instant proceeding.   Thus, despite actual notice of Complainant's objections and attempts to reach a settlement (which gave Respondent ample time to end usage of the Disputed Domain), Respondent has knowingly, illicitly and continually illicit used the Disputed Domain. Accordingly, the record establishes that Respondent registered and has used the Disputed Domain in bad faith.

## [8.]   REMEDY SOUGHT

The Complainant requests that the Panel issue a decision that the Disputed Domain and domain-name registration be *transferred*. UDRP Rule 3(b)(x); UDRP Policy ¶ 4(1).

## [9.]   OTHER LEGAL PROCEEDINGS

Boston Sports Medicine, Inc. v. Boston Sports Medicine & Research Institute, LLC, United States District Court for the District of Massachusetts, Docket No.: 1:16-cv-10143-DJC, filed on 02/01/2016 and terminated per Agreement on 12/01/17. (Annex 12) UDRP Rule 3(b)(xi)

**[10.]   MUTUAL JURISDICTION**

In accordance with Paragraph 3(b)(xiii) of the Rules, the Complainant will submit, with respect to any challenges that may be made by the Respondent to a decision by the Administrative Panel to transfer or cancel the domain name that is the subject of this Complaint, to the jurisdiction of the courts at the location of the domain name holder's address, as shown for the registration of the domain name in the concerned registrar's WhoIs database at the time of the submission of the Complaint to the Forum. UDRP Rule 3(b)(xii).

**[11.]   CERTIFICATION**

Complainant agrees that its claims and remedies concerning the registration of the domain name, the dispute, or the dispute's resolution shall be solely against the domain-name holder and waives all such claims and remedies against (a) the National Arbitration Forum and panelists, except in the case of deliberate wrongdoing, (b) the registrar, (c) the registry administrator, and (d) the Internet Corporation for Assigned Names and Numbers, as well as their directors, officers, employees, and agents.

Complainant certifies that the information contained in this Complaint is to the best of Complaint's knowledge complete and accurate, that this Complaint is not being presented for any improper purpose, such as to harass, and that the assertions in this Complaint are warranted under these Rules and under applicable law, as it now exists or as it may be extended by a good-faith and reasonable argument.

Respectfully Submitted,

/s/ ADAM J. BRUNO

ADAM J. BRUNO
Attorney for Complainant
Bay State IP, LLC
10 Post Office Square, Suite 800 South
Boston, MA 02109

6-9-2021

# NATIONAL ARBITRATION FORUM

| | |
|---|---|
| Boston Sports Medicine, Inc. )<br>1 Braintree Street, )<br>Alston MA 02134 )<br> )<br>**(Complainant)** )<br> )<br>v. )<br> )<br>Boston Sports Medicine and )<br>Research Institute, LLC )<br>40 Allied Drive, Suite 110 )<br>Dedham, MA 02026 )<br> )<br>**(Respondent)** )<br>———————————————— ) | **Domain Name In Dispute:**<br><br>bostonsportsmedicine.com |

## TABLE OF CONTENTS OF EVIDENCE IN SUPPORT OF COMPLAINT IN ACCORDANCE WITH THE UNIFORM DOMAIN NAME DISPUTE RESOLUTION POLICY

**ANNEX 1 –** Copy of Complainant's US Trademark Certificate of Registration for mark "BOSTON SPORTS MEDICINE" Logo

**ANNEX 2 –** Copy of Complainant's US Trademark Certificate of Registration for mark "BOSTON SPORTS MEDICINE"

**ANNEX 3 –** Copy of Complainant's US Trademark Application for service mark "BOSTON SPORTS MEDICINE"

**ANNEX 4 –** Copy of Complainant's Corporate Filing with the State of Massachusetts

**ANNEX 5 –** Copy of Complainant's Affidavit

**ANNEX 6 –** Copy of WHOIS database for Respondent's Domain Name

**ANNEX 7 –** Copy of Complainant's Cease-and-Desist Letter Sent to Respondent

**ANNEX 8 –** Copy of Respondent's response to Complainant's Cease-and-Desist Letter

**ANNEX 9 –** Screenshot of a Google Search of Respondent's Website

**ANNEX 10 –** Copy of Complainant's Second Cease-and-Desist Letter Sent to Respondent

**ANNEX 11 –** Copy of Respondent's Response to Complainant's Second Cease-and-Desist Letter

**ANNEX 12 –** Copy of Complainant's Complaint and Jury Demand

ANNEX 1

# United States of America

## United States Patent and Trademark Office



**Reg. No. 4,746,612**

**Registered June 2, 2015**

**Int. Cl.: 44**

**SERVICE MARK**

**PRINCIPAL REGISTER**

BOSTON SPORTS MEDICINE (MASSACHUSETTS CORPORATION)
P.O. BOX 322
1 BRAINTREE STREET
ALSTON, MA 02134

FOR: MEDICAL, PHYSICAL REHABILITATION AND PHYSICAL THERAPY SERVICES, IN CLASS 44 (U.S. CLS. 100 AND 101).

FIRST USE 6-30-2003; IN COMMERCE 6-30-2003.

NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "SPORTS MEDICINE", APART FROM THE MARK AS SHOWN.

THE COLOR(S) RED, BLACK AND TEAL IS/ARE CLAIMED AS A FEATURE OF THE MARK.

THE MARK CONSISTS OF AN ATHLETE KICKING A BALL AND WITH THE WORDS "BOSTON SPORTS MEDICINE" LOCATED IN FRONT OF THE ATHLETE, THE ATHLETE IS BLACK, THE WORDS "BOSTON" AND "MEDICINE" ARE TEAL, AND THE WORD "SPORTS" IS RED.

SEC. 2(F) AS TO "BOSTON SPORTS MEDICINE".

SER. NO. 86-335,888, FILED 7-14-2014.

RONALD MCMORROW, EXAMINING ATTORNEY



Director of the United States
Patent and Trademark Office

---

**REQUIREMENTS TO MAINTAIN YOUR FEDERAL
TRADEMARK REGISTRATION**

**WARNING: YOUR REGISTRATION WILL BE CANCELLED IF YOU DO NOT FILE THE
DOCUMENTS BELOW DURING THE SPECIFIED TIME PERIODS.**

---

**Requirements in the First Ten Years***
**What and When to File:**

> *First Filing Deadline:*  You must file a Declaration of Use (or Excusable Nonuse) between the 5th and 6th years after the registration date.  *See* 15 U.S.C. §§1058, 1141k.  If the declaration is accepted, the registration will continue in force for the remainder of the ten-year period, calculated from the registration date, unless cancelled by an order of the Commissioner for Trademarks or a federal court.

> *Second Filing Deadline:*  You must file a Declaration of Use (or Excusable Nonuse) **and** an Application for Renewal between the 9th and 10th years after the registration date.* *See* 15 U.S.C. §1059.

**Requirements in Successive Ten-Year Periods***
**What and When to File:**

> You must file a Declaration of Use (or Excusable Nonuse)  **and** an Application for Renewal between every 9th and 10th-year period, calculated from the registration date.*

**Grace Period Filings***

The above documents will be accepted as timely if filed within six months after the deadlines listed above with the payment of an additional fee.

***ATTENTION MADRID PROTOCOL REGISTRANTS:**  The holder of an international registration with an extension of protection to the United States under the Madrid Protocol must timely file the Declarations of Use (or Excusable Nonuse) referenced above directly with the United States Patent and Trademark Office (USPTO). The time periods for filing are based on the U.S. registration date (not the international registration date).   The deadlines and grace periods for the Declarations of Use (or Excusable Nonuse) are identical to those for nationally issued registrations.   *See* 15 U.S.C. §§1058, 1141k.  However, owners of international registrations do not file renewal applications at the USPTO. Instead, the holder must file a renewal of the underlying international registration at the International Bureau of the World Intellectual Property Organization, under Article 7 of the Madrid Protocol, before the expiration of each ten-year term of protection, calculated from the date of the international registration.   *See* 15 U.S.C. §1141j.  For more information and renewal forms for the international registration, see http://www.wipo.int/madrid/en/.

**NOTE:  Fees and requirements for maintaining registrations are subject to change.  Please check the USPTO website for further information.   With the exception of renewal applications for registered extensions of protection, you can file the registration maintenance documents referenced above online at** http://www.uspto.gov.

**NOTE:  A courtesy e-mail reminder of USPTO maintenance filing deadlines will be sent to trademark owners/holders who authorize e-mail communication and maintain a current e-mail address with the USPTO. To ensure that e-mail is authorized and your address is current, please use the Trademark Electronic Application System (TEAS) Correspondence Address and Change of Owner Address Forms available at** http://www.uspto.gov.

ANNEX 2

# United States of America

## United States Patent and Trademark Office

# Boston Sports Medicine

**Reg. No. 5,577,543**

**Registered Oct. 02, 2018**

**Int. Cl.: 44**

**Service Mark**

**Supplemental Register**

Boston Sports Medicine (MASSACHUSETTS CORPORATION)
P.o. Box 322, 1 Braintree Street
Alston, MASSACHUSETTS 02134

CLASS 44: Medical, physical rehabilitation and physical therapy services

FIRST USE 6-30-2003; IN COMMERCE 6-30-2003

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT STYLE, SIZE OR COLOR

OWNER OF U.S. REG. NO. 4746612

No claim is made to the exclusive right to use the following apart from the mark as shown: "SPORTS MEDICINE"

SER. NO. 87-639,313, FILED P.R. 10-10-2017; AM. S.R. 07-25-2018

Director of the United States
Patent and Trademark Office

**REQUIREMENTS TO MAINTAIN YOUR FEDERAL TRADEMARK REGISTRATION**

**WARNING: YOUR REGISTRATION WILL BE CANCELLED IF YOU DO NOT FILE THE DOCUMENTS BELOW DURING THE SPECIFIED TIME PERIODS.**

**Requirements in the First Ten Years***
**What and When to File:**

- *First Filing Deadline:* You must file a Declaration of Use (or Excusable Nonuse) between the 5th and 6th years after the registration date. See 15 U.S.C. §§1058, 1141k. If the declaration is accepted, the registration will continue in force for the remainder of the ten-year period, calculated from the registration date, unless cancelled by an order of the Commissioner for Trademarks or a federal court.

- *Second Filing Deadline:* You must file a Declaration of Use (or Excusable Nonuse) and an Application for Renewal between the 9th and 10th years after the registration date.* See 15 U.S.C. §1059.

**Requirements in Successive Ten-Year Periods***
**What and When to File:**

- You must file a Declaration of Use (or Excusable Nonuse) and an Application for Renewal between every 9th and 10th-year period, calculated from the registration date.*

**Grace Period Filings***

The above documents will be accepted as timely if filed within six months after the deadlines listed above with the payment of an additional fee.

***ATTENTION MADRID PROTOCOL REGISTRANTS:** The holder of an international registration with an extension of protection to the United States under the Madrid Protocol must timely file the Declarations of Use (or Excusable Nonuse) referenced above directly with the United States Patent and Trademark Office (USPTO). The time periods for filing are based on the U.S. registration date (not the international registration date). The deadlines and grace periods for the Declarations of Use (or Excusable Nonuse) are identical to those for nationally issued registrations. See 15 U.S.C. §§1058, 1141k. However, owners of international registrations do not file renewal applications at the USPTO. Instead, the holder must file a renewal of the underlying international registration at the International Bureau of the World Intellectual Property Organization, under Article 7 of the Madrid Protocol, before the expiration of each ten-year term of protection, calculated from the date of the international registration. See 15 U.S.C. §1141j. For more information and renewal forms for the international registration, see http://www.wipo.int/madrid/en/.

**NOTE: Fees and requirements for maintaining registrations are subject to change. Please check the USPTO website for further information. With the exception of renewal applications for registered extensions of protection, you can file the registration maintenance documents referenced above online at** http://www.uspto.gov.

**NOTE: A courtesy e-mail reminder of USPTO maintenance filing deadlines will be sent to trademark owners/holders who authorize e-mail communication and maintain a current e-mail address with the USPTO. To ensure that e-mail is authorized and your address is current, please use the Trademark Electronic Application System (TEAS) Correspondence Address and Change of Owner Address Forms available at** http://www.uspto.gov.

ANNEX 3

64931

Fee: $50.00

# The Commonwealth of Massachusetts

**William Francis Galvin**
Secretary of the Commonwealth
One Ashburton Place, Boston, Massachusetts 02108-1512

## APPLICATION FOR REGISTRATION OF A SERVICE MARK
(General Laws, Chapter 110B, Section 2)

1. Name of applicant: *Michael J. Velsmid for Boston Sports Medicine, Inc*

2. (a) Principal business address: *Boston Sports Medicine, Inc., P.O. Box 322, Allston, MA 02134*

   (b) *Business address in Massachusetts, if any:*
   *556 Cambridge St., #5, Allston, MA 02134*

   **903343**

3. State whether applicant is an individual, partnership, corporation, union or association: *Corporation*

4. If a corporation, the state of incorporation is: *Massachusetts*

5. Describe mark: *Boston Sports Medicine logo includes the name "Boston Sports Medicine" integrated with the image of an athlete (see attached). The name, Boston Sports Medicine used separately from the logo*

6. Describe the specific services in connection with which the mark is used: *Physical Therapy, muscular therapy, massage therapy, medical care*

7. Class No.: *35*

8. The mark is used by displaying it:

   ☒ in advertisements of the service        ☒ in other fashions (explain): *Signage, business cards,*
   ☒ on documents, wrappers, or articles delivered   ☒ in connection with the services rendered  *Web site*

9. Date of first use of mark by applicant or predecessor. If first use of mark was in Massachusetts, use the same date in both (a) and (b).

   (a) Anywhere: *6/30/2003*

   (b) In Massachusetts: *6/30/2003*

10. If either of the above first uses was by a predecessor of the applicant, state which use or uses were by a predecessor and identify that predecessor:

State of: *MA*

County of: *Suffolk*

Name of applicant: *Michael J Velsmid*

Signature of applicant: 

Title: *President*

**Note: This document must be notarized – see reverse side.**
*Fill in only if principal business address is not in Massachusetts*

110bcrsm 12/18/03

_Michael J. Velsmid_ , being duly sworn, deposes and says that he is the _Same as_
of the above named applicant, that the statements contained in the foregoing statement are true and that he verily believes
that said applicant is the owner of the mark sought to be registered and that no other person has the right in the Common-
wealth of Massachusetts to use such mark either in the identical form thereof, or in such near resemblance thereto, as to be
likely, when applied to the goods or services of such person, to cause confusion or to cause mistake or to deceive.

SUBSCRIBED and sworn to before me this _15th_ day of _October_ ,20 _04_ .

_Evelina Gershanova_
(Notary Public)

EVELINA GERSHONOVA
MY COMMISSION EXPIRES
MAY 21, 2010
COMMONWEALTH OF
ASSACHUSETTS
NOTARY PUBLIC

*Please print the name and address in the space provided below of the person to whom you wish this application to be sent.*

CERTIFICATE OF REGISTRATION
OF A SERVICE MARK

General Laws, Chapter 110B, Section 4

Filed with
William Francis Galvin,
Secretary of the Commonwealth
and Secretary's Certificate of Record issued on:

_this 19th of October, 20 04_
_Ct #1897L_

CASHIERS
SECRETARY'S OFFICE

FEE PAID
$ 50.-

William Francis Galvin
Secretary of the Commonwealth
Trademark Section

_Michael Velsmid_
_Boston Sports Medicine_
_P.O. Box 322_
_Allston, MA  02134_

#1651 P.002 /005

**TMR
SMR**

Filing Fee $50.00 per class
5 year renewal period

# The Commonwealth of Massachusetts

**William Francis Galvin**
Secretary of the Commonwealth
One Ashburton Place, Boston, Massachusetts 02108-1512

## Trademark / Service Mark Renewal
### (General Laws Chapter 110H, Section 6)

All information must be completed or this document will not be accepted for filing.

(1) Applicant's name and business address:

a) Individual: _____

| Last | First | Middle |

Business address: _____

| Number | Street |

| City | State | Zip |

**or**

b) Business Organization: **Boston Sports Medicine, Inc.**

Business address:   **1**   **Braintree Street**

| Number | Street |

**Allston**   **MA**   **02134**

| City | State | Zip |

(2) The mark is (complete one of the following):

a) **Words only** - If the mark is only words, the words in the mark are (include type style if it is claimed as part of the mark):

b) **Design Only** - If the mark is a design only, describe the design (include colors if they are claimed as part of the mark):

c) **Words and Design** - State the words in the mark (include color and type style if they are claimed as part of the mark) and describe the design:

   Words "Boston Sports Medicine" used separately and the logo utilizing the words "Boston Sports Medicine" in teal and red integrated with the image of an athlete.

(3) For each class provide the number and class in which such goods or services fall (see attached classification schedule):
*(An application may include multiple classes)*

**35**

(4) Provide the Massachusetts registration date and number:

**10/19/2004**
**#64931**

(5) Attach a specimen showing actual use of the mark on or in connection with the goods or services. The sample specimen may not be larger than 3" x 3".



The applicant for renewal is the owner of the mark and hereby asserts that the mark has been and is still in use in Massachusetts and that the attached specimen shows actual use of the mark on or in connection with goods or services in the classification noted herein.

I, _____ Michael J. Velsmid, DPT, MS _____ ,

state that I am the applicant for renewal and declare under penalty of perjury that the foregoing application is true and correct.

Executed on: _____ September _____ 3, _____ 2014 _____

(Month, Day, Year)

Signature: _____ DPT, MS _____

# COMMONWEALTH OF MASSACHUSETTS

William Francis Galvin
Secretary of the Commonwealth
One Ashburton Place, Boston, Massachusetts 02108-1512

## Trademark / Service Mark Application
### (General Laws Chapter 110H)

Registered with

WILLIAM FRANCIS GALVIN
*Secretary of the Commonwealth*
on:

## September 03, 2014

Trademark Section
One Ashburton Place, Rm. 1717
Boston, MA 02108

**TMR**
**SMR**

Filing Fee $50.00 per class
5 year renewal period

# The Commonwealth of Massachusetts

**William Francis Galvin**
Secretary of the Commonwealth
One Ashburton Place, Boston, Massachusetts 02108-1512

FORM MUST BE TYPED

### Trademark / Service Mark Renewal
(General Laws Chapter 110H, Section 6)

FORM MUST BE TYPED

All information must be completed or this document will not be accepted for filing.

(1) Applicant's name and business address:

a) Individual: _____

|  | Last | First | Middle |

Business address: _____

|  | Number | Street |  |

|  | City | State | Zip |

**or**

b) Business Organization Boston Sports Medicine, Inc.

Business address: _____ 1 _____ Braintree Street _____

|  | Number | Street |  |

Allston     MA     02134

|  | City | State | Zip |

(2) The mark is (complete one of the following):

a) **Words only** - If the mark is only words, the words in the mark are (include type style if it is claimed as part of the mark):

b) **Design Only** - If the mark is a design only, describe the design (include colors if they are claimed as part of the mark):

c) **Words and Design** - State the words in the mark (include color and type style if they are claimed as part of the mark) and describe the design:

Words "Boston Sports Medicine" used separately and the logo utilizing the words "Boston Sports Medicine" in teal and red integrated with the image of an athlete.

c110ns6 10/26/00

(3) For each class provide the number and class in which such goods or services fall (see attached classification schedule):

*(An application may include multiple classes)*
35

(4) Provide the Massachusetts registration date and number:
10/19/2004
#64931

(5) Attach a specimen showing actual use of the mark on or in connection with the goods or services. The sample specimen may not be larger than 3" x 3".



The applicant for renewal is the owner of the mark and hereby asserts that the mark has been and is still in use in Massachusetts and that the attached specimen shows actual use of the mark on or in connection with goods or services in the classification noted herein.

I, _____ Michael J. Velsmid, DPT, MS _____

state that I am the applicant for renewal and declare under penalty of perjury that the foregoing application is true and correct.

Executed on: _____ June _____ 26 _____ 2019

*(Month, Day, Year)*

Signature: _____ DPT, MS

# COMMONWEALTH OF MASSACHUSETTS

William Francis Galvin
Secretary of the Commonwealth
One Ashburton Place, Boston, Massachusetts 02108-1512

## Trademark / Service Mark Renewal
(General Laws Chapter 110H, Section 6)

Registered with

WILLIAM FRANCIS GALVIN
*Secretary of the Commonwealth*

July 2        on:        19

, 20

1580

Trademark Section
One Ashburton Place, Rm. 1717
Boston, MA 02108

Contact Information

Bay State IP, LLC
*Name*

10 Post Office Square, Suite 800 South
*Mailing Address*

| Boston | MA | 02109 |
|--------|------|-------|
| *City/town* | *State* | *ZIP* |

| 617-439-3200 | trademarks@baystatepatent.com |
|--------------|-------------------------------|
| *Telephone* | *Email* |

DD

ANNEX 4

# Corporations Division

## Business Entity Summary

**ID Number: 043542015**

Request certificate    New search

Summary for: **BOSTON SPORTS MEDICINE, INC.**

| |
|---|
| **The exact name of the Domestic Profit Corporation:**   BOSTON SPORTS MEDICINE, INC. |
| **The name was changed from:** ALLSTON-BRIGHTON PHYSICAL THERAPY, INC. **on** 11-19-2003 |
| **Entity type:**   Domestic Profit Corporation |
| **Identification Number:** 043542015      **Old ID Number:** 000733521 |
| **Date of Organization in Massachusetts:** 01-01-2001 |
| **Last date certain:** |
| **Current Fiscal Month/Day:** 12/31      **Previous Fiscal Month/Day:** 00/00 |
| **The location of the Principal Office:** <br><br> Address:   1 BRAINTREE STREET <br> City or town, State, Zip code, Country:     ALLSTON,   MA   02134   USA |
| **The name and address of the Registered Agent:** <br><br> Name:    MICHAEL J. VELSMID <br> Address:   48 AUSTIN STREET <br> City or town, State, Zip code, Country:     CHARLESTOWN,   MA   02129   USA |

**The Officers and Directors of the Corporation:**

| Title | Individual Name | Address |
|---|---|---|
| PRESIDENT | MICHAEL JOHN VELSMID III | 48 AUSTIN STREET CHARLESTOWN, MA 02129 USA |
| TREASURER | MICHAEL JOHN VELSMID III | 48 AUSTIN STREET CHARLESTOWN, MA 02129 USA |
| SECRETARY | JULIA V VELSMID | 48 AUSTIN STREET CHARLESTOWN, MA 02129 USA |
| DIRECTOR | MICHAEL JOHN VELSMID III | 48 AUSTIN STREET CHARLESTOWN, MA 02129 USA |

| |
|---|
| **Business entity stock is publicly traded:**    ☐ |
| **The total number of shares and the par value, if any, of each class of stock which this business entity is authorized to issue:** |

| Class of Stock | Par value per share | Total Authorized | Total issued and outstanding |
|---|---|---|---|

| | | No. of shares | Total par value | No. of shares |
|---|---|---|---|---|
| CWP | $ 0.01 | 200,000 | $ 2000.00 | 99,999 |

| | ☐ Consent | ☐ Confidential Data | ☐ Merger Allowed | ☐ Manufacturing |
|---|---|---|---|---|

**View filings for this business entity:**

ALL FILINGS
Administrative Dissolution
Annual Report
Application For Revival
Articles of Amendment

**View filings**

**Comments or notes associated with this business entity:**

**New search**

ANNEX 5



NATIONAL ARBITRATION
FORUM

| | |
|---|---|
| Boston Sports Medicine, Inc. ) | |
| 1 Braintree Street, ) | |
| Alston MA 02134 ) | |
| ) | |
| **(Complainant)** ) | |
| ) | |
| v. ) | **Domain Name In Dispute:** |
| ) | |
| Boston Sports Medicine and ) | |
| Research Institute, LLC ) | bostonsportsmedicine.com |
| 40 Allied Drive, Suite 110 ) | |
| Dedham, MA 02026 ) | |
| ) | |
| **(Respondent)** ) | |

**AFFIDAVIT OF MICHAEL J. VELSMID IN ACCORDANCE WITH
THE UNIFORM DOMAIN NAME DISPUTE RESOLUTION POLICY**

I, Michael J. Velsmid, being duly sworn, depose and state:

1. I am the president of Boston Sports Medicine, Inc.

2. In or around June of 2014, I was told by the clinic director of Boston Sports Medicine, Inc., Dr. Erin Looney that Dr. Thomas J. Gill, M.D. ("Gill") had opened Boston Sports Medicine & Research Institute, in Boston, Massachusetts, a medical services clinic possessing a virtually identical name to that of my Boston Sports Medicine facility. Dr. Looney and I immediately realized that Boston Sports Medicine & Research Institute was a virtually identical clinic to Boston Sports Medicine, and thus an entity that infringed upon our trademark and unfairly competes with our company by using a confusingly similar name in the same geographic where our company is known and uses the Boston Sports Medicine Mark.

3. In or around June of 2014, I was informed by Dr. Looney that Boston Sports Medicine, Inc. received a fax intended for the "Boston Sports Medicine & Research Institute" and Gill.

4. After further investigation, in or around June of 2014, I discovered that Boston Sports Medicine & Research Institute had also registered the domain name

www.bostonsportsmedicine.com to advertise its services, many of which are identical those provided at my clinic.

5. In or around February 2015, while browsing the Boston Sports Medicine & Research Institute's website, I recognized that both clinics offer physical therapy services. Specifically, the Boston Sports Medicine & Research Institute website possessed a "Physical Therapy" tab highlighting different physical therapy protocols.

6. Specifically, the Boston Sports Medicine & Research Institute website possessed a "Physical Therapy" tab highlighting different physical therapy protocols. A true and accurate copy of the Boston Sports Medicine & Research Institute website, showing the "Physical Therapy" tab, in February 2015 is attached hereto as Exhibit A.

7. Further, upon clicking the "Physical Therapy" tab, I was directed to another specific Physical Therapy webpage, wherein physical therapy services were advertised. A true and accurate copy of the Boston Sports Medicine & Research Institute Physical Therapy webpage in February 2015 is attached hereto as Exhibit B.

8. On or around August of 2015, JrEagleGirlsHockey (@jr_eagle_girls on Twitter) sent a "tweet" to the Twitter handle of Boston Sports Medicine, Inc. (@BostonSportsMed) thanking Gill for helping a patient recover from an injury. Additionally, several other individuals favorited this Tweet and "re-tweeted" it (kaleigh donnelly, Gayle Norcross, Jake peters) thanking Gill.

9. On October 1, 2015 I was notified by patient Juan Gali ("Gali") that Gali had been referred to me by another patient, David Serpa ("Serpa"), and that upon trying to contact me, Gali experienced difficulty trying to locate me because he was confused with Boston Sports Medicine & Research Institute.

10. On or about August of 2015, while once again browsing the Boston Sports Medicine & Research Institute website, Dr. Velsmid noticed that the "Physical Therapy" tab was removed from the website and replaced with a "Rehab Protocols" tab. The new tab illustrated the exact same list of protocols as the "Physical Therapy" tab but was now renamed to "Rehab Protocols."

11. On October 1, 2015, I was notified by patient Juan Gali ("Gali") that Gali had been referred to me by another patient, David Serpa ("Serpa"), and that upon trying to contact me at BSM, Gali experienced difficulty trying to locate BSM because he was confused with Boston Sports Medicine & Research Institute. Gali needed to re-contact Serpa in order to gain clarification on which Boston Sports Medicine to contact.

12. On November 5, 2015, I was notified by one of my employees, Michelle Perry ("Perry") that while attending a conference, Perry was approached by a representative of DONJOY/DJO Global who believed we were affiliated with Boston Sports Medicine & Research Institute. Perry clarified that she in fact was associated with Boston Sports Medicine and not Boston Sports Medicine & Research Institute.

13. Thus, on February 1, 2016, through my attorneys, I was forced to file a complaint with the Federal Court (hereinafter known as the "Federal Complaint") in Boston, Massachusetts, for, trademark infringement, among other allegations. Exhibit C.

14. After filing the complaint, my attorneys and the attorneys for BSMRI set a meeting to discuss settlement and at the meeting, it appeared we could reach common ground and settle the matter. The settlement demands were memorialized in a letter dated May 23, 2016 to counsel for Dr. Gill. Exhibit D.

15. Subsequent to this meeting, I engaged in discussions and meetings with Dr. Gill, sans counsel, and brokered an agreement surrounding the demands in our letter dated May 23, 2016, with terms for doing business going forward. We did not hammer out these terms into written agreement as I felt I could clearly trust Dr. Gill on his word as he was a prominent figure in our field.

16. Under the agreement, Respondent was bound to cease using the domain name www.bostonsportsmedicine.com entirely after a reasonable period for changeover to a new domain and was also bound to prominently feature Complainant as a "preferred provider" of physical therapy services on the BSMRI web site, as well as increase referrals to Complainant a recompense for years of willful and illicit infringement.

17. Due to the verbal agreement, I dismissed the Federal Court Complaint and Dr. Gill and I agreed to move forward as professional associates.

18. During the time period subsequent to the agreement, I accepted and did not question the veracity of Dr. Gill's representations regarding BSMRI's compliance with the directives of the agreement which included moving away from use of the domain name www.bostonsportsmedicine.com and referring enough patients to Boston Sports Medicine to compensate for Respondent's years of willful infringement of the Boston Sports Medicine mark.

19. However, recently I made the realization that Respondent had feigned compliance with the agreement and instead of conforming and moving away from use of the domain name www.bostonsportsmedicine.com, Dr. Gill and BSMRI have continued use of the domain name www.bostonsportsmedicine.com.

20. Upon recognition and fear of possibly being hoodwinked by Dr. Gill's specious activities once again, I began to study referral trends and realized the once very

3

lucrative stream of referrals from St. Elizabeth's Hospital through Dr. Gill had begun to decline.

21. Moreover, after considerable research, I am able to pin-point the beginning of the decline of patients from St. Elizabeth's Hospital to the exact period when I was tricked into dismissing the federal court complaint against BSMRI.

22. Additionally, in the midst of discovering the dearth of promised referrals from BSMRI, which was not commensurate with the numbers promised by Dr. Gill to get me to drop the law suit, I reached out to Dr. Gill to discuss the low volume of referral patients coming from him and also and to prompt Dr. Gill to greatly increase the number of referrals in order to meet with our Agreement which led me to dismiss the law suit.

23. In return I received a somewhat vexing response as Dr. Gill requested some business cards and brochures from me, for handing out to his patients, which was quizzical at best considering the relationship in which we were supposed to be bound.

24. Upon receiving this strange response, I realized that I, and BSM, had apparently fallen from the ranks of "preferred provider" of physical therapy services to a forgotten entity.

25. My review of the contents of Respondent's web site would astonishingly verify that there was no mention of me, nor my company to be found on the site, let alone in a physical therapy referral environment.  What's more, there is no mention of me or BSM as a provider, let alone a "preferred provider," of physical therapy services and instead other physical therapy professionals are mentioned in utter defiance of our agreement.

26. Respondent was never authorized, licensed, or granted permission to use the Boston Sports Medicine Mark in connection with medical, physical rehabilitation and physical therapy services.

27. Although our offices have experienced a volume of confused patients, recently there has been an uptick in confused and angry customers. Many of these customers have used the telephone numbers listed on the respective web sites and are getting directed to the wrong entities and this has caused a great disruption to my business, consumption of resources, including administrative time and answering service expenses, not to mention injury to the reputation of my company.

28. Therefore, BSMRI's continued bad faith use of our trademark has caused disruption to my business and has garnered many clients from BSM through the intentional attraction of users searching the Internet for BSM, finding physical therapy service providers listed on the BSMRI and using those providers.

29. In the past, Dr. Gill and his legal counsel contended that BSMRI does not provide physical therapy services and attempted to this as a defense to our charge of infringement, despite the myriads of confused consumers and patients alike.

30. As I shown herein, Dr Gill and BSMRI list physical therapy services in numerous manners through search engines and on the BSMRI website. Exhibit E.

31. In fact, under the listing of staff on the BSMRI web site, Sheryl Hassett RN is listed as a staff Registered Nurse. Additionally, the "Important Contact Information" states the following: "[p]lease contact Sheryl for any questions regarding: - Post-op Recovery/Rehabilitation, - Physical Therapy" among other services. Exhibit E.

32. Therefore, there is no disputing BSMRI employs an on-staff person to provide physical therapy services and thus Dr. Gill and BSMRI provides physical therapy services

33. Additionally, it is indisputable that Dr. Gill has generated a wealth of physical therapy business for New England Baptist Hospital (hereinafter known as "NEBH") and Health Care/Mass General Brigham (hereinafter known as "Partners"), through the use of this pipeline of referrals that were supposed to go to BSM.  Dr. Gill has thus created strong reciprocal relationships with NEBH and Partners, which have enriched BSMRI and taken money out of the pockets of BSM, all while featuring the Boston Sports Medicine name.

34. Additionally, Dr. Gill is featured on the NEBH and Partners web sites even if though he may not have directly provided PT himself or through any of his hired employees. As an employee of NEBH and Partners, he was financially rewarded for generating that physical therapy business through wages.  It is my experience after years of practice in this field of medical endeavor that orthopedic doctors not only generate revenue for hospitals from claim submissions for orthopedic services but also referrals to other services. Therefore Dr. Gill used the name "Boston Sports Medicine" in collusion with NEBH and Partners to enrich themselves. His website reveals that funnel. NEBH and Partners complicit as the link goes to the site www.bostonsportsmedicine.com. Exhibit F.

35. Additionally, per the agreement regarding the Federal Complaint, as Dr. Gill agreed to compensate BSM for infringement damages by providing a guarantee of a great number of referrals to BSM, listing BSM as a "preferred provider" of physical therapy services on the BSMRI web site as well as relinquishing use of the domain www.bostonsportsmedicine.com, for Dr. Gill or BSMRI to deny that BSMRI provides physical therapy services is disingenuous.

36. Recently, through discussions with my search engine optimization (hereinafter known as "SEO") expert, I was informed that we have continually had to design around the existence of the domain bostonsportsmedicine.com.

37. The latest situation occurred on May 7, 2021 wherein my SEO expert informed me that we have had a decline in web traffic and dip in campaigns because Dr. Gill's domain name bostonsportsmedicine.com name is so similar to our Boston Sports Medicine that Dr. Gill has once again began to pop and thus we had to alter our campaign and add in the "Dr. Gill" negative keyword.

**Activities establishing the prior knowledge in intentions of Dr. Gill**

38. In or around 2001, I began referring cases for treatment to the orthopedic department at Saint Elizabeth's Hospital in Boston, MA (hereinafter known as St. Elizabeth's Hospital).

39. In or around 2001, when I began referring cases for treatment to the orthopedic department at St. Elizabeth's Hospital, one of the referring doctors to which I regularly referred patients was Dr. Thomas J. Gill, M.D. ("Dr. Gill"), the founder and resident agent for BSMRI.

40. In the referral process, I regularly submitted hundreds of copies of medical records to those referring doctors, including Dr. Gill.

41. At all applicable times during these referrals, my company name Boston Sports Medicine was prominently displayed on the medical records of the referred patients.

42. In or around Sept 2017, I received a telephone message from Dr. Gill stating the following: "… I wanted to know if we could talk about next steps on a couple of fronts, you and I partnering, my atty has been [asking] me about what we're going to do with the lawsuit … if you're comfortable with it, I want to know what makes the most sense for you, can we get something in writing, if you want to postpone it or put off or cancel the charges now and you and I can work towards changing the name once BOI is built or you and I can partner more closely and you run PT over there and all the other partnerships we talked about that would be great to, give me a shout."

43. Further evidence of continuing negotiations in line with Dr. Gill's statements in ¶42 were memorialized by my attorney in summarizing Dr. Gill's attorney's statements, in ¶14 herein and in Exhibit D. Due to these agreements, my attorneys filed the Stipulation to Dismiss in good faith. Exhibit G.

44. Moreover, as additional evidence illustrating that BSMRI and Dr. Gill possessed knowledge of Boston Sports Medicine prior to the use and registration of the Disputed Domain, attached here are physical therapy initial evaluations sent to the referring doctor, in this case Dr. Gill, requesting acknowledgement and approval of our treatment plan for patients referred. This evidence spans the years prior to the incorporation date of BSMRI and the registration date of the Disputed Domain, to subsequent filing and dismissal of the Federal Complaint due to the agreement with

Dr. Gill. This evidence shows that show that Dr. Gill received documentation with our business name on it and put his signature, signature stamp, or electronic signature on these documents. <u>Exhibit H.</u>

45. Further included are scripts from Dr. Gill wherein he references his own website bostonsportsmedicine.com for physical therapy protocols and it is common practice for orthopedic doctors to make and provide physical therapy protocols to physical therapists. Thus, Dr. Gill has additionally infringed the Boston Sports Medicine trademark by advertising the Boston Sports Medicine mark on his prescriptions, which were sent to us for patients he referred, but also likely sent to other physical therapy practices.

46. Therefore, Dr. Gill and BSMRI possessed knowledge of my company name, Boston Sports Medicine, which is identical to the bostonsportsmedicine.com, as early as 2001.

Signed under the penalties of perjury this 4th day of June, 2021.

<u>/s/ Michael J. Velsmid</u>
Michael J. Velsmid

7

# EXHIBIT A

Boston Sports Medicine | Doctor Thomas Gill - 2014-3    https://web.archive.org/web/20140414.../http://www.bostonspor...



| INTERNET ARCHIVE WaybackMachine | 27 captures 26 Mar 04 - 15 Jan 16 | http://www.bostonsportsmedicine.com/    Go | JAN ◀ 14 ▶ APR 2013    2016 | Close Help |

**BOSTON SPORTS MEDICINE & RESEARCH INSTITUTE**

SCHEDULE AN APPOINTMENT

ABOUT US    APPOINTMENTS    FOR PATIENTS    FOR PHYSICIANS    EDUCATION & RESEARCH    PHYSICAL THERAPY





We are happy to announce our new office location

NE Baptist Outpatient Care Center
40 Allied Drive Dedham, MA 02026
781-251-3535 (office)



## Mission

Boston Sports Medicine and Research Institute strives to provide the highest quality, world-class, comprehensive orthopedic care centered around each patient's individual needs. It is committed to performing innovative, ground-breaking research, and to educating tomorrow's leaders in the field of sports medicine.

## News and Press

Dr. Thomas Gill: Mankins one of the toughest

## Who We Are

INTERNET ARCHIVE
WayBackMachine

27 captures
26 Mar 04 - 15 Jan 16

Go

JAN    APR    Close
◄  14  ►    Help
2013    2016

Read more

## Dr. Thomas Gill named to "70 Best Knee Surgeons in America"

*Jul 20, 2014* - Physicians were polled to name the top knee surgeons in America. Surgeons were selected based upon major awards, recognition by national societies, and patient satisfaction.

Read more



Dr. Thomas Gill and members of the Boston Sports Medicine and Research Institute are nationally and internationally recognized as leaders in the field of Sports Medicine and research. Dr. Gill has served as Head Team Physician for the New England Patriots, Medical Director for the Boston Red Sox, Team Physician for the Boston Bruins, Venue Medical Director for both men's and women's World Cup Soccer, Medical Director for the Boston Breakers, Consultant to Boston College and Harvard University, and Chief of the MGH Sports Medicine Service.

## Concussions in High School Student Athletes

*Jul 15, 2014* - Dr. Thomas Gill and his co-authors Dr. Ben Heyworth and Kaitlin Carroll have their research study on concussions in high school athletes accepted for podium presentation at the 2014 American Orthopedic Society for Sports Medicine in Seattle, WA. The study is one of the first to highlight not only the recommended treatment and return to play criteria for high school athletes with concussions, but also the need for academic accommodations while the patient is recovering. The stress of academic studies and mental exertion can have a negative impact on patients with concussions, just as physical exertion can. Criteria for safe return to both sports and classes are presented.

Read more

## Dr. Thomas Gill named "DePalma Orator"

*May 10, 2014* - Dr. Thomas Gill was named the "DePalma Orator" and graduation speaker for Thomas Jefferson University Department of Orthopedic Surgery commencement ceremonies. The title of his lecture was "Being a Team Physician".

Read more

## More News

## Patients say

## Schedule an Appointment

Of course, each patient's condition is unique, and the best course of treatment always begins with a thorough physician evaluation. If you would like to schedule an appointment with us, please click here.



"I am a 57 year old female and tore my ACL and PCL. Dr Gill performed surgery on these tears and within 4 months my knee was as good as new. There is no better Sports Orthopedic Surgeon in New England!!"

"I cannot believe that I am the first one to write this. He is the "KNEE GOD"."

"Dr. Gill has taken wonderful care of me for more than ten years. He is an attentive listener, and is a caring, skilled, and realistic surgeon. Dr. Gill has consistently made accurate diagnoses of my injuries and ailments; with each injury or ailment, he has prescribed treatments that resulted in improvement. Dr. Gill performed surgery on me at Massachusetts General Hospital and at MGH West (in Waltham), and I have maintained the highest level of confidence in him throughout my worries, aches, pains, surgery, and rehab."

| About Us | Appointments | For Patients | For Physicians | Education & Research | Physical Therapy | Boston Sports Medicine |
|---|---|---|---|---|---|---|
| - Our Mission | - Book an | - VisionScope | - Rehabilitation | - CV or Bibliography | - List of protocols | NE Baptist Outpatient Care Center |
| - Our Staff | appointment | - Informational | Protocols | - Orthopedic | | |
| - News and Press | | Videos | | | | |



Boston Sports Medicine & Research Institute © 2014

# EXHIBIT B

Boston Sports Medicine & Reserch Institute                     https://web.archive.org/web/20150215004405/http://www.bostonspor...



INTERNET ARCHIVE
WayBackMachine
4 captures
28 Sep 14 - 15 Feb 15

http://www.bostonsportsmedicine.com/therapy/therapy.html      Go

DEC   FEB   MAR     Close
◄  15  ►      Help
2014  2015  2016


BOSTON SPORTS
MEDICINE
& RESEARCH INSTITUTE

SCHEDULE AN APPOINTMENT

ABOUT US     APPOINTMENTS     FOR PATIENTS     FOR PHYSICIANS     EDUCATION & RESEARCH     PHYSICAL THERAPY

## PHYSICAL THERAPY

# Physical Therapy

**LIST OF PROTOCOLS**

Our multi-disciplinary approach, comprised of physical therapists, physical therapist assistants, and athletic trainers, is committed to working closely with our patients and athletes to return them to the highest level of activity possible after injury.

| About Us | Appointments | For Patients | For Physicians | Education & Research | Physical Therapy | Boston Sports Medicine |
|---|---|---|---|---|---|---|
| - Our Mission | - Book an appointment | - VisionScope | - Rehabilitation Protocols | - CV or Bibliography | - List of protocols | NE Baptist Outpatient Care Center |
| - Our Staff | | - Informational Videos | - Surgical Techniques | - Orthopedic Bioengineering Laboratory | | 40 Allied Drive |
| - News and Press | | - Rehabilitation Protocols | | - Laboratory for Musculoskeletal Tissue Engineering | | Dedham, MA |
| - Contact and Directions | | - Sports Performance Center | | | | |
| - Giving to Boston Sports Medicine and Research Institute | | - Injury Prevention Tips | | | | Tel: (781) 251-3535 |
| | | - Newton Wellesley Hospital Surgical | | | | Fax: (781) 251-3532 |
| | | - Boston Out-Patient Surgical Suites, LLC | | | | |

    

Boston Sports Medicine & Research Institute © 2014



INTERNET ARCHIVE
WaybackMachine

11 captures
8 Dec 14 - 3 Jul 15

http://www.bostonsportsmedicine.com/patients/rehabilitation-protocols.html | Go

JAN | MAR | Close
◀ 15 ▶
2014 | 2016 | Help



**BOSTON SPORTS**
**MEDICINE**
**& RESEARCH INSTITUTE**

SCHEDULE AN APPOINTMENT

ABOUT US    APPOINTMENTS    FOR PATIENTS    FOR PHYSICIANS    EDUCATION & RESEARCH    PHYSICAL THERAPY

## FOR PATIENTS    Rehabilitation Protocols

**VISIONSCOPE**

**INFORMATIONAL VIDEOS**

**REHABILITATION PROTOCOLS**

**SPORTS PERFORMANCE CENTER**

**INJURY PREVENTION TIPS**

**NEWTON WELLESLEY HOSPITAL SURGICAL**

**BOSTON OUT-PATIENT SURGICAL SUITES, LLC**

**GENERAL**
Crutch Walking

**SHOULDER**
AC joint
Arthroscopic Bankart Repair
Arthroscopic surgery information
Biceps tenodesis surgery
Frozen Shoulder
Pectoralis Major Repair
posterior Bankart repair
Rotator cuff repair protocol
Shoulder Arthroscopic Capsular Release
Shoulder arthroscopy rehabilitation (no repair)
Shoulder Exercise descriptions Comprehensive list
Shoulder Exercise descriptions for Bankart
Shoulder Exercise descriptions for Combined labrum repair
Shoulder Exercise descriptions for Posterior Bankart
Shoulder Exercise descriptions for protocols
Shoulder Exercise descriptions for Rotator cuff and periscapular stabilization
Shoulder plyometric program
Shoulder range of motion exercises
Shoulder strength training
Shoulder Stretching Exercises
shoulder tendinitis
SLAP exercise descriptions
SLAP repair protocol
Theraband strengthening

**KNEE**
ACL patient information
ACL pre-operative protocol
ACL reconstruction rehab protocol
Arthroscopy of the Knee Rehab protocol
Arthrosurface joint replacement protocol
High Tibial Osteotomy
Iliotibial band tendinitis
knee evaluation
Knee scope chart
knee sports conditioning
Knee Strength training
MCL sprain
Meniscus repair
Microfracture surgery



INTERNET ARCHIVE
WayBackMachine
11 captures
8 Dec 14 - 3 Jul 15

Go

JAN   MAR   Close
◄ 15 ►
2014   2016   Help



Patellar tendon debridement
Patellofemoral rehabilitation
PCL reconstruction
Single leg exercise progression

**GROIN & HIP**
Adductor release rehab protocol
Hamstring strain

**FOOT & ANKLE**
Achilles tendon repair
Ankle sprain
Calf strain

**BACK**
Low back pain

**ELBOW**
Elbow strengthening exercises
Golfer's elbow
Tennis elbow

**FITNESS**
Balance and Proprioceptive Training Program
Injury Mechanisms
Jump and Plyometric training
Muscle structure and function
optimal training
physical fitness for health and sports
return to running
Swimming program
Tennis program

**THROWING**
Interval throwing off pitcher's mound
Interval throwing program
Interval throwing program for Little league
Shoulder TEN strengthening program
Shoulder TWELVE strengthening program
Thrower Exercise Grid
Thrower Shoulder program TEN plus plyometric
Throwing shoulder conditioning program

**SPORTS CONDITIONING PROGRAMS**
Sports Conditioning Page

**Exercise Videos**

Lower Extremity

Shoulder Theraband Videos

| About Us | Appointments | For Patients | For Physicians | Education & Research | Physical Therapy | Boston Sports Medicine |
|---|---|---|---|---|---|---|
| - Our Mission | - Book an appointment | - VisionScope | - Rehabilitation Protocols | - CV or Bibliography | - List of protocols | NE Baptist Outpatient Care Center |
| - Our Staff | | - Informational Videos | - Surgical Techniques | - Orthopedic Bioengineering Laboratory | | 40 Allied Drive |
| - News and Press | | - Rehabilitation Protocols | | - Laboratory for Musculoskeletal Tissue Engineering | | Dedham, MA |
| - Contact and Directions | | - Sports Performance Center | | | | |
| - Giving to Boston Sports Medicine and Research Institute | | - Injury Prevention Tips | | | | Tel: (781) 251-3535 |
| | | - Newton Wellesley Hospital Surgical | | | | Fax: (781) 251-3532 |

# EXHIBIT C

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

BOSTON SPORTS MEDICINE, INC.,

                Plaintiff,

    v.

BOSTON SPORTS MEDICINE &
RESEARCH INSTITUTE , LLC,

          Defendant.

Civil Action No.:

## PLAINTIFF, BOSTON SPORTS MEDICINE, INC.'S
## COMPLAINT AND JURY DEMAND

NOW COMES the plaintiff, Boston Sports Medicine, Inc., and files this Complaint against the Defendant, Boston Sports Medicine & Research Institute, LLC, alleging as follows:

## NATURE OF THE ACTION

1.     This action arises under the Trademark Act of 1946, 15 U.S.C. §§ 1051 *et seq.*, as amended (the "Lanham Act"), and the laws of the Commonwealth of Massachusetts. Plaintiff owns the BOSTON SPORTS MEDICINE service mark for use in connection with a variety of goods and services in the field of rehabilitation and physical therapy. Defendant is improperly using Plaintiff's service mark and domain name to confuse consumers. Defendant's activities are likely to cause consumer confusion unless enjoined.

1

## PARTIES

2.      Plaintiff Boston Sports Medicine, Inc., (hereinafter "Boston Sports Medicine") is a corporation organized under the laws of the Commonwealth of Massachusetts with a principal office located in Boston, Massachusetts that does business at, among other locations,  1 Braintree Street in Allston, Massachusetts 02134, under the name of Boston Sports Medicine.

3.      Defendant, Boston Sports Medicine & Research Institute, LLC, (hereinafter "Defendant"), is a limited liability company organized under the laws of the Commonwealth of Massachusetts, on January 15, 2014, with a principal office indicated in the corporate documents located at 8 Hawthorne Place, Suite 110, Boston, Massachusetts 02114, and a principal office indicated on its website of 40 Allied Drive, Dedham, Massachusetts 02026.

## JURISDICTION AND VENUE

4.      Jurisdiction in this Court is proper as this Complaint poses federal questions arising under particular federal statutes, including the Federal Trademark Act (the "Lanham Act") as amended in 15 U.S.C., §§ 1051 *et seq*., and the Unfair Competition Act under 15 U.S.C., §§ 1125 *et seq.*  This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C., §§1331 and 1338, and 15 U.S.C., § 1121.

5.      To the extent this Complaint contains claims for relief under the laws of the Commonwealth of Massachusetts, those claims are specifically authorized to be brought in this Court under the supplemental jurisdiction provision of 28 U.S.C., § 1367 and under 28 U.S.C., § 1338.

6.     The Court has personal jurisdiction over Defendant as they are conducting business within the Commonwealth of Massachusetts by, among other things, contracting to offer and offering services in the Commonwealth.

7.     Venue is proper in the Commonwealth of Massachusetts and in this District pursuant to 28 U.S.C., § 1391 because a substantial part of the events or omissions giving rise to this action occurred in this District and Defendant is incorporated in the Commonwealth and within this judicial District.

**FACTS**

8.     Boston Sports Medicine was founded in 1999, as the result of years of planning, training, and education by its owner Dr. Michael J. Velsmid ("Dr. Velsmid").

9.     Boston Sports Medicine, was incorporated on January 1, 2001, as Allston-Brighton Physical Therapy, Inc.  The company operated as Boston Sports Medicine from January of 2001 and filed an amendment to change its name to Boston Sports Medicine, Inc., with the Secretary of State on November 19, 2003.

10.     Boston Sports Medicine has many well-known clinics with locations in several areas of Massachusetts, including Boston, Brookline, Marblehead, Somerville, and Watertown.

11.     Boston Sports Medicine specializes in sports, dance, orthopedic, and post-surgical physical and aquatic therapy.

12.     Dr. Velsmid holds the degrees of Doctor of Physical Therapy from MGH Institute of Health Professions, Master of Science in Exercise Science from the University

of Massachusetts, Amherst, and Master of Science in Physical Therapy from Simmons College.

13.     Dr. Velsmid started his career as a physical therapist at the Department of Veterans Affairs in 1995.

14.     Dr. Velsmid specializes in sports and outpatient orthopedics and has extensive experience in rehabilitation of high-level competitive athletes.

15.     Since starting Boston Sports Medicine, Dr. Velsmid and his team of clinicians have provided exceptional physical therapy care.

16.     Dr. Velsmid's first location for Boston Sports Medicine was at 556 Cambridge Street, Allston, Massachusetts which subsequently moved to 1 Braintree Street, Allston, Massachusetts.  By the opening of this first location Dr. Velsmid had carefully researched and chosen his clinic name "BOSTON SPORTS MEDICINE".

17.     Dr. Velsmid designed an accompanying logo for his clinics.

18.     On October 19, 2004, Boston Sports Medicine, obtained a Massachusetts trademark registration for the mark "Boston Sports Medicine" for physical therapy, muscular therapy, and massage therapy medical care.  A true and accurate copy of Boston Sports Medicine's mark Massachusetts registration is attached hereto as Exhibit A.

19.     The state trademark was renewed on September 3, 2014.  A true and accurate copy of Boston Sports Medicine's mark Massachusetts renewal registration is attached hereto as Exhibit B.  On July 14, 2014, Boston Sports Medicine, Inc. of which Dr. Velsmid is the Manager, filed an application for registration of the service mark "Boston Sports Medicine" with the United States Patent and Trademark Office ("USPTO").

20.     On June 2, 2015, the USPTO granted registration of "Boston Sports Medicine" on the Principal Register, with registration number 4,746,612 for medical, physical rehabilitation and physical therapy services, in Class 044 (hereinafter referred to as the "Boston Sports Medicine Mark").  A true and accurate copy of the Boston Sports Medicine's mark and registration is attached hereto as <u>Exhibit C.</u>

21.     Boston Sports Medicine has continuously used the Boston Sports Medicine Mark in connection with and to identify its services, in order to distinguish its services from the services offered by other companies.

22.     The result of Boston Sports Medicine's continuous use of the Boston Sports Medicine Mark is that it conveys an immediate idea of the Boston Sports Medicine clinics that have been created, and the high quality of service Boston Sports Medicine provides, such that the Boston Sports Medicine Mark has acquired secondary meaning.

23.     Boston Sports Medicine has made a substantial investment in the creation of the Boston Sports Medicine Mark and in the promotion and protection of the Boston Sports Medicine Mark, and considers the Mark among its most important and valuable assets.

24.     Boston Sports Medicine has the exclusive right, among other things, to exploit commercially the Boston Sports Medicine Mark and to bar use by any third parties of any confusingly similar marks or trade names.

25.     Through extensive use, continuous promotion, and prominent recognition by noteworthy publications, the Boston Sports Medicine Mark has come to be associated with Boston Sports Medicine and to identify Boston Sports Medicine as the

source of the goods and services offered in connection with the Boston Sports Medicine Mark.

26.     Those who define the market and potential market have come to recognize the Boston Sports Medicine Mark for the medical, physical rehabilitation and physical therapy services offered by Boston Sports Medicine.

27.     Boston Sports Medicine's use and promotion of the Boston Sports Medicine Mark has proven enormously successful as Boston Sports Medicine has created a loyal and growing following, together with a sterling medical reputation as exhibited by sources such as SportsMD, online customer reviews on Google, Yelp and other similar websites, and patients recognizing Boston Sports Medicine and highly recommending its services to others.

**DISCOVERY THAT DEFENDANT, BOSTON SPORTS MEDICINE & RESEARCH INSTITUTE, LLC, IS INFRINGING ON THE BOSTON SPORTS MEDICINE MARK AND IS UNFAIRLY COMPETING WITH BOSTON SPORTS MEDICINE**

28.     In or around June of 2014, Dr. Velsmid and the clinic director of Boston Sports Medicine, Dr. Erin Looney discovered that Dr. Thomas J. Gill, M.D. ("Gill") had opened Boston Sports Medicine & Research Institute, in Boston, Massachusetts.  Dr. Velsmid and Dr. Looney immediately realized that Boston Sports Medicine & Research Institute was a virtually identical clinic to Boston Sports Medicine, and thus an entity that infringes upon the Boston Sports Medicine Mark and unfairly competes with Boston Sports Medicine by using a confusingly similar name in the area where Boston Sports Medicine is known and uses the Boston Sports Medicine Mark.

6

29.     In or around June of 2014, Dr. Looney informed Dr. Velsmid that Boston Sports Medicine, received a fax intended for the "Boston Sports Medicine & Research Institute".

30.     The "Boston Sports Medicine & Research Institute" name is strikingly similar and nearly identical to the Boston Sports Medicine Mark and incorporates the Boston Sports Medicine Mark in the entirety.  There is little material difference in the sight, sound, and meaning between the trade names.

31.     After further investigation, in or around June of 2014, Dr. Velsmid discovered that Boston Sports Medicine & Research Institute had also registered the domain name www.bostonsportsmedicine.com to advertise its services.

32.     In or around February 2015, while browsing the Boston Sports Medicine & Research Institute's website, Dr. Velsmid recognized that both clinics offer physical therapy services. Specifically, the Boston Sports Medicine & Research Institute website possessed a "Physical Therapy" tab highlighting different physical therapy protocols.   A true and accurate copy of the Boston Sports Medicine & Research Institute website, showing the "Physical Therapy" tab, in February 2015 is attached hereto as Exhibit D.

33.     Further, upon clicking the "Physical Therapy" tab, Dr. Velsmid was directed to another specific Physical Therapy webpage, wherein physical therapy services were advertised.  A true and accurate copy of the Boston Sports Medicine & Research Institute Physical Therapy webpage in February 2015 is attached hereto as Exhibit E.

34.     Having learned of the extent of the Boston Sports Medicine & Research Institute infringement on the Boston Sports Medicine Mark, along with the actual customer confusion caused by Defendant's infringement, (discussed herein below), Boston Sports Medicine served a Cease and Desist letter upon Boston Sports Medicine & Research Institute and Gill on July 6, 2015.  A true and accurate copy of this July 6, 2015 letter is attached hereto as Exhibit F.

35.     This initial Cease and Desist letter expressly informed and furnished formal notice to Defendant that Boston Sports Medicine was a registered word mark that Defendant was infringing.  The letter additionally highlighted the customer confusion that the name Boston Sports Medicine & Research Institute will cause, and placed Defendant on notice of Boston Sports Medicine's intention to enforce the Boston Sports Medicine Mark.

36.     This initial Cease and Desist letter additionally requested that Defendant provide written assurances by July 15, 2015 that Defendant cease and desist from using the name Boston Sports Medicine and to immediately transfer and assign any domain names that consist of the Boston Sports Medicine Mark, including, without limitation, the www.bostonsportsmedicine.com domain name.

37.     On July 27, 2015, Defendant responded to the initial Cease and Desist letter.  A true and accurate copy of this July 27, 2015 response letter is attached hereto as Exhibit G.

38.     Defendant stated in its response that the use of the Boston Sports Medicine & Research Institute name will not cause confusion, mistake, or deception among consumers in the marketplace.  See Exhibit G.

8

39.     Defendant also asserted that they did not offer similar services as Boston Sports Medicine and that a sophisticated consumer carefully choosing medical care would not mistake Boston Sports Medicine and Boston Sports Medicine & Research Institute. See Exhibit G.

40.     After receiving the response from Boston Sports Medicine & Research Institute, Dr. Velsmid continued to receive phone calls from confused consumers.

41.     On or around August of 2015, "JrEagleGirlsHockey" (@jr_eagle_girls on Twitter) mistakenly sent a "tweet" to the Twitter handle of Boston Sports Medicine, (@BostonSportsMed) thanking Dr. Gill for helping a patient recover from an injury. Additionally, several other individuals favorited this Tweet and "re-tweeted" it ("kaleigh donnelly", "Gayle Norcross", "Jake peters") thanking Dr. Gill.   A true and accurate copy of a screenshot of the Tweet to the Twitter handle of Boston Sports Medicine, is attached hereto as Exhibit H.

42.     On or about August of 2015, while once again browsing the Boston Sports Medicine & Research Institute website, Dr. Velsmid noticed that the "Physical Therapy" tab was removed from the website and replaced with a "Rehab Protocols" tab.  The new tab illustrated the exact same list of protocols as the "Physical Therapy" tab but was now renamed to "Rehab Protocols."   Furthermore, despite the curious removal of the tab, Defendant continues to offer physical therapy services as evidenced by their "Important Contact Information."  A true and accurate copy of the Boston Sports Medicine & Research Institute website on August 2015, is attached hereto as Exhibit I.

43.     Boston Sports Medicine sent Defendant a second Cease and Desist letter on September 29, 2015, that reiterated the demand that Defendant discontinue its

infringing and deceptive conduct. This second Cease and Desist letter also informed Defendant of the specific instances of consumer confusion.  A true and accurate copy of this September 29, 2015 Cease and Desist letter is attached hereto as Exhibit J.

44.    Boston Sports Medicine also reasserted that, although Defendant claimed that the services offered by the two companies were substantially different, both Boston Sports Medicine and Defendant offer physical therapy and post-surgical rehabilitation and recovery, as well as preoperative services.

45.    On October 1, 2015 Dr. Velsmid was notified by patient Juan Gali ("Gali") that Gali had been referred to Dr. Velsmid by another patient, David Serpa ("Serpa"), and that upon trying to contact Dr. Velsmid, Gali experienced difficulty trying to locate Dr. Velsmid because he was confused with Boston Sports Medicine & Research Institute.  Gali needed to re-contact Serpa in order to gain clarification on which Boston Sports Medicine to contact.  See Affidavit of Dr. Velsmid at ¶ 5, attached hereto as Exhibit K.

46.    On November 5, 2015, Dr. Velsmid was also notified by one of his employees, Michelle Perry ("Perry") that while attending a conference, Perry was approached by a representative of DONJOY/DJO Global who believed they were affiliated with Boston Sports Medicine & Research Institute.  Perry clarified that she in fact was associated with Boston Sports Medicine and not Boston Sports Medicine & Research Institute.  Perry then reported this incident to Dr. Velsmid.  See Affidavit of Dr. Velsmid at ¶ 6, attached hereto as Exhibit K.

47.    Defendant responded to the second Cease and Desist letter on November 12, 2015.

48.     Defendant reasserted that there was no evidence of actual confusion and that consumers are not likely to be confused.  A true and accurate copy of this November 12, 2015 Cease and Desist letter is attached hereto as Exhibit L.

49.     The inquiries Dr. Velsmid received regarding Boston Sports Medicine & Research Institute make it clear that public confusion has already arisen as to whether Boston Sports Medicine & Research Institute is affiliated with or sponsored by Boston Sports Medicine.

50.     To the extent that these and other prospective customers for whom Boston Sports Medicine and Boston Sports Medicine & Research Institute compete in the same market and the same area mistakenly believe that Boston Sports Medicine & Research Institute is authorized, licensed, endorsed, or sponsored by Boston Sports Medicine, and owing to the confusion created by offering virtually identical services, there is a grave risk of tarnishment to the Boston Sports Medicine Mark and Boston Sports Medicine itself.

51.     The services offered by Defendant are identical to the services offered under the Boston Sports Medicine Mark, both clinics offer physical therapy and rehabilitation services.

52.     Defendant was never authorized, licensed, or granted permission to use the Boston Sports Medicine Mark in connection with medical, physical rehabilitation and physical therapy services.

53.     Defendant's use of the Boston Sports Medicine Mark has already caused, presently causes, and is likely to continue to cause further confusion among consumers

and to deceive consumers as to the source, quality, and nature of Defendant's goods and services.

54.     Now with express knowledge as to Boston Sports Medicine's trademark rights, Defendant continues to use the confusing name "Boston Sports Medicine & Research Institute" they selected in an attempt to cause confusion in the marketplace and capitalize on the goodwill and reputation that has been developed by and is associated with "Boston Sports Medicine."

55.     Defendant's misappropriation of Boston Sport Medicine's name, its infringement of the Boston Sports Medicine Mark, and its unfair competition, has caused and continues to cause significant damages and irreparable harm to Boston Sports Medicine.

## COUNT I

### (Federal Trademark Infringement—15 U.S.C., §§ 1114 et seq.)

56.     Boston Sports Medicine incorporates and re-alleges by reference the above paragraphs 1 through 55 as if expressly set forth herein.

57.     Boston Sports Medicine is the legal owner of the Boston Sports Medicine Mark, has not abandoned the Boston Sports Medicine Mark since its first use, and has been, and continues to be, in continuous use in interstate and intrastate commerce.

58.     Defendant's unauthorized use, reproduction, copying or colorable imitations of the Boston Sports Medicine Mark, as explained above, and as done by

Boston Sports Medicine & Research Institute, has caused and is likely to continue to cause confusion, mistake, and/or deception among consumers as to the source, quality, and/or nature of Defendant's goods and services.

59.     Defendant's use, reproduction, copying or colorable imitation of the Boston Sports Medicine Mark also likely creates the misconception among consumers that Boston Sports Medicine somehow ratifies or authorizes Defendant's infringing use of the Boston Sports Medicine Mark and/or that Boston Sports Medicine is affiliated in some manner with Defendant's business, when such is not the case.

60.     Boston Sports Medicine did not give and has not given Defendant permission to use the Boston Sports Medicine Mark and Boston Sports Medicine, as owner of the Boston Sports Medicine Mark, objects to Defendant's past, and continued, infringing use of the Boston Sports Medicine Mark and/or any confusingly similar derivations thereof.

61.     While Boston Sports Medicine has notified Defendant on several occasions that its use of the Boston Sports Medicine Mark and/or any confusingly similar derivations thereof is unauthorized, Defendant continues to use and extensively exploit, for its own commercial advantage, the Boston Sports Medicine Mark, to the detriment of Boston Sports Medicine as well as the consuming public.

62.     Because Defendant's continued use of the Boston Sports Medicine Mark, and/or any confusingly similar derivations thereof, prevents Boston Sports Medicine from exercising exclusive control over its intellectual property rights and because Defendant's continued use of the Boston Sports Medicine Mark, and/or any confusingly similar derivations thereof, is likely to continue to cause confusion,

mistake, and/or deception as to the source, affiliation, or sponsorship of the goods and services that Defendant advertises, promotes, and/or sells through its infringing use of the Boston Sports Medicine Mark, Boston Sports Medicine lacks an adequate remedy at law.

63.     Unless temporary, preliminary and permanent injunctions are issued enjoining Defendant from any continuing or future infringing use of the Boston Sports Medicine Mark, Boston Sports Medicine will continue to sustain irreparable damage. Defendant has already proven it is a willful infringer who has complete disregard of the intellectual property rights of Boston Sports Medicine.

64.     Pursuant to 15 U.S.C., § 1116(a), Boston Sports Medicine is entitled to an order enjoining Defendant from using the Boston Sports Medicine Mark to advertise, market, and/or sell Defendant's goods or services.

65.     As a direct and proximate cause of Defendant's infringing conduct, Boston Sports Medicine has been damaged and will continue to be damaged. Pursuant to 15 U.S.C., § 1117(a), Boston Sports Medicine is entitled to an order requiring Defendant to account to it for any and all profits and other ill-gotten gains Defendant derived from its unauthorized and infringing use of the Boston Sports Medicine Mark, as detailed herein, and to an order awarding all damages sustained by Boston Sports Medicine by reason of Defendant's infringing conduct.

66.     As evidenced by, *inter alia*, Defendant's refusal to cease further use of the Boston Sports Medicine Mark after receiving notice of Boston Sports Medicine's objections to Defendant's infringement of the Boston Sports Medicine Mark, Defendant's conduct was and continues to be intentional and in conscious disregard of

Boston Sports Medicine's rights. Boston Sports Medicine, therefore, is entitled to an award of treble damages and/or enhanced profits from Defendant.

## COUNT II

### (Federal Unfair Competition and False Advertising—15 U.S.C., § 1125(a))

67.     Boston Sports Medicine incorporates and re-alleges by reference the above paragraphs 1 through 66 as if expressly set forth herein.

68.     Boston Sports Medicine is the legal owner of the Boston Sports Medicine Mark, has not abandoned the Boston Sports Medicine Mark since its first use, and the Boston Sports Medicine Mark has been, and remains in continuous use.

69.     Despite knowledge of Boston Sports Medicine's ownership interests in the Boston Sports Medicine Mark, Defendant has made, and continues to make, use in commerce of the Boston Sports Medicine Mark and/or any confusingly similar derivations thereof without Boston Sports Medicine's permission.

70.     Defendant's unauthorized use of the Boston Sports Medicine Mark creates a false association between Defendant and Boston Sports Medicine.

71.     Defendant's unauthorized infringing use of the Boston Sports Medicine Mark and/or any confusingly similar derivations thereof also tends to cause confusion, mistake, and/or deception among consumers as to the source, quality, and nature of Defendant's goods and services.

72.     Defendant has engaged in fraudulent business practices, false advertising, and unfair competition by using the Boston Sports Medicine Mark and/or any confusingly similar derivations thereof, associated goodwill, and other intangible

15

rights of Boston Sports Medicine without permission in an attempt to pass off Defendant's goods as coming from, being sponsored by, and/or affiliated with Boston Sports Medicine, when such is not the case.

73.     Defendant's use of the Boston Sports Medicine Mark and/or any confusingly similar derivations thereof, goodwill, and other intangible rights of Boston Sports Medicine is in direct violation of 15 U.S.C., § 1125(a) et seq., and represents false advertising and false designation of source entitling Boston Sports Medicine to all remedies available under the law.

74.     As a direct and proximate result of the foregoing conduct, Boston Sports Medicine is entitled to damages against Defendant, in an amount according to proof at trial, to a temporary, preliminary, and permanent injunction, and to any and all other relief the Court deems just and proper under the law.

## COUNT III

**(Unfair Methods of Competition / Deceptive Acts and Practices—M.G.L. c. 93A, §§ 2 and 11)**

75.     Boston Sports Medicine incorporates and re-alleges by reference the above paragraphs 1 through 74 as if expressly set forth herein.

76.     Defendant is engaged in the conduct of trade or commerce within the meaning of M.G.L. c. 93A.

77.     The foregoing conduct by Defendant constitutes a pattern of unfair, deceptive, and fraudulent acts and practices within the meaning of M.G.L. c. 93A in that:

16

a.     Boston Sports Medicine is the legal owner of the Boston Sports Medicine Mark, has not abandoned the Boston Sports Medicine Mark since its first use, and the Boston Sports Medicine Mark has been, and continues to be, in continuous use.  Despite knowledge of Boston Sports Medicine's ownership interests in the Boston Sports Medicine Mark, Defendant has made, and intentionally continued to make, use in commerce of the Boston Sports Medicine Mark without Boston Sports Medicine's permission.

b.     Boston Sports Medicine never granted Defendant permission to use the Boston Sports Medicine Mark or any similar marks or to engage in the offending activities. After discovering Defendant's infringing use of the Boston Sports Medicine Mark, Boston Sports Medicine demanded that Defendant cease further use of the Boston Sports Medicine Mark. Defendant has refused to cease further use and continues, to this day, to misappropriate Boston Sports Medicine's rights in the Boston Sports Medicine Mark.

c.     Defendant has engaged in a pattern of unfair, deceptive, and fraudulent acts to enrich itself by misappropriating Boston Sports Medicine's exclusive rights to the Boston Sports Medicine Mark and using it for its own benefit.

d.     Defendant has engaged in fraudulent business practices, false advertising, and unfair competition by using the Boston Sports Medicine Mark, associated goodwill, and other intangible rights of Boston Sports Medicine, including but not limited to an improper attempt to pass off Defendant's services as coming from, being sponsored by, and/or affiliated with Boston Sports Medicine.

78.     Defendant's unauthorized use and intentional infringement of the Boston Sports Medicine Mark, as explained above, creates a false association between Defendant and Boston Sports Medicine and is likely to cause confusion, mistake, and/or deception among consumers as to the source, quality, and/or nature of Defendant's goods and services.

79.     Boston Sports Medicine has been damaged and will continue to be damaged by Defendant's unlawful, unfair, and fraudulent and deceptive business practices as alleged herein.

80.     Boston Sports Medicine is entitled to a preliminary and permanent injunction enjoining Defendant from using the Boston Sports Medicine Mark to advertise, market, and/or sell Defendant's goods or services.  Defendant has profited from its activities and, unless its conduct is enjoined, Boston Sports Medicine will continue to suffer irreparable harm that cannot be adequately calculated or compensated by monetary damages. Accordingly, injunctive relief is proper pursuant to M.G.L. c. 93A, § 11.

81.     As a direct and proximate result of Defendant's conduct, Boston Sports Medicine has been harmed and is entitled to damages against Defendant in an amount according to proof at trial and to any and all other relief the Court deems just and proper under the law.

82.     Boston Sports Medicine is informed and believes, and thereon alleges, that Defendant's conduct was intentional, willful, wanton, malicious, and in conscious disregard of Boston Sports Medicine's rights, thereby justifying an award of three

times its damages, together with reasonable attorneys' fees, pursuant to M.G.L. c. 93A, § 11.

## COUNT IV

### (Trademark Infringement Under M.G.L. c. 110H)

83.     Boston Sports Medicine incorporates and re-alleges by reference the above paragraphs 1 through 82 as if expressly set forth herein.

84.     Boston Sports Medicine owns and enjoys common law trademark rights which are superior to any rights Defendant may claim to any similar mark.

85.     As such, the Boston Sports Medicine Mark is entitled to protection under M.G.L. c. 110H, § 13.

86.     Defendant's unauthorized use of the Boston Sports Medicine Mark in Massachusetts was intended to cause confusion, or to cause mistake, or to deceive as to affiliation, connection, or association of Defendant with Boston Sports Medicine as to the origin, sponsorship, or approval of Defendant's goods.

87.     Defendant's infringement of the Boston Sports Medicine Mark has been willful, wanton, reckless, and done with full knowledge and disregard of Boston Sports Medicine's prior use and rights in its Mark.

88.     Defendant's unauthorized use of a mark confusingly similar to the Boston Sports Medicine Mark in Massachusetts has caused and will continue to cause substantial and irreparable injury to Boston Sports Medicine's business reputation unless Defendant's use of the Boston Sports Medicine Mark is enjoined by this Court.

89.     Boston Sports Medicine is entitled to injunctive relief to enjoin Defendant's further use of the Boston Sports Medicine Mark under M.G.L. c. 110H, § 3.

## COUNT V

### (Massachusetts Common Law Trademark Infringement)

90.     Boston Sports Medicine incorporates and re-alleges by reference the above paragraphs 1 through 89 as if expressly set forth herein.

91.     The Boston Sports Medicine Mark is the proprietary property of Boston Sports Medicine, which possesses certain common law trademark rights and protections in the Boston Sports Medicine Mark under the common law of the Commonwealth of Massachusetts.

92.     Defendant's unauthorized use and intentional infringement of the Boston Sports Medicine Mark, as explained above is likely to cause confusion, mistake, and/or deception among consumers as to the source, quality, and/or nature of Defendant's goods and services, thereby, committing common law trademark infringement.

93.     Defendant has engaged in unfair competition by using a mark confusingly similar to the Boston Sports Medicine Mark, associated goodwill, and other intangible rights of Boston Sports Medicine without permission in an attempt to pass off Defendant's services as coming from, being sponsored by, and/or affiliated with Boston Sports Medicine.

94.     Defendant's acts and conduct as set forth herein constitutes unfair

competition, willful, unfair, and deceptive acts or practices within the Commonwealth of Massachusetts and violation of Massachusetts common law.

95.    Boston Sports Medicine never gave Defendant permission to use the Boston Sports Medicine Mark or any similar marks or engage in the offending activities. After discovering Defendant's infringing use of the Boston Sports Medicine Mark and/or any confusingly similar derivations thereof, Boston Sports Medicine demanded that Defendant cease further use of the Boston Sports Medicine Mark. Defendant, however, has refused to cease further use and continues, to this day, to misappropriate Boston Sports Medicine's rights in the Boston Sports Medicine Mark.

96.    Boston Sports Medicine has been damaged and will continue to be damaged by Defendant's infringing activities.

97.    As a direct and proximate result of the foregoing conduct, Boston Sports Medicine is entitled to damages against Defendant in an amount that is subject to proof at trial, to a preliminary and permanent injunction, and to any and all other relief the Court deems just and proper under the law.

98.    Boston Sports Medicine is informed and believes, and thereon alleges, that Defendant's conduct was willful, wanton, malicious, and in conscious disregard of Boston Sports Medicine's rights, thereby justifying an award of punitive and/or exemplary damages in an amount according to proof at trial.

## COUNT VI

### (Massachusetts Common Law Unfair Competition)

99.    Boston Sports Medicine incorporates and re-alleges by reference the above paragraphs 1 through 98 as if expressly set forth herein.

100.    Boston Sports Medicine is the legal owner of the Boston Sports Medicine Mark, has not abandoned the Boston Sports Medicine Mark since its first use, and the Boston Sports Medicine Mark has been, and continues to be, in continuous use. Despite knowledge of Boston Sports Medicine's ownership interests in the Boston Sports Medicine Mark, Defendant has made, and intentionally continues to make, use in commerce of the Boston Sports Medicine Mark without Boston Sports Medicine's permission.

101.    Defendant has engaged in a pattern of unfair, deceptive, and fraudulent acts to enrich itself by misappropriating Boston Sports Medicine's rights to the Boston Sports Medicine Mark and using them for its own benefit.

102.    Defendant's unauthorized use of the Boston Sports Medicine Mark creates a false association between Defendant and Boston Sports Medicine. Defendant's unauthorized use of the Boston Sports Medicine Mark also tends to cause confusion, mistake, and/or deception among consumers as to the source, quality, and nature of Defendant's goods and services.

103.    Defendant has engaged in fraudulent business practices, false advertising, and unfair competition by using the Boston Sports Medicine Mark and associated goodwill, without permission in an attempt to pass off Defendant's goods as coming from, being sponsored by, and/or affiliated with Boston Sports Medicine.

22

104.    Boston Sports Medicine has been damaged and will continue to be damaged by Defendant's unlawful, unfair, and/or fraudulent business practices and misleading advertising as alleged herein. Boston Sports Medicine, therefore, is entitled to a preliminary and permanent injunction enjoining Defendant from using the Boston Sports Medicine Mark to advertise, market, and/or sell Defendant's goods and services.

105.    As a direct and proximate result of the foregoing conduct, Boston Sports Medicine has been harmed and is entitled to damages against Defendant in an amount according to proof at trial and to any and all other relief the Court deems just and proper under the law.

106.    Boston Sports Medicine is informed and believes, and thereon alleges, that Defendant's conduct was willful, wanton, malicious, and in conscious disregard of Boston Sports Medicine's rights, thereby justifying an award of punitive and/or exemplary damages in an amount according to proof at trial.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests this Honorable Court enter judgment in its favor and against Defendant as to all Counts, together with the following relief:

A.    For a preliminary and permanent injunction that enjoins Defendant and its agents, affiliates, parent companies, subsidiaries, servants, employees, and all persons acting in privity or in concert with them, from, directly or indirectly:

(i)    Using the Boston Sports Medicine Mark or trade name in connection with Defendant's services, marketing, advertising, or

23

promotional materials, or otherwise in connection with Defendant's business;

(ii)     Using confusingly similar variations of the Boston Sports Medicine Mark or trade name, specifically including but not limited to "Boston Sports Medicine & Research Institute," causing a likelihood of confusion, deception, and/or mistake as to the source, nature, and/or quality of Defendant's goods or services;

(iii)     Otherwise infringing upon the Boston Sports Medicine Mark or trade name; and

(iv)     Continuing to perform in any manner whatsoever any of the acts complained of in this Complaint.

B.     For an Order directing Defendant to file with this Court and serve on Boston Sports Medicine, within 10 days after service of an injunction, a written report, signed under oath, setting forth, in detail, the manner and form by which Defendant has complied with the injunction.

C.     For an Order that Defendant pays to Boston Sports Medicine compensatory damages for the injuries sustained by Boston Sports Medicine in consequence of the unlawful acts alleged herein and that such damages be trebled pursuant to 15 U.S.C., § 1117, M.G.L. c. 93A, and any other applicable law because of the willful and knowing unlawful acts as alleged herein.

D.     For an Order requiring Defendant to account for and pay over to Boston Sports Medicine all gains, profits, and advantages derived by them from the willful and

knowing unlawful activities alleged herein pursuant to 15 U.S.C., § 1117, M.G.L. c. 110H, and any other applicable law.

      E.     For an Order awarding Boston Sports Medicine its costs and attorneys' fees incurred in prosecuting this action.

      F.     For an Order awarding Boston Sports Medicine pre- and post-judgment interest.

      G.     For an Award awarding Boston Sports Medicine such further relief as the Court deems just and proper.

## JURY DEMAND

Boston Sports Medicine hereby demands a trial by jury as to all claims or issues so triable.

                                    BOSTON SPORTS MEDICINE, INC.,
                                    By its attorneys,

                                    */s/ Douglas F. Hartman*
                                    _____
                                    Douglas F. Hartman, BBO# 642823
                                    HARTMAN LEONE
                                    One Boston Place
                                    201 Washington Street, 26th Floor
                                    Boston, Massachusetts 02108
                                    P:  617-807-0091
                                    F:  617-507-8334
                                    dhartman@hartmanleone.com

# EXHIBIT D



# HARTMAC LEOCE

OCE BOSTON PLACE,   26ᵀᴴ FLOOR,   BOSTON,   MASSACHUSETTS 02108

TEL: 617-807-0144     FAX: 617-904-1757

**Douglas F. Hartman**
Direct Dial:  617-807-0091
Direct Fax:  617-507-8334
dhartman@hartmanleone.com

## CONFIDENTIAL COMMUNICATION IN FURTHERANCE
## OF SETTLEMENT PURPOSES ONLY

May 23, 2016

**Via Email to LDeMeo@mgmlaw.com**
Larry K. DeMeo
Manion Maynor & Manning
125 High Street
Boston, Massachusetts 02110

Re:     *Boston Sports Medicine, Inc., v. Boston Sports Medicine*
        *& Research Institute, LLC*
        U.S.D.C., D. Mass.
        Civil Action No.:  1:16-cv-10143

Dear Larry:

Please allow this letter to serve as a follow up to our meeting on May 13, 2016, and your client's offer of settlement.  BSM would be willing to settle the litigation with BSMRI along the lines of our client's proposed terms below.  Please be aware that any conditional acceptance of a single term in your letter would only be agreeable if all of our terms are met.

1.  BSM will be listed as the preferred and sole provider, including, but not limited to, physical rehabilitation and physical therapy services on the home page of the BSMRI website and any other appropriate pages to be agreed upon by the parties.

2.  A licensing agreement between BSM and BSMRI regarding the use of the Trademark "Boston Sports Medicine" with terms of the licensing agreement outlined below:

    a)  Limited geographic scope in which BSMRI may utilize the "Boston Sports Medicine" mark: Boston boroughs of Brighton (ST E's) and Jamaica Plain (New England Baptist), unless authorized in writing by BSM.

HARTMAC LEOCE

   b) BSMRI may not open/operate at another location outside of St. Elizabeth's and the New England Baptist Hospital without the express written consent of BSM.

   c) Transfer all rights in the BSMRI name, URL and any other online presence of the BSMRI name to BSM should Dr. Gill cease operation as a practicing full-time physician in the geographic scope in which the mark may be utilized according to the licensing agreement;

   d) The licensing agreement is non-transferable nor assignable without prior written consent of BSM;

   e) A monthly referral volume target of patients from BSMRI to BSM as follows:

   i.    A minimum of 3 registered patients per day in any BSM office from Steward Health Care System/St. Elizabeth's Orthopedics Dept. (assuming 250 business days in a single calendar year) in any of their clinics from either Dr. Gill or any other doctor of Steward Health Care System/St. Elizabeth's Orthopedics Dept. (Registered patient shall mean a patient that signs in at BSM and completes at least one initial session with BSM);

   ii.   The yearly requirement equates to 750 new evaluations at BSM per year, which equates to approximately $45,000 (US) in revenue per month;

   iii.  If the referral target is not met by BSMRI, then BSMRI will pay the difference between the required revenue and actual revenue as a licensing fee; $720 per patient.

   iv.   The referral target will be evaluated and the licensing fee will be paid (if required) on a quarterly basis from BSMRI to BSM

   f) BSMRI may only use the term "Boston Sports Medicine" in conjunction at all times with the following terms "and Research Institute"; this includes, but is not limited to: usage on all websites, social media accounts, and advertising.

   g) BSMRI must indicate on BSMRI's home page of BSMRI's website that the "Boston Sports Medicine" term is licensed from BSM;

   h) The licensing agreement will have an initial term with an option to renew

   i) System for tracking referrals

   j) BSMRI will agree to indemnify BSM for any patients treated by BSMRI and referred to BSM

3. BSMRI will no longer utilize the URL: www.bostonsportsmedicine.com and the parties will agree upon a new URL that BSMRI will use prior to execution of the licensing agreement.

4. At the expense of BSMRI, BSMRI will obtain for BSM a written approval & a separate agreement acceptable to BSM creating a partnership between BSM and Steward Health Care System granting BSM full permission and authorization to

HARTMAC LEOCE

see their patients outside of the Steward Health Care System that are referred to BSM.

5. At the expense of BSMRI, BSMRI will obtain a written approval & a separate agreement for BSM, to allow BSM to be "In-network" with Steward Health Care System's Tufts Health Plan to ensure that Steward Health Care System's Employees and Steward Health Care System's Tufts Health Plan Patients possess the same co-payment at BSM as they have at Steward Health Care System's Physical Therapy **within (60) days of agreeing to these terms**.

6. BSMRI will obtain a written approval & separate agreement acceptable to BSM that Steward Health Care System's Physical Therapy center's will not compete with BSM in that new Steward Health Care System's Physical Therapy center's will not open within (5) miles of any BSM location and existing Steward Health Care System's Physical Therapy center's will not expand.

7. If BSMRI does not comply with all the terms of the settlement agreement, BSM will immediately terminate the licensing agreement and revoke use of the "Boston Sports Medicine" mark from BSMRI.

Moving forward, we have provided our position with respect to the terms where we believe BSM would be willing to settle this matter. However, if BSMRI is inclined to either not accept or deliver on all of these terms, then BSM will have no other option except to continue forward with this lawsuit on all fronts.

This letter is not intended to be a recitation of all our rights, and we reserve all of our rights.

We look forward to hearing your response to BSM's proposal no later than June 10, 2016. If we do not hear back from you by this date, we will assume you have no intention of modifying your settlement proposal.

Thank you for your attention to these matters. Should you have any questions, please do not hesitate to contact me.

Very truly yours,

Douglas F. Hartman

# EXHIBIT E



https://www.google.com/search?client=firefox-b-1-d&q=bostonsportsmedicine.com

Q All  ▶ Videos  ⊞ News  ▣ Images  ♡ Maps  ⋮ More          Settings  Tools

About 45,300 results (0.62 seconds)

❋ COVID-19 safety info                                    >

https://www.bostonsportsmedicine.com  ⋮

Boston Sports Medicine | Doctor Thomas Gill

Mission. **Boston Sports Medicine** and Research Institute strives to provide the highest
quality, world-class, comprehensive orthopedic care centered around each ...
You've visited this page many times. Last visit 4/14/21

Rehabilitation Protocols                About Us
Rehabilitation Protocols                About Us. Members of Boston
Regenerative Medicine ...                Sports Medicine and Research ...

Our Staff                                News and Press
Thomas J. Gill, MD, Director,            Dr. Gill and Boston Sports
Boston Sports Medicine and ...           Medicine and Research Institute...

Physical Therapy                         Contact & Directions
Physical Therapy. Our multi-             NE Baptist Outpatient Care Center.
disciplinary approach ...                40 Allied Drive. Dedham, MA ...

Surgical Information                     Education & Research
Amanda Bates- Surgical                   Boston Sports Medicine &
Coordinator. Phone: 781-251...           Research Institute. Schedule ...



## Our Staff

### Thomas J. Gill, MD

Director, Boston Sports Medicine and Research Institute

Professor of Orthopedic Surgery, Tufts Medical School

Chairman of Orthopedic Surgery, Steward Healthcare Network

### Brian Petrone, PA-C

Physician Assistant

bpetrone@partners.org

### Sheryl Hassett, RN

Registered Nurse

SHASSETT@partners.org

## ABOUT US

OUR MISSION

OUR STAFF

NEWS AND PRESS

CONTACT AND DIRECTIONS

GIVING TO BOSTON SPORTS
MEDICINE AND RESEARCH
INSTITUTE

https://www.bostonsportsmedicine.com/about/our-staff.html

https://www.bostonsportsmedicine.com/patients/Surgical-Information.html



Email: abates@nebh.org

Please contact Amanda for any questions regarding:

- Surgical Scheduling
- Post-op appointment scheduling
- Medical Clearance
- Insurance Verification
- Prior Authorization

**Nicole Chea- Administrative Assistant**
Phone 781-251-3535
Email: Nchea@partners.org

Please contact Nicole for any questions regarding:

- Academic meeting/travel
- Medical Equipment/DME
- Work Comp inquires
- Medical Records
- Viscosupplementation
- Vision Scope
- Deposition/Narrative request

**Sheryl Hassett- Registered Nurse**
Phone 781-251-3535
Email: Shassett@partners.org

Please contact Sheryl for any questions regarding:

- Post-op Recovery/Rehabilitation
- Physical Therapy
- Disability paperwork
- Medications/pain management

**Billing Information: DBI Billing**

REHABILITATION PROTOCOLS

INJURY PREVENTION TIPS

# EXHIBIT F

Beth Israel Lahey Health
New England Baptist Hospital

Patients & Care Partners   Who We Are   Record List   Trademark   Record List   Fund   Inbox   Record List   Trade   USPTO   USPTO   USPTO

Find a Doctor   What We Offer   Quality Care   Health Professionals

Who We Are   Give Now   Contact Us

Search

Make a Gift

https://www.nebh.org/find-a-doctor/doctors/thomas-j-gill/

# Thomas J. Gill, MD

Medical Director of Sports Fellowship Education

PRINT



After graduating Phi Beta Kappa and Magna Cum Laude in Biology from Harvard College, Dr. Thomas Gill received his medical degree from Harvard Medical School. He performed his internship in general surgery at the Massachusetts General Hospital, and completed his orthopaedic surgery training at the Harvard Combined Orthopaedic Residency Program. Upon his graduation, Dr. Gill was awarded the Maurice E. Muller Scholarship to study reconstructive surgery in Bern, Switzerland and throughout other European



Mass General Brigham

Find a Doctor    Who We Are    Hospitals & Locations    How We Lead    Find & Get Care    Log In to Patient Gateway    Patient Information

COVID-19

Return to search results or Start a new search

Thomas J Gill, MD
Orthopedic Surgery

ACCEPTING NEW PATIENTS

Share:

**Boston Sports Medicine and Research Institute, LLC**
40 Allied Drive
Dedham, MA 02026

Get Directions

781-251-3535
617-264-1101

About    Expertise    Insurance

## About Thomas J Gill

| | |
|---|---|
| Specialties | Orthopedic Surgery |
| Affiliations | Newton-Wellesley Hospital |
| Provider Gender | Male |
| Language | English French |
| Age Groups Seen | Adults Geriatrics |

## Expertise

**Education**

American Board of Orthopaedic Surgery
Board Certification, Orthopaedic Sports Medicine, 2013

American Board of Orthopaedic Surgery
Board Certification, Orthopaedic Surgery General, 2000

Steadman Hawkins Clinic
Fellowship, Sports Medicine, 1998

Brigham and Women's Hospital
Residency, Orthopaedic Surgery, 1997

# EXHIBIT G

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| BOSTON SPORTS MEDICINE, INC., | : | |
| | : | |
| Plaintiff, | : | |
| | : | Civil Action No.: 1:16 cv10143 DJC |
| v. | : | |
| | : | |
| BOSTON SPORTS MEDICINE & | : | |
| RESEARCH INSTITUTE, LLC, | : | |
| | : | |
| Defendant. | : | |

## <u>STIPULATION OF DISMISSAL</u>

The parties in the above entitled matter, hereby stipulate, pursuant to Fed.R.Civ.P.

41(a)(1)(A)(ii), that the action be dismissed without prejudice.

BOSTON SPORTS MEDICINE, INC.,
By its attorneys,

*/s/ Douglas F. Hartman*
_____
Douglas F. Hartman, BBO# 642823
HARTMAN LEONE
One Boston Place
201 Washington Street, 26th Floor
Boston, Massachusetts 02108
P: 617-807-0091
F: 617-507-8334
dhartman@hartmanleone.com

BOSTON SPORTS MEDICINE AND
RESEARCH INSTITUTE, LLC
By its attorney,

*/s/ Lawrence K. DeMeo*
_____
Lawrence K. DeMeo (BBO #: 658867)
MANION GAYNOR & MANNING, LLP
125 High Street
Boston, MA 02110
(617) 670-8800
(617) 670-8801 (fax)
LDemeo@mgmlaw.com

# EXHIBIT H

| Fax | To:<br>Fax: 16176234224 | From: THOMAS J. GILL, MD IV<br>Fax: (781) 251-3532<br>Phone: (781) 251-3535 |
|---|---|---|
| | | |

This fax may contain legally privileged health information and is intended for the sole use of the intended recipient. You are hereby notified that the disclosure, or other unlawful use of this health information is prohibited.

If you received this fax in error visit www.athenahealth.com/NotMyFax to notify the sender and confirm that the information will be destroyed. If you do not have internet access, please call 1-888-482-8436 to notify the sender and confirm that the information will be destroyed. [ID:252635-H-11813]



Boston Sports Medicine
259 Elm Street
Davis Square
Somerville, MA 02144
P: 617-623-6300
F: 617-623-4224

# Fax

Please sign, date, and return ONLY last page as response.

Thank you.

The information in this message is privileged and confidential. If you received this in error, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this message in error, please notify us by telephone immediately, and return original message to us at the above address via the U.S. Postal Service. Thank you.



**Somerville Davis Square**
259 Elm Street
2nd Floor
Somerville, MA  02144

Phone: (617) 623-6300
Fax: (617) 623-4224

Progress Evaluation for
Joshua Fowler
05/04/16
Case: (R) SLAP repair
Therapist(s):
         Lauren Mooney, PT

Referred by: Thomas Gill, MD
Phone: (781) 251-3535
Fax: (781) 251-3532

Diagnosis  :Pain in right shoulder
ICD-9: **M25.511**

## Summary

Pt is a pleasant 28 y/o, R hand dominant, male who presents to physical therapy for evaluation and treatment of his R shoulder pain s/p R shoulder arthroscopic SLAP repair and Bankart on 1/14/16. Pt has been seen 28 times since IE. He presents to re-evaluation with improving ROM and mobility and peri-scapular strength. Pt continues to have weakness with flexion and abduction motions and continues to require education and encouragement to utilize his R UE with ADLs and IADLs. Pt will continue to benefit from skilled PT 1x/week for 4-6 weeks to address functional and clinical impairments and continue to progress through protocol.

## Subjective

**Current Complaints**

**Pain Intensity at Worst:** 0/10: No Pain.

**Current Functional Level**

**Use of Computer:** no discomfort with computer use. **Lying down:** able to sleep on R side with no pain, occasional discomfort.

**Subjective**

**Reports:** Pt presents with low level of residual soreness in R. shoulder due to moving furniture around yesterday.  Feels that he is tolerating program well and has improved strength and ROM.

## Objective

**Outcomes Scores**

| | Result | Note |
|---|---|---|
| **Disabilities of the Arm, Shoulder, and Hand (DASH)** | 20.5 - Minimal to moderate disability (20 - 39) | |
| **Shoulder Passive ROM** | | |
| **Shoulder Flexion PROM** | 155 degrees | mild pain; AROM 150 degrees |
| **Shoulder Abduction PROM** | 175 degrees | minimal pain; AROM 160 degrees |
| **Shoulder External Rotation PROM** | 73 degrees | minimal pain |
| **Shoulder Internal Rotation PROM** | 60 degrees | no pain |
| **Shoulder Muscle Testing** | | |
| **Latissimus dorsi** | 4+ /5 | |
| **Lower Trapezius** | 4+ /5 | |

| | | |
|---|---|---|
| Middle Trapezius | 4+ /5 | |
| **Shoulder Strength Testing** | | |
| Shoulder Abduction Strength | 4 /5 | |
| Shoulder External Rotation Strength | 4- /5 | |
| Shoulder Flexion Strength | 4- /5 | |
| Shoulder Internal Rotation Strength | 4- /5 | |
| **Shoulder Functional Mobility Tests** | | |
| Reach back of opposite shoulder | Able with difficulty | |
| Reach between scapula | Able with difficulty | |
| Reach small of back | Able with difficulty | |
| Reach top of head | Able with difficulty | |

**Today's Treatment**

**Today's Treatment:** See procedures list below for today's treatment. Patient education was conducted.

**Goals**

| Item | Initial | Current | Goal | By Date | Progress | Achieved On |
|---|---|---|---|---|---|---|
| 1: Pain Intensity at Worst | 7/10: Severe Pain. | 0/10: No Pain. | 0/10: No Pain. | 4/25/16 | | |
| 2: Use of Computer | discomfort with computer use. | no discomfort with computer use. | no pain with 8 hour use during work | 2/23/16 | | 3/14/16 |
| 3: Lying down | wakes from pain, unable to lay on R side. | able to sleep on R side with no pain, occasional discomfort | able to sleep without waking due to pain | 3/8/16 | | 3/14/16 |
| 4: Disabilities of the Arm, Shoulder, and Hand (DASH) | 79 - Moderate to severe disability. (60 - 79) | 20.5 - Minimal to moderate disability (20 - 39) | 40 - Moderate disability. (40 - 59) | 4/25/16 | | |
| 5: Shoulder Flexion PROM | 85 degrees | 155 degrees | 180 degrees | 5/9/16 | | |
| 6: Shoulder Abduction PROM | 60 degrees | 175 degrees | 180 degrees | 5/9/16 | | |
| 7: Shoulder External Rotation PROM | 0 degrees | 73 degrees | 90 degrees | 5/9/16 | | |
| 8: Shoulder Internal Rotation PROM | 35 degrees | 60 degrees | 90 degrees | 5/9/16 | | |
| 9: Shoulder Abduction Strength | 3 /5 | 4 /5 | 5 /5 | 5/9/16 | | |
| 10: Shoulder External Rotation Strength | 3 /5 | 4- /5 | 5 /5 | 5/9/16 | | |
| 11: Shoulder Flexion Strength | 3 /5 | 4- /5 | 5 /5 | 5/9/16 | | |
| 12: Shoulder Internal Rotation Strength | 3 /5 | 4- /5 | 5 /5 | 5/9/16 | | |
| 13: Reach back of opposite shoulder | Unable | Able with difficulty | Able | 4/25/16 | | |
| 14: Reach between scapula | Unable | Able with difficulty | Able | 4/25/16 | | |

| 15: Reach small of back | Unable | Able with difficulty | Able | 4/25/16 | | |
| 16: Reach top of head | Unable | Able with difficulty | Able | 4/25/16 | | |

## Assessment

### Assessment

**Today's PT session:** Pt continues to have the most restriction in IR and horizontal adduction ROM. He continues to benefit from education on sleeper stretch to improve this mobility. Pt demonstrated an increase in strength peri-scapular, however has continued significant weakness with active flexion and abduction. Pt was encouraged to continue to return to his normal activity around the home and at work with his R UE.

## Plan

### Daily Note

**Continue:** Same goals. Same treatment plan.

Electronically signed by:
License:
05/05/16 10:14 am

Electronically signed by: Lauren Mooney, PT
PT Lic. #: 20642
on 05/05/16 10:14 am

## Plan of Care Approval for **Joshua Fowler**

Thank you for this referral.

We are required to obtain an approval of Joshua's plan of care. You may approve the plan of care and make any changes to the plan of care by commenting below. As always, please feel free to call us at (617) 623-6300 if you have any questions or concerns.

**Respectfully yours,**

Electronically signed by: Lauren Mooney, PT

05/05/16 10:14 am

### Plan of Care Approval

☒ Approval of the plan of care as documented

☐ Approval of the plan of care with changes noted below

☐ Plan of care is not approved. Ask patient to return to my office.

**Changes to Plan of Care:**

Signature:

*Thomas Gill, M.D.*                **06/17/2016**

Thomas Gill, MD

Approval Date:    /   /

| Fax | To:<br>Fax: 16176234224 | From: THOMAS J. GILL, MD IV<br>Fax: (781) 251-3532<br>Phone: (781) 251-3535 |
|---|---|---|

This fax may contain legally privileged health information and is intended for the sole use of the intended recipient. You are hereby notified that the disclosure, or other unlawful use of this health information is prohibited.

If you received this fax in error visit www.athenahealth.com/NotMyFax to notify the sender and confirm that the information will be destroyed. If you do not have internet access, please call 1-888-482-8436 to notify the sender and confirm that the information will be destroyed. [ID:250447-H-11813]



Boston Sports Medicine
259 Elm Street
Davis Square
Somerville, MA 02144
P: 617-623-6300
F: 617-623-4224



Please sign, date, and return ONLY last page as response.

Thank you.

The information in this message is privileged and confidential.  If you received this in error, you
are hereby notified that any dissemination, distribution, or copying of this communication is
strictly prohibited.  If you have received this message in error, please notify us by telephone
immediately, and return original message to us at the above address via the U.S. Postal Service.
Thank you.



**Somerville Davis Square**
259 Elm Street
2nd Floor
Somerville, MA 02144

Phone: (617) 623-6300
Fax: (617) 623-4224

Initial Evaluation for
Joseph Giesting
04/29/16
Case: L Knee
Therapist(s): Emily Bojorquez, PT
                         Dr. Meaghan Harwood, PT

Referred by: Thomas Gill, MD
Phone: (781) 251-3535
Fax: (781) 251-3532

Diagnosis :Encounter for other specified surgical
aftercare
Pain in left knee
ICD-9: Z48.89
M25.562

---

## Summary

Pt presents to physical therapy for evaluation and treatment of (L) knee pain, ongoing since ACL tibial screw removal and arthroscopic debridement 01/16/16. Pt received PT at another facility for approx 20 visits but he was not pleased with his progress. Pt presents with knee pain, reduced ROM, reduced flexibility, gait abnormalities, balance deficits and significant weakness. pt will benefit from skilled PT 2x/wk for 6wks to address functional deficits outlined in IE.

## Subjective

### Case History

**Onset Description:** Pt presents to physical therapy for evaluation and treatment of (L) knee pain, ongoing since ACL tibial screw removal and arthroscopic debridement 01/16/16. Pt received PT at another facility for approx 20 visits but he was not pleased with his progress. . **Diagnostic Testing / Results:** MRI pre-op. X-rays post-op.

### Current Complaints

**Pain Intensity at Best:** 4/10: Moderate Pain. **Pain Intensity at Worst:** 6/10: Moderate Pain. **Pain Location / Behavior:** diffuse, lateral>medial and anterior knee described as ache, throb and burning. **Aggravating Factors:** any weight bearing, prolonged walking, uneven surfaces, squatting, pivoting, stairs. **Easing Factors:** rest, ice.

### Medical History

**Current Medications:** none. **General Medical History:** h/o ACL reconstruction, patellar tendon graft 20yrs ago, per pt never a full recovery. **Prior Physical Therapy:** Yes. 20 visits at another facility. Treatment included modalities (ultrasound, IFC, russian e-stim), massage and strengthening.

### Treatment / Modality Screening

**Adhesive / Latex Allergy Screen:** Patient denies any known allergies. **Incontinence Screen:** Pt denies any known bowel or bladder incontinence. **Cancer Screen:** Pt denies any known history of CA. **Open Wound Screen:** Patient denies any presence of open wounds. **Implanted Metal Screen:** Patient denies presence of implanted metal. **Pacemaker Screen:** Patient denies presence of implanted pacemaker.

### Current Functional Level

**Standing:** painful >1hr. **Ambulation:** painful, avoided <1mile. **Stairs:** SOS c HR and pain. **Running:** unable.

### Footwear

**Other::** sneakers most of the time.

### Related Habits

**Lifestyle:** enjoys golf and tennis (has not been able to).

### Vocational

**Current Status:** F/T software engineer.

**Pt Goals / Expectations for PT**

**Patient's Goals / Expectations:** walk without pain.

<span style="background:black;color:white">Objective</span>

**Functional Scales**

**Activity Pace:** Score 1: Performs activities at a slow pace. **LEFS - Lower Extremity Functional Scale:** Score 48-59: 60% to 74% of Maximum Function.

**Outcomes Scores**

| Lower Extremity Functional Scale (LEFS) | 51 - Minimal to moderate disability. (48 - 62) | |
|---|---|---|

**Observation**

**Standing Double Leg Squat:** Moderate lateral weight shift to (R), R>L LE adduction. **Posture and Alignment:** dec WB on left, genu valgus deformity on left. **Single Leg Squat:** 0-30deg left, painful, 0-60deg (R). **Balance:** Poor proprioception on (R). **Running:** NT. **Walking:** (R) hip ER with foot clearance, genu valgus/IR collapse on initial contact.

| | Result | Note |
|---|---|---|
| **Hip Screen** | | |
| ROM | WNL | |
| Strength | WNL | |
| **Ankle / Foot Screen** | | |
| ROM | WNL | tight gastroc |
| Strength | WNL | |
| **Knee AROM** | | |
| Knee Extension AROM | 0 degrees | |
| Knee Flexion AROM | 133 degrees | (R) 141 |
| **Knee PROM** | | |
| Knee Extension PROM | 0 degrees | no pain over pressure |
| Knee Flexion PROM | 138 degrees | "tight" overpressure |
| **Knee** | | |
| ACL - Anterior Drawer | Negative | |
| PCL - Posterior Drawer | Negative | |
| MCL - Valgus Stress | Negative | |
| LCL - Varus Test | Negative | |
| Meniscus - McMurray | Negative | |
| Meniscus - Apley's Grind | Negative | |
| Patellar Subluxation - Apprehension | Negative | |
| PFS - Grind | Negative | |
| Distal ITB - Noble's Compression | Negative | |
| **Palpation** | | |
| Alignment | Abnormal | genu valgus deformity |
| Joint Play | Abnormal | tight tibiofemoral anterior |
| Tenderness | Moderate | peroneals, ITB |

| Tissue Integrity | Normal | | |
|---|---|---|---|
| **Lower Extremity Girth Measurement** | | | |
| 10 cm above medial knee joint line | 38.0 cm | | (R) 39.5cm |
| **Balance Tests** | | | |
| Single Leg Stance Eyes Closed | <4 seconds | | |
| Single Leg Stance Eyes Open | 20 seconds | | knee instability |
| **Flexibility** | | | |
| Calf | Abnormal | | |
| Hamstrings | Abnormal | | |
| IT Band | Abnormal | | |
| Quadriceps | Abnormal | | |
| *Bilateral Hip Joint* | Left | Right | |
| **Hip Strength Testing** | | | |
| Hip Extension | 4- /5 | 4+ /5 | |
| Hip Flexion | 4 /5 | 4+ /5 | |
| Hip Abduction | 4 /5 | 4+ /5 | |
| Hip Adduction | 4 /5 | 4+ /5 | |
| Hip Ext Rotation | 3+ /5 | 3+ /5 | |
| Hip Internal Rotation | 4- /5 | 4- /5 | |
| *Bilateral Knee* | Left | Right | |
| **Knee Strength Testing** | | | |
| Knee Extension Strength | 4 /5 | 5 /5 | |
| Knee Flexion Strength | 4 /5 | 4+ /5 | |

## Goals

| Item | Initial | Goal | By Date |
|---|---|---|---|
| *Bilateral Hip Joint* | | | |
| 1: Hip Extension | 4- /5 | 5 /5 | 5/27/16 |
| 2: Hip Flexion | 4 /5 | 5 /5 | 5/27/16 |
| 3: Hip Ext Rotation | 3+ /5 | 5 /5 | 5/27/16 |
| *Bilateral Knee* | | | |
| 4: Knee Extension Strength | 4 /5 | 5 /5 | 5/27/16 |
| | | | |
| 5: Single Leg Stance Eyes Closed | <4 seconds | 15 seconds | 5/27/16 |
| 6: Walking | (R) hip ER with foot clearance, genu valgus/IR collapse on initial contact. | gait to WNL | 6/10/16 |
| 7: Lower Extremity Functional Scale (LEFS) | 51 - Minimal to moderate disability. (48 - 62) | 32 - Moderate disability. (32 - 47) | 6/10/16 |
| 8: Standing Double Leg Squat | Moderate lateral weight shift to (R), R>L LE adduction | 0-90deg without compensation | 6/10/16 |
| 9: Ambulation | painful, avoided <1mile | unlimited community mobility | 6/10/16 |

## Assessment

### Assessment

**Knee Diagnosis:** Pt presents with knee pain, reduced ROM, reduced flexibility and significant weakness s/p arthroscopy and screw removal. Pt has signs/symptoms of lateral compartment OA as well.

### PT Dx/Practice Pattern

**PT Dx/Practice Pattern:** 4D Impairments/Connective Tissue Dysfunction. 4Impairments/Bony or Soft Tissue Surgery.

### Clinical Impairments

**Clinical Impairments:** Pain, weakness, decreased ROM, gait, balance.

### Functional Limitations

**Functional Limitations:** Prolonged standing, walking, stairs, squatting.

### Precautions / Contraindications to Treatment

**Precautions / Contraindications:** None.

### Rehabilitation Potential

**Rehabilitation Potential:** Good.

 **Plan**

### General Care

**General Care:** Coordination, Communication, Documentation.

### Home Exercises / Patient Education

**Home Exercises:** HEP will be progressed according to patient's level of performance while under the supervision of PT and overall progress toward clinical and functional goals. Patient education will be provided throughout the course of therapy to maximize results.

### Supervised Exercises

**Supervised Exercises:** Supervised exercise may include any of the following based on the patient's current needs: aquatic therapy, cardio, open-chain strengthening, closed-chain strengthening, balance / proprioception, stretching.

### Modalities

**Treatment Modalities:** Treatment may include any of the following based on the patient's current needs: thermotherapy, cryotherapy, electric stimulation, ultrasound, cold laser.

### Procedures

**Treatment Procedures:** Treatment may include any of the following based on the patient's current needs: joint mobilization, manual stretching, massage. MFR, TPR, Graston, cupping.

### Treatment Plan Parameters

**Visit Frequency:** 2 visits per week. **Duration:** 6 weeks. **Range of Visits:** For Pattern 4D: 3-36. Eighty percent of patients/clients who are classified into this pattern achieve their goals within the time frame noted.

### Treatment Plan Discussion

**Plan of Care Discussion:** Discussed plan of care, goals and prognosis with patient. Patient understands and agrees with the plan of care.

### Certification

**Necessity and Skill Level:** I certify that these procedures are reasonable and medically necessary for the assessment, treatment, and improvement of the documented impairments and functional limitations. These services require the expert knowledge / guidance of a licensed PT.

Electronically signed by: Emily Bojorquez, PT
License: 18353
05/02/16 7:14 am

Electronically signed by: Dr. Meaghan Harwood, PT
PT Lic. #:20019
05/02/16 7:14 am

## Plan of Care Approval for **Joseph Giesting**

Thank you for this referral.

We are required to obtain an approval of Joseph's plan of care. You may approve the plan of care and make any changes to the plan of care by commenting below. As always, please feel free to call us at (617) 623-6300 if you have any questions or concerns.

**Respectfully yours,**

Electronically signed by: Dr. Meaghan Harwood, PT

05/02/16 7:14 am

## Plan of Care Approval

☐   Approval of the plan of care as documented

☐   Approval of the plan of care with changes noted below

☐   Plan of care is not approved. Ask patient to return to my office.

**Changes to Plan of Care:**

Signature: *Thomas Gill, M.D.*

**05/25/2016**

Thomas Gill, MD

Approval Date:    /    /

09-28-'16 09:04 FROM- Rehab & Spine Dedham 17812513501 T-571 P0001/0004 F-028
Case 1:21-cv-11945-DJC Document 1-25 Filed 12/03/21 Page 106 of 213

08/23/16 08:42:53 Clinicient → athena Outbound Fax Page 001



**Watertown**
36 Arlington Street
at Gymit Health Club
Watertown, MA 02472-5001

Phone: (617) 926-2300
Fax (617) 926-5886

Progress Evaluation for
Katherine Papaporfiriou
08/09/16
Case: post-op R shoulder 5/11/16
Therapist(s):
    Abigail Jamula, PT

Referred by: Thomas Gill, MD
Phone: (781) 251-3535
Fax (781) 251-3532

Diagnosis ;Pain in right shoulder
ICD-9: M25.511

## Summary

Katherine Papaporfiriou is progressing well with her post operative R RTC rehab and according to outlined MD protocol. She continues to have weakness, slight ROM deficits and decreased functional mobility/endurance with daily activities. She will benefit from continuing with PT treatment 1x/week for an additional 4 weeks with anticipated discharge to HEP at that time. She is aware and in agreement with the outlined PT POC and stated goals.

## Subjective

**Current Complaints**

    Pain Intensity at Best: 0/10: No pain. **Pain Intensity at Worst: 6/10:** Moderate Pain.

**Current Functional Level**

    Use of Arms Overhead: Able, but c/o weakness/some pain. **Lying down:** Able to sleep through the night, but unable to maintain R s/l for >30min.

**Subjective**

    Reports: It gets sore, but I'm able to do more.

**Outcomes Scores Correlated to Medicare Impairment Rating**

| | |
|---|---|
| **Quick Disabilities of the Arm, Shoulder, and Hand (DASH) Modified for Medicare Impairment Ratings** | 45 - CK: 40 to 59% Impaired. Moderate disability. (40 - 59) |

## Objective

| | Result | Note |
|---|---|---|
| **Shoulder Active ROM** | | |
| Shoulder Flexion Active Range of Motion | 165 degrees | |
| Shoulder Abduction AROM | 165 degrees | painful arc |
| Shoulder External Rotation AROM | 85 degrees | at 90/90 |
| Shoulder Internal Rotation AROM | 80 degrees | at 90/90 |
| **Shoulder Strength Testing** | | |
| Shoulder Abduction Strength | 3+ /5 | |
| Shoulder External Rotation Strength | 3+ /5 | |
| Shoulder Flexion Strength | 4- /5 | |
| Shoulder Internal Rotation Strength | 4- /5 | |
| **Shoulder Functional Mobility Tests** | | |

| Reach back of opposite shoulder | Able | |
| Reach top of head | Able | |

**Today's Treatment**

Today's Treatment: Please refer to procedures listed above for today's treatment. Patient education was conducted throughout session. Home exercise program will be progressed when applicable and appropriate throughout the patient's duration of treatment.

**Goals**

| Impairment Category | Carrying, Moving & Handling Objects |
| Current Impairment Rating (G8984) | 45% Impairment Level (CK: At least 40 percent but less than 60 percent impaired, limited or restricted) |
| Goal Impairment Rating (G8985) | 20% Impairment Level (CJ: At least 20 percent but less than 40 percent impaired, limited or restricted) |
| Projected Goal Completion Date | 9/9/2016 |
| Rationale for impairment rating | FLR impairment rating based on subjective reports, objective measurements, functional outcome scores, MD post surgical protocol/procedure and PT clinical judgement. |

| Item | Initial | Current | Goal | By Date | Progress | Achieved On |
|---|---|---|---|---|---|---|
| 1: Pain Intensity at Worst | 9/10: Severe Pain. | 6/10: Moderate Pain. | 5/10: Moderate Pain. | 9/9/16 | Good | |
| 2: Pain Intensity at Best | 5/10: Moderate Pain. | 0/10: No pain. | 0/10: No pain. | 9/9/16 | Goal met | 8/9/16 |
| 3: Use of Arms Overhead | Completely unable. | Able, but c/o weakness/some pain | Able, pain free | 9/9/16 | Good | |
| 4: Lying down | Pain/difficulty noted, unable to sleep flat in her bed. | Able to sleep through the night, but unable to maintain R s/l for >30min | Able, pain free. | 9/9/16 | Good | |
| 5: Quick Disabilities of the Arm, Shoulder, and Hand (DASH) Modified for Medicare Impairment Ratings | 80 - CM: 80 to 99% Impaired. Severe disability. (80 - 99) | 45 - CK: 40 to 59% Impaired. Moderate disability. (40 - 59) | 20 - CJ: 20 to 39% Impaired. Minimal to moderate disability. (20 - 39) | 9/9/16 | Good | |
| 6: Shoulder Flexion Active Range of Motion | 0 degrees | 165 degrees | 180 degrees | 9/9/16 | Good | |
| 7: Shoulder Abduction AROM | 0 degrees | 165 degrees | 180 degrees | 9/9/16 | Good | |
| 8: Shoulder External Rotation AROM | 0 degrees | 85 degrees | 90 degrees | 9/9/16 | Good | |
| 9: Shoulder Internal Rotation AROM | 0 degrees | 80 degrees | 90 degrees | 9/9/16 | Good | |
| 10: Shoulder Abduction Strength | NT/5 | 3+/5 | 5/5 | 9/9/16 | Good | |
| 11: Shoulder External Rotation Strength | NT/5 | 3+/5 | 5/5 | 9/9/16 | Good | |
| 12: Shoulder Flexion Strength | NT/5 | 4-/5 | 5/5 | 9/9/16 | Good | |

| 13: Shoulder Internal Rotation Strength | NT /5 | 4- /5 | 5 /5 | 0/9/16 | Good | |
| 14: Reach back of opposite shoulder | Unable | Able | Able | 9/9/16 | Goal met | 8/9/16 |
| 15: Reach small of back | Unable | | Able | 8/9/16 | Goal met | 8/9/16 |
| 16: Reach top of head | Unable | Able | Able | 9/9/16 | Goal met | 8/9/16 |

**Assessment**

### Assessment

**Today's PT session:** Well tolerated. Initiated theraband IR/ER strengthening with good tolerance but significant c/o fatigue following. Applied MHP post session to continue to promote R UT relaxation/decreased tone. Patient in agreement with outlined PT POC of continuing with treatment 1x/week for 4 additional weeks. Her next f/u with MD is in October.

### Compliance

**Attendance to PT:** Regular. **HEP Performance:** Good.

### Progress toward goals

Progress toward goals: Satisfactory.

**Plan**

### Plan

**Plan:** Continue PT 1x/week for 4 weeks, progress towards independent HEP performance. Progress functional strengthening and mobility with regard to symptoms and/or MD instruction.

Electronically signed by:
License:
08/09/16 12:02 pm

Electronically signed by: Abigail Jamula, PT
PT Lic. #: 20686
on 08/09/16 12:02 pm

## Plan of Care Approval for **Katherine Papaporfiriou**

Thank you for this referral.

We are required to obtain an approval of Katherine's plan of care. You may approve the plan of care and make any changes to the plan of care by commenting below. As always, please feel free to call us at (617) 926-2300 if you have any questions or concerns.

Respectfully yours,
Electronically signed by: Abigail Jamula, PT
08/09/16 12:02 pm

### Plan of Care Approval

☑ Approval of the plan of care as documented

☐ Approval of the plan of care with changes noted below

☐ Plan of care is not approved. Ask patient to return to my office.

**Changes to Plan of Care:**

Signature:

Thomas Gill, MD
Approval Date: 9/2/16

| Fax | To:<br>Fax: 16176234224 | From: THOMAS GILL, IV, MD<br>Fax: (617) 779-6555<br>Phone: (617) 779-6500 |
|-----|--------------------------|---------------------------------------------------------------------------|

This fax may contain legally privileged health information and is intended for the sole use of the intended recipient. You are hereby notified that the disclosure, or other unlawful use of this health information is prohibited.

If you received this fax in error visit www.athenahealth.com/NotMyFax to notify the sender and confirm that the information will be destroyed. If you do not have internet access, please call 1-888-482-8436 to notify the sender and confirm that the information will be destroyed. [ID:44967863-H-2017]



Boston Sports Medicine
259 Elm Street
Davis Square
Somerville, MA 02144
P: 617-623-6300
F: 617-623-4224

# Fax

Please sign, date, and return ONLY last page as response.

### Thank you.

The information in this message is privileged and confidential. If you received this in error, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this message in error, please notify us by telephone immediately, and return original message to us at the above address via the U.S. Postal Service. Thank you.



**Somerville Davis Square**
259 Elm Street
2nd Floor
Somerville, MA 02144
Phone: (617) 623-6300
Fax (617) 623-4224

Progress Evaluation for
Cristal Tejeda
10/13/16
Case: s/p ACL reconstruction
Therapist(s):
        Marisa Frank, PT, DPT, CSCS

Referred by: Thomas Gill, MD
Phone: (781) 251-3535
Fax: (781) 251-3532

Diagnosis :Other spontaneous disruption of
anterior cruciate ligament of right knee
ICD-9: M23.611

## Summary

Pt has been attending physical therapy for one month s/p R ACL reconstruction. Pt reports improvement in overall pain, increased ROM and improved tolerance of ADLs. Pt reports continued functional limitations with decreased tolerance in standing, difficulty donning her R shoe and difficulty with squatting. Observed improvements have been significant with improved AROM and PROM, increase in strength and improved ambulation technique. Pt continues to demonstrate functional limitations with decreased ROM into flexion, decreased quad strength especially in terminal knee extension, abnormal gait and abnormal stair navigation. Pt would continue to benefit from skilled physical therapy. Thank you for this referral.

## Subjective

**Current Complaints**

**Pain Intensity at Best:** 0/10: No pain. **Pain Intensity at Worst:** 4/10: Moderate Pain. **Easing Factors:** rest, ice, no movement, decreased WB. **Pain Frequency:** Intermittent, Daily. **Pain in response to the following activitivies:** WB, ambulation, stretching. **Pain Localization:** Patient has no difficulty localizing pain at site of injury.

**Medical History**

**Current Medications:** motrin. **Prior Physical Therapy:** Yes, prior to this calendar year.

**Functional Level At Present**

**ADL Problems:** Trouble getting R sock on. . **Ambulation Problems:** . No problems. **Ambulation Tolerance:** Able to walk without significant pain for 20-30 min. **Driving Tolerance:** Able to drive an automobile 45-60 min. before significant pain develops. **Stair Climbing Ability:** Ascends or descends stairs with minimal pain. **Standing Tolerance:** Able to stand 15-30 min. before significant pain develops.

## Objective

**Outcomes Scores**

**Lower Extremity Functional Scale (LEFS)**

49 - Minimal to moderate disability.
(48 - 62)

**Gait**

**Abnormality:** Pt is currently ambulating without knee brace. Pt is able to demonstrate improved ambulation with decreased TKE during initial contact, decreased knee flexion during mid stance and decreased push-off.

|  | Result | Note |
|---|---|---|
| **Flexibility** |  |  |
| Calf | Normal |  |
| Hamstrings | Abnormal |  |

| | | |
|---|---|---|
| Hip Flexors | Normal | |
| IT Band | Normal | |
| Quadriceps | Normal | |

**Muscle Atrophy**
   Hip and Thigh: VMO.

| | Result | Note |
|---|---|---|
| **Knee AROM** | | |
|   Knee Extension AROM | -5 degrees | |
|   Knee Flexion AROM | 110 degrees | |
| **Knee PROM** | | |
|   Knee Extension PROM | 0 degrees | |
|   Knee Flexion PROM | 112 degrees | |

**General Core Strength**
   TA Activation: Fair.

| | Result | Note |
|---|---|---|
| **Hip Strength Testing** | | |
|   Hip Extension | 3+ /5 | |
|   Hip Flexion | 3+ /5 | |
|   Hip Abduction | 3+ /5 | |
|   Hip Adduction | 3+ /5 | |
|   Hip Ext Rotation | 3 /5 | |
|   Hip Internal Rotation | 3 /5 | |
| **Knee Strength Testing** | | |
|   Knee Extension Strength | 3 /5 | |
|   Knee Flexion Strength | 3+ /5 | |
| **Palpation** | | |
|   Crepitation with Movement | Negative | |
|   Tenderness | Moderate | |
|   Tissue Integrity | Swollen | |
| **Girth Measurement** | | |
|   10 cm. above joint line | 52 cm | L 44 |
|   At joint line | 47 cm | L 44 |
|   5 cm. below joint line | 46 cm | L44.5 |
| **Lower Extremity Function** | | |
|   One leg stance, eyes open | 15 seconds | |
| **Activity Tolerance** | | |
|   Bilat Squats | 2 reps | |

**Today's Treatment**
   **Today's Treatment:** Please refer to procedures listed above for today's treatment. Patient education was conducted.

throughout session. Home exercise program will be progressed when applicable and appropriate throughout the patient's duration of treatment.

| | Result | | | Note | | |
|---|---|---|---|---|---|---|
| **Strength** | | | | | | |
| Screening | Abnormal | | | | | |

**Goals**

| Item | Initial | Current | Goal | By Date | Progress | Achieved On |
|---|---|---|---|---|---|---|
| 1: Pain Intensity at Worst | 7/10: Severe Pain. | 4/10: Moderate Pain. | 2/10: Minimal Pain. | 12/15/16 | | |
| 2: Pain Frequency | Constant. | Intermittent, Daily | Occasional, Less Than Daily | 12/15/16 | | |
| 3: Ambulation Tolerance | Able to walk without significant pain for < 10 min. | Able to walk without significant pain for 20-30 min. | Able to walk without significant pain for 30-45 min. | 12/15/16 | | |
| 4: Stair Climbing Ability | Ascends or descends stairs with significant pain. | Ascends or descends stairs with minimal pain | Ascends or descends stairs without any pain | 12/15/16 | | |
| 5: Driving Tolerance | Able to drive an automobile 10-15 min. before significant pain develops | Able to drive an automobile 45-60 min. before significant pain develops | Able to drive an automobile over two hours without significant pain. | 12/15/16 | | |
| 6: 10 cm. above joint line | 55 cm | 52 cm | 46 cm | 12/15/16 | | |
| 7: Tenderness | Moderate | Moderate | Absent | 12/15/16 | | |
| 8: One leg stance, eyes open | <5 seconds | 15 seconds | 30 seconds | 12/15/16 | | |
| 9: Hip Abduction | 3 /5 | 3+ /5 | 5 /5 | 12/15/16 | | |
| 10: Hip Flexion | 3 /5 | 3+ /5 | 5 /5 | 12/15/16 | | |
| 11: Knee Extension AROM | -12 degrees | -5 degrees | 0 degrees | 12/15/16 | | |
| 12: Knee Flexion AROM | 72 degrees | 110 degrees | 140 degrees | 12/15/16 | | |

**Assessment**

### Assessment

**Knee Diagnosis:** R ACL reconstruction. **Diagnosis and Impression:** Observed improvements have been significant with improved AROM and PROM, increase in strength and improved ambulation technique. Pt continues to demonstrate functional limitations with decreased ROM into flexion, decreased quad strength especially in terminal knee extension, abnormal gait and abnormal stair navigation. Pt would continue to benefit from skilled physical therapy. **Examination Response:** Good tolerance to examination. **Prognosis and Rehabilitation Potential:** During the episode of care, pt will achieve anticipated goals/expected global outcomes of interventions described in the plan of care for the patients classified in this pattern. Good rehab potential. **Treatment Response:** Good symptom relief with today's treatment. **Today's PT session:** Treatment emphasis was placed on increasing overall quad activation. Pt was able to tolerate progression in exercise without increase in pain. Pt continues to demonstrate most tenderness in medial tibial knee pain. Pt was indicated to continue to stretch the knee into extension since gait continues to be with bent knee.

### Compliance

**Attendance to PT:** Regular. **HEP Performance:** Good.

### Progress toward goals

Progress toward goals: Satisfactory.

PT Dx/Practice Pattern

PT Dx/Practice Pattern: 4D Impairments/Connective Tissue Dysfunction.



### General Care

General Care: Coordination, Communication, Documentation.

### Treatment Plan Parameters

Range of Visits: For Pattern 4D: 3-36. The lower and upper limits of the # of PT visits required to achieve goals and expected outcomes. 80% percent of patients who are classified into this pattern fall into this range.

### Treatment Plan Discussion

Expected Ultimate Outcomes: Complete restoration of function; Decrease the frequency, severity and duration of exacerbations; Independent HEP. **Plan of Care Discussion:** Discussed plan of care, goals and prognosis with patient Patient understands and agrees with the plan of care.

### Certification

Necessity and Skill Level: I certify that these procedures are reasonable and medically necessary for the assessment, treatment, and improvement of the documented impairments and disabilities. These services require the expert

### Pt to Call or E-Mail

for any of the following reasons: Upon any increase in symptoms; including pain, swelling, tingling, or numbness; If there is any problem with home exercises or home program; If there is any question about the treatment plan.

### Knee Plan of Care

Duration: Eight weeks. **Frequency:** Twice weekly. **Home Exercises:** 4 Way Leg Lifts. Isometrics. Closed Chain Exercise for Strengthening. Terminal Knee Extension. **Supervised Exercises:** Closed chain strengthening and stabilization. **Treatment Modalities:** Ice Packs. Interferential Electrical Stimulation. Ultrasound. Cold laser. **Treatment Procedures:** Joint Mobilization. Manual Stretching. Massage. **Treatment Progression:** Progress to more active home exercise program after symptoms subside.

### Plan

Plan: Progress functional strengthening and mobility with regard to symptoms and/or MD instruction.

Electronically signed by:
License:
10/14/16 10:36 am

Electronically signed by: Marisa Frank, PT, DPT, CSCS
PT Lic. #: 19384
on 10/14/16 10:36 am

## Plan of Care Approval for Cristal Tejeda

Thank you for this referral.

We are required to obtain an approval of Cristal's plan of care. You may approve the plan of care and make any changes to the plan of care by commenting below. As always, please feel free to call us at (617) 623-6300 if you have any questions or concerns.

Respectfully yours,

**Electronically signed by THOMAS GILL, IV, MD on 11/28/2016 at 03:20:48 PM**

Electronically signed by: Marisa Frank, PT, DPT, CSCS
10/14/16 10:36 am

### Plan of Care Approval

☐   Approval of the plan of care as documented

☐   Approval of the plan of care with changes noted below

☐   Plan of care is not approved. Ask patient to return to my office.

**Changes to Plan of Care:**

Signature:

Thomas Gill, MD

Approval Date:    /    /

| Fax | To:<br>Fax: 16179265886 | From: THOMAS J. GILL, MD IV<br>Fax: (781) 251-3532<br>Phone: (781) 251-3535 |
|---|---|---|

This fax may contain legally privileged health information and is intended for the sole use of the intended recipient. You are hereby notified that the disclosure, or other unlawful use of this health information is prohibited.

If you received this fax in error visit www.athenahealth.com/NotMyFax to notify the sender and confirm that the information will be destroyed. If you do not have internet access, please call 1-888-482-8436 to notify the sender and confirm that the information will be destroyed. [ID:242092-H-11813]



**Watertown**
36 Arlington Street
at GymIt Health Club
Watertown, MA  02472-5001

Phone: (617) 926-2300
Fax: (617) 926-5886

Initial Evaluation for
Dennis Woods
03/01/16
Case: R quad rupture
Therapist(s):
Justin J. Wu, PT

Referred by: Thomas Gill, MD
Phone: (781) 251-3535
Fax: (781) 251-3532

Diagnosis :Unspecified injury of right quadriceps
muscle, fascia and tendon, initial encounter
ICD-9: S76.101A

---

## Summary

Pt is a 65 year old male who is seen in PT s/p R quad rupture repair performed on 1/14/16. Pt's impairments include pain, decreased ROM, decreased endurance, and decreased strength. Currently, he is 7 weeks s/p and will see MD for follow-up on 3/23/16. Anticipate that at his follow-up he will be slowly weaned out of immobilizer. Otherwise, PT will be focused on phase 2 of protocol and he will benefit from skilled PT 1-2x/week for 12-14 weeks.

## Subjective

### Case History

**Onset Description:** Pt reports that on 12/29/15 he fell and tore his R quad and L RTC. He had surgical repair of his R quad on 1/14/16 with no post op complications. He was discharged home after spending a couple days at the hospital with home PT. He saw his MD for a follow up 2 weeks s/p who reports to continue home PT and then to begin outpatient PT when applicable. He was d/c from home PT on 2/25 and is now seen at BSM for rehab. **Recent Symptom Trend:** No change. **Diagnostic Testing / Results:** None taken since surgery. **Precautions:** See protocols.

### Current Complaints

**Pain Intensity at Best:** 0/10: No pain. **Pain Intensity at Worst:** 1/10: Min Pain. **Pain Location / Behavior:** R quad. **Aggravating Factors:** Unsure, hasn't been using RLE secondary to being in brace. **Easing Factors:** Rest.

### Medical History

**Current Medications:** See pt intake. **General Medical History:** HTN. **Prior Physical Therapy:** Pt has had PT in the past for separate issues.

### Treatment / Modality Screening

**Adhesive / Latex Allergy Screen:** Patient denies any known allergies. **Incontinence Screen:** Pt denies any known bowel or bladder incontinence. **Cancer Screen:** Pt denies any known history of CA. **Open Wound Screen:** Incision site healing. **Implanted Metal Screen:** Patient denies presence of implanted metal. **Pacemaker Screen:** Patient denies presence of implanted pacemaker.

### Current Functional Level

**Standing:** Using a SC and immobilizer. **Ambulation:** SC with immobilizer. **Stairs:** Circumduction and heavy reliance on railing, immobilizer.

### Functional Defects

**Primary Functional Limitation:** Patient is unable to use his RLE functionally and must be immobilizer at this time.

### Related Habits

**Lifestyle:** Prior to injury, pt was relatively sedentary.

### Vocational

**Current Status:** Full-time real estate, pt sits for prolonged periods of time.

### Pt Goals / Expectations for PT

**Patient's Goals / Expectations:** To use RLE functionally.

**Outcomes Scores Correlated to Medicare Impairment Rating**

The scores reported below are based on widely accepted functional assessment tools. OPTIMAL © Copyright 2012, 2006, 2005 American Physical Therapy Association. All Rights Reserved: The score interpretations have been modified to give an approximate correlation of the score to the Medicare Impairment Rating.

| Lower Extremity Functional Scale (LEFS) Modified for Medicare Impairment Ratings | 22 - CL: 60 to 79% Impaired. Moderate to severe disability. (17 - 31) | |
|---|---|---|

## Objective

### Observation

**Balance:** NT. **Standing Double Leg Squat:** NT. **Posture and Alignment:** In immobilizer with SC. **Walking:** With Immobilizer and SC: circumduction, 2 point gait pattern.

| | Result | Note |
|---|---|---|
| **Knee AROM** | | |
| Knee Extension AROM | 3 degrees | |
| Knee Flexion AROM | 80 degrees | seated |
| **Knee PROM** | | |
| Knee Extension PROM | 0 degrees | |
| Knee Flexion PROM | 90 degrees | per protocol, seated |
| **Hip Strength Testing** | | |
| Hip Extension | NT /5 | |
| Hip Flexion | NT /5 | |
| Hip Abduction | NT /5 | |
| **Knee Strength Testing** | | |
| Knee Extension Strength | NT /5 | |
| Knee Flexion Strength | NT /5 | |
| **Knee** | | |
| ACL - Anterior Drawer | Negative | |
| PCL - Posterior Drawer | Negative | |
| MCL - Valgus Stress | Negative | |
| LCL - Varus Test | Negative | |
| Meniscus - McMurray | Negative | s/p R quad repair |
| Meniscus - Apley's Grind | Negative | |
| Patellar Subluxation - Apprehension | Negative | (-) Homan's |
| PFS - Grind | Negative | |
| Distal ITB - Noble's Compression | Negative | |
| **Palpation** | | |
| Alignment | WNL | |
| Tenderness | Minimal: around incision site, quad, gastroc | |
| Tissue Integrity | Firm and swollen | |

## Goals

| | | | |
|---|---|---|---|
| **Impairment Category** | Mobility: Walking & Moving Around | | |
| **Current Impairment Rating (G8978)** | 80% Impairment Level (CM: At least 80 percent but less than 100 percent impaired, limited or restricted) | | |
| **Goal Impairment Rating (G8979)** | 20% Impairment Level (CJ: At least 20 percent but less than 40 percent impaired, limited or restricted) | | |
| **Projected Goal Completion Date** | 6/21/2016 | | |
| **Rationale for impairment rating** | Functional Assessment Score Correlated to Impairment Rating, Functional Assessment Tool Score, Clinical Tests, Clinical Judgment, Patient Report | | |

| Item | Initial | Goal | By Date |
|---|---|---|---|
| 1: Pain Intensity at Worst | 1/10: Min Pain. | 0/10: No Pain. | 6/21/16 |
| 2: Standing | Using a SC and immobilizer. | Able to stand without AD and 0/10 pain for 2 hours. | 6/21/16 |
| 3: Ambulation | SC with immobilizer. | Able to ambulate 1 mile without use of AD and 0/10 pain. | 6/21/16 |
| 4: Stairs | Circumduction and heavy reliance on railing, immobilizer. | Able to negotiate 1 FLOS with 0/10 pain | 6/21/16 |
| 5: Lower Extremity Functional Scale (LEFS) Modified for Medicare Impairment Ratings | 22 - CL: 60 to 79% Impaired. Moderate to severe disability. (17 - 31) | 65 - CI: 1 to 19% Impaired. Minimal disability. Avoids prolonged or advanced mobility. (63 - 79) | 6/21/16 |
| 6: Walking | With Immobilizer and SC: circumduction, 2 point gait pattern. | WNL | 6/21/16 |
| 7: Balance | NT. | 30 sec SLS | 6/21/16 |
| 8: Standing Double Leg Squat | NT. | 5 double leg squats with 0/10 pain. | 6/21/16 |
| 9: Knee Extension AROM | 3 degrees | 0 degrees | 6/21/16 |
| 10: Knee Flexion AROM | 80 degrees | 140 degrees | 6/21/16 |
| 11: Knee Extension PROM | 0 degrees | 0 degrees | 6/21/16 |
| 12: Knee Flexion PROM | 90 degrees | 140 degrees | 6/21/16 |
| 13: Hip Extension | NT /5 | 5 /5 | 6/21/16 |
| 14: Hip Flexion | NT /5 | 5 /5 | 6/21/16 |
| 15: Hip Abduction | NT /5 | 5 /5 | 6/21/16 |
| 16: Knee Extension Strength | NT /5 | 5 /5 | 6/21/16 |
| 17: Knee Flexion Strength | NT /5 | 5 /5 | 6/21/16 |

**Assessment**

## Assessment

**Diagnosis:** This patient does/does not have a diagnosis that is exempt from the Medicare cap. Pt presents with measurable impairments that are directly causing loss of function. **Barriers To Rehab:** The patient has other medical complications that may delay recovery from this injury. **Impression:** Without physical therapy the patient will not be able to resume normal activities.. It is expected that this patient's treatment will exceed the Medicare cap due to complications including age, comorbidities, severity of impairments and dysfunction.

**PT Dx/Practice Pattern**

**PT Dx/Practice Pattern:** 4D Impairments/Connective Tissue Dysfunction. 4I Impairments/Bony or Soft Tissue Surgery.

**Clinical Impairments**

**Clinical Impairments:** Pain, decreased ROM, decreased endurance, decreased strength.

**Functional Limitations**

**Functional Limitations:** Pain and inability to use RLE secondary to precautions and surgery.

**Clinical Impression**

**Clinical Impression:** Pt's s/s are consistent with s/p R quad repair.

**Precautions / Contraindications to Treatment**

**Precautions / Contraindications:** See PT protocol.

**Rehabilitation Potential**

**Rehabilitation Potential:** Good.



**Plan**

**General Care**

**General Care:** Coordination, Communication, Documentation.

**Home Exercises / Patient Education**

**Home Exercises:** HEP will be progressed according to patient's level of performance while under the supervision of PT and overall progress toward clinical and functional goals. Patient education will be provided throughout the course of therapy to maximize results.

**Supervised Exercises**

**Supervised Exercises:** Supervised exercise may include any of the following based on the patient's current needs: aquatic therapy, cardio, open-chain strengthening, closed-chain strengthening, balance / proprioception, stretching.

**Modalities**

**Treatment Modalities:** Treatment may include any of the following based on the patient's current needs: thermotherapy, cryotherapy, electric stimulation, ultrasound, cold laser.

**Procedures**

**Treatment Procedures:** Treatment may include any of the following based on the patient's current needs: joint mobilization, manual stretching, massage, IASTM, TPR, and ART.

**Treatment Plan Parameters**

**Visit Frequency:** 2 visits per week. **Duration:** 8 weeks. **Range of Visits:** For Pattern 4D and I: 3-36. Eighty percent of patients/clients who are classified into this pattern achieve their goals within the time frame noted.

**Treatment Plan Discussion**

**Plan of Care Discussion:** Discussed plan of care, goals and prognosis with patient. Patient understands and agrees with the plan of care.

**Certification**

**Necessity and Skill Level:** I certify that these procedures are reasonable and medically necessary for the assessment, treatment, and improvement of the documented impairments and functional limitations. These services require the expert knowledge / guidance of a licensed PT.

Electronically signed by:
License:
03/01/16 7:01 pm

Electronically signed by: Justin J. Wu, PT
PT Lic. #:20432
03/01/16 7:01 pm

**Plan of Care Approval for Dennis Woods**

Thank you for this referral.

We are required to obtain an approval of Dennis's plan of care. You may approve the plan of care and make any changes to the plan of care by commenting below. As always, please feel free to call us at (617) 926-2300 if you have any questions or concerns.

**Respectfully yours,**

Electronically signed by: Justin J. Wu, PT

03/01/16 7:01 pm

**Plan of Care Approval**

☐   Approval of the plan of care as documented

☐   Approval of the plan of care with changes noted below

☐   Plan of care is not approved. Ask patient to return to my office.

**Changes to Plan of Care:**

Signature:

*Thomas Gill, M.D.*

Thomas Gill, MD

Approval Date:    /    /

**03/09/2016**



**Boston Sports Medicine
Brookline**
54 Harvard St

Brookline, MA  02445

Phone: (617) 262-0030
Fax: (617) 396-3040

Initial Evaluation for
Sybil Levisohn
02/03/15
Case: Baker's Cyst
Therapist(s):
         Jennifer Mohns, PT

Referred by: Thomas Gill, MD
Phone: (617) 779-6500
Fax:  (617) 779-6555

Diagnosis  :Sprain of knee & leg NOS
ICD-9: 844.9

---

## Summary

Sybil Levisohn presents to physical therapy with complaints of R knee pain which started on 9/2/14 due to dancing. MRI reveals old meniscus injury c Baker's cyst. Clinically, she demonstrates R knee pain, Baker's cyst, postural dysfunction, gait abnormalities, as well as deficits in R knee flexibility, strength, and stability. This patient would benefit from skilled PT services in order to address the above concerns through manual therapy, stretching, strengthening, stability training, and modalities PRN. Patient to be seen 1-2x/week for 8 weeks; plan to re-evaluate in 1 month.

## Subjective

### Case History

**Onset Description:** Patient reports L knee pain that started when she was dancing at a wedding on 9/2/2014. She reports that she had stiffness in the knee on that same day leading up to the incident. She reports that she had been on a significant hike a couple of weeks before and she thinks she may have aggravated the knee then. She went to see her PCP who was concerned about a blood clot which upon ultrasound a baker's cyst. She then went to see Dr. Gill who took images of her knee and found the cyst and normal wear/tear of the meniscus with underlying arthritis. She then participated in physical therapy. **Recent Symptom Trend:** condition unchanged. **Diagnostic Testing / Results:** ultrasound to L knee: Baker's cyst. **Precautions:** activity as tolerated.

### Current Complaints

**Pain Intensity at Best:** 4/10: Moderate pain. **Pain Intensity at Worst:** 8/10: Severe Pain. **Pain Location / Behavior:** entire the R knee joint and calf. **Aggravating Factors:** all weight bearing activities. **Easing Factors:** rest, massage, ultrasound.

### Medical History

**Current Medications:** levothryroxine and advil. **General Medical History:** Pt denies any other significant PMH. **Prior Physical Therapy:** None.

### Treatment / Modality Screening

**Adhesive / Latex Allergy Screen:** Patient denies any known allergies. **Incontinence Screen:** Pt denies any known bowel or bladder incontinence. **Cancer Screen:** Pt denies any known history of CA. **Open Wound Screen:** Patient denies any presence of open wounds. **Implanted Metal Screen:** Patient denies presence of implanted metal. **Pacemaker Screen:** Patient denies presence of implanted pacemaker.

### Current Functional Level

**Standing:** 10-15 minutes. **Ambulation:** 20 minutes. **Stairs:** significant pain with ascending>descending.

### Footwear

**Other::** sneakers.

### Related Habits

**Lifestyle:** patient enjoys going for long walks.

### Vocational

**Current Status:** retired.

### Pt Goals / Expectations for PT

**Patient's Goals / Expectations:** reduce pain at R knee and calf, return to pain-free walking and stairs.

## Objective

**Functional Scales**

**Activity Pace:** Score 1: Performs activities at a slow pace. **LEFS - Lower Extremity Functional Scale:** Score 36-47: 45% to 59% of Maximum Function.

**Observation**

**Balance:** SLS for 8 seconds on R side and 12 seconds on L side. **Posture and Alignment:** pes planus and genu valgum. **Single Leg Squat:** n/a. **Standing Double Leg Squat:** discomfort past 60 degrees. **Walking:** decreased knee flexion and extension on the R side.

| | Result | Note |
|---|---|---|
| **Hip Screen** | | |
| **ROM** | WNL | |
| **Strength** | Abnormal | gluteal weakness |
| **Ankle / Foot Screen** | | |
| **ROM** | WNL | |
| **Strength** | Abnormal | gastroc weakness |
| **Knee AROM** | | |
| **Knee Extension AROM** | 0 degrees | |
| **Knee Flexion AROM** | 115 degrees | |
| **Knee PROM** | | |
| **Knee Extension PROM** | 0 degrees | |
| **Knee Flexion PROM** | 118 degrees | |
| **Hip Strength Testing** | | |
| **Hip Extension** | 4 /5 | |
| **Hip Flexion** | 4 /5 | |
| **Hip Abduction** | 3+ /5 | |
| **Hip Adduction** | 4- /5 | |
| **Hip Ext Rotation** | 3+ /5 | |
| **Hip Internal Rotation** | 4 /5 | |
| **Knee Strength Testing** | | |
| **Knee Extension Strength** | 4- /5 | |
| **Knee Flexion Strength** | 4- /5 | |
| **Knee** | | |
| **ACL - Anterior Drawer** | Negative | |
| **PCL - Posterior Drawer** | Negative | |
| **MCL - Valgus Stress** | Negative | |
| **LCL - Varus Test** | Negative | |
| **Meniscus - McMurray** | Negative | |
| **Meniscus - Apley's Grind** | Negative | |
| **Patellar Subluxation - Apprehension** | Negative | |
| **PFS - Grind** | Negative | |
| **Distal ITB - Noble's Compression** | Negative | |
| **Flexibility Screening** | | |
| **Flexibility Screening** | Abnormal | R gastroc and HS |
| **Palpation** | | |
| **Alignment** | WNL | |

| | | |
|---|---|---|
| **Tenderness** | Moderate | R gastroc and medial knee |
| **Tissue Integrity** | Spasm palpated | R gastroc and medial knee |

## Goals

| Item | Initial | Goal | By Date |
|---|---|---|---|
| **1: Pain Intensity at Worst** | 8/10: Severe Pain. | 0/10: No Pain. | 4/3/15 |
| **2: Standing** | 10-15 minutes. | 60 minutes | 4/3/15 |
| **3: Stairs** | significant pain with ascending>descending. | WNL | 4/3/15 |
| **4: Ambulation** | 20 minutes | 90 minutes | 4/3/15 |
| **5: Activity Pace** | Score 1: Performs activities at a slow pace. | Score 3: Performs activities at customary pace | 4/3/15 |
| **6: LEFS - Lower Extremity Functional Scale** | Score 36-47: 45% to 59% of Maximum Function. | Score 72-80: 90% to 100% of Maximum Function | 4/3/15 |
| **7: Walking** | decreased knee flexion and extension on the R side. | Unremarkable | 4/3/15 |
| **8: Knee Flexion PROM** | 118 degrees | 140 degrees | 4/3/15 |
| **9: Hip Abduction** | 3+ /5 | 5 /5 | 4/3/15 |
| **10: Hip Ext Rotation** | 3+ /5 | 5 /5 | 4/3/15 |
| **11: Hip Adduction** | 4- /5 | 5 /5 | 4/3/15 |
| **12: Knee Extension Strength** | 4- /5 | 5 /5 | 4/3/15 |
| **13: Knee Flexion Strength** | 4- /5 | 5 /5 | 4/3/15 |

## Assessment

**PT Dx/Practice Pattern**
    **PT Dx/Practice Pattern:** 4D Impairments/Connective Tissue Dysfunction.
**Clinical Impairments**
    **Clinical Impairments:** R knee pain, Baker's cyst, postural dysfunction, gait abnormalities, as well as deficits in R knee flexibility, strength, and stability.
**Functional Limitations**
    **Functional Limitations:** all weight bearing activities.
**Clinical Impression**
    **Clinical Impression:** good rehab prognosis.
**Precautions / Contraindications to Treatment**
    **Precautions / Contraindications:** None.
**Rehabilitation Potential**
    **Rehabilitation Potential:** Good.

## Plan

**General Care**
    **General Care:** Coordination, Communication, Documentation.
**Home Exercises / Patient Education**
    **Home Exercises:** HEP will be progressed according to patient's level of performance while under the supervision of PT and overall progress toward clincal and functional goals.  Patient education will be provided throughout the course of therapy to maximize results.
**Supervised Exercises**
    **Supervised Exercises:** Supervised exercise may include any of the following based on the patient's current needs:  aquatic therapy, cardio, open-chain strengthening, closed-chain strengthening, balance / proprioception, stretching.

**Modalities**

**Treatment Modalities:** Treatment may include any of the following based on the patient's current needs:  thermotherapy, cryotherapy, electric stimulation, ultrasound, cold laser.

**Procedures**

**Treatment Procedures:** Treatment may include any of the following based on the patient's current needs:  joint mobilization, manual stretching, massage. MFR, TPR, Graston, cupping.

**Treatment Plan Parameters**

**Visit Frequency:** 2 visits per week. **Duration:** 8 weeks. **Range of Visits:** For Pattern 4D: 3-36. Eighty percent of patients/clients who are classified into this pattern achieve their goals within the time frame noted.

**Treatment Plan Discussion**

**Plan of Care Discussion:** Discussed plan of care, goals and prognosis with patient.  Patient understands and agrees with the plan of care.

**Certification**

**Necessity and Skill Level:** I certify that these procedures are reasonable and medically necessary for the assessment, treatment, and improvement of the documented impairments and functional limitations.  These services require the expert knowledge / guidance of a licensed PT.

Electronically signed by:
License:
02/05/15 11:25 am

Electronically signed by: Jennifer Mohns, PT
PT Lic. #:19758
02/05/15 11:25 am

**Plan of Care Approval for Sybil Levisohn**

Thank you for this referral.

We are required to obtain an approval of Sybil's plan of care.  You may approve the plan of care and make any changes to the plan of care by commenting below.  As always, please feel free to call us at (617) 262-0030 if you have any questions or concerns.

**Respectfully yours,**
Electronically signed by: Jennifer Mohns, PT
02/05/15 11:25 am

**Plan of Care Approval**

☐    Approval of the plan of care as documented

☐    Approval of the plan of care with changes noted below

☐    Plan of care is not approved. Ask patient to return to my office.

**Changes to Plan of Care:**

Signature:


Thomas Gill, MD

Approval Date:     /    /



**Boston Sports Medicine Brookline**
54 Harvard St
Brookline, MA  02445

Phone: (617) 262-0030
Fax: (617) 396-3040

Progress Evaluation for
Sybil Levisohn
03/26/15
Case: Baker's Cyst
Therapist(s):
      Jennifer Mohns, PT

Referred by: Thomas Gill, MD
Phone: (617) 779-6500
Fax:  (617) 779-6555

Diagnosis  :Sprain of knee & leg NOS
ICD-9: 844.9

## Summary

Sybil Levisohn returns to physical therapy after 6 weeks of traveling. She underwent a cortisone injection and aspiration to the Baker's cyst. She return to PT with less complaints of R knee pain but no other improvements have been made at this time due to taking a break from PT. This injury started on 9/2/14 due to dancing. MRI reveals old meniscus injury c Baker's cyst. Clinically, she demonstrates R knee pain, Baker's cyst, postural dysfunction, gait abnormalities, as well as deficits in R knee flexibility, strength, and stability. This patient would benefit from skilled PT services in order to address the above concerns through manual therapy, stretching, strengthening, stability training, and modalities PRN. Patient to be seen 1-2x/week for 8 weeks; plan to re-evaluate in 1 month.

## Subjective

**Case History**

    **Onset Description:** Patient reports L knee pain that started when she was dancing at a wedding on 9/2/2014. She reports that she had stiffness in the knee on that same day leading up to the incident. She reports that she had been on a significant hike a couple of weeks before and she thinks she may have aggravated the knee then. She went to see her PCP who was concerned about a blood clot which upon ultrasound a baker's cyst. She then went to see Dr. Gill who took images of her knee and found the cyst and normal wear/tear of the meniscus with underlying arthritis. She then participated in physical therapy. **Recent Symptom Trend:** condition unchanged. **Diagnostic Testing / Results:** ultrasound to L knee: Baker's cyst. **Precautions:** activity as tolerated.

**Current Complaints**

    **Pain Intensity at Best:** 4/10: Moderate pain. **Pain Location / Behavior:** entire the R knee joint and calf. **Aggravating Factors:** all weight bearing activities. **Easing Factors:** rest, massage, ultrasound.

**Medical History**

    **Current Medications:** levothryroxine and advil. **General Medical History:** Pt denies any other significant PMH. **Prior Physical Therapy:** None.

**Treatment / Modality Screening**

    **Adhesive / Latex Allergy Screen:** Patient denies any known allergies. **Incontinence Screen:** Pt denies any known bowel or bladder incontinence. **Cancer Screen:** Pt denies any known history of CA. **Open Wound Screen:** Patient denies any presence of open wounds. **Implanted Metal Screen:** Patient denies presence of implanted metal. **Pacemaker Screen:** Patient denies presence of implanted pacemaker.

**Footwear**

    **Other::** sneakers.

**Related Habits**

    **Lifestyle:** patient enjoys going for long walks.

**Vocational**

    **Current Status:** retired.

**Pt Goals / Expectations for PT**

    **Patient's Goals / Expectations:** reduce pain at R knee and calf, return to pain-free walking and stairs.

## Objective

**Observation**
**Balance:** SLS for 8 seconds on R side and 12 seconds on L side. **Posture and Alignment:** pes planus and genu valgum. **Single Leg Squat:** n/a. **Standing Double Leg Squat:** discomfort past 60 degrees.

| | Result | Note |
|---|---|---|
| **Hip Screen** | | |
| **ROM** | WNL | |
| **Strength** | Abnormal | gluteal weakness |
| **Ankle / Foot Screen** | | |
| **ROM** | WNL | |
| **Strength** | Abnormal | gastroc weakness |
| **Knee AROM** | | |
| **Knee Extension AROM** | 0 degrees | |
| **Knee Flexion AROM** | 115 degrees | |
| **Knee PROM** | | |
| **Knee Extension PROM** | 0 degrees | |
| **Hip Strength Testing** | | |
| **Hip Extension** | 4 /5 | |
| **Hip Flexion** | 4 /5 | |
| **Hip Internal Rotation** | 4 /5 | |
| **Knee** | | |
| **ACL - Anterior Drawer** | Negative | |
| **PCL - Posterior Drawer** | Negative | |
| **MCL - Valgus Stress** | Negative | |
| **LCL - Varus Test** | Negative | |
| **Meniscus - McMurray** | Negative | |
| **Meniscus - Apley's Grind** | Negative | |
| **Patellar Subluxation - Apprehension** | Negative | |
| **PFS - Grind** | Negative | |
| **Distal ITB - Noble's Compression** | Negative | |
| **Flexibility Screening** | | |
| **Flexibility Screening** | Abnormal | R gastroc and HS |
| **Palpation** | | |
| **Alignment** | WNL | |
| **Tenderness** | Moderate | R gastroc and medial knee |
| **Tissue Integrity** | Spasm palpated | R gastroc and medial knee |

**Goals**

| Item | Initial | Current | Goal | By Date | Progress | Achieved On |
|---|---|---|---|---|---|---|
| 1: Pain Intensity at Worst | 8/10: Severe Pain. | | 0/10: No Pain. | 4/30/15 | | |
| 2: Standing | 10-15 minutes. | | 60 minutes | 4/30/15 | | |
| 3: Stairs | significant pain with ascending>descending. | | WNL | 4/30/15 | | |

Progress Evaluation for Sybil Levisohn
DOB: 07/05/1941

| | | | | | | |
|---|---|---|---|---|---|---|
| **4: Ambulation** | 20 minutes | | 90 minutes | 4/30/15 | | |
| **5: Activity Pace** | Score 1: Performs activities at a slow pace. | | Score 3: Performs activities at customary pace | 4/30/15 | | |
| **6: LEFS - Lower Extremity Functional Scale** | Score 36-47: 45% to 59% of Maximum Function. | | Score 72-80: 90% to 100% of Maximum Function | 4/30/15 | | |
| **7: Walking** | decreased knee flexion and extension on the R side. | | Unremarkable | 4/30/15 | | |
| **8: Knee Flexion PROM** | 118 degrees | | 140 degrees | 4/30/15 | | |
| **9: Hip Abduction** | 3+ /5 | | 5 /5 | 4/30/15 | | |
| **10: Hip Ext Rotation** | 3+ /5 | | 5 /5 | 4/30/15 | | |
| **11: Hip Adduction** | 4- /5 | | 5 /5 | 4/30/15 | | |
| **12: Knee Extension Strength** | 4- /5 | | 5 /5 | 4/30/15 | | |
| **13: Knee Flexion Strength** | 4- /5 | | 5 /5 | 4/30/15 | | |

## Assessment

**PT Dx/Practice Pattern**

    **PT Dx/Practice Pattern:** 4D Impairments/Connective Tissue Dysfunction.

**Clinical Impairments**

    **Clinical Impairments:** R knee pain, Baker's cyst, postural dysfunction, gait abnormalities, as well as deficits in R knee flexibility, strength, and stability.

**Functional Limitations**

    **Functional Limitations:** all weight bearing activities.

**Clinical Impression**

    **Clinical Impression:** good rehab prognosis.

**Precautions / Contraindications to Treatment**

    **Precautions / Contraindications:** None.

**Rehabilitation Potential**

    **Rehabilitation Potential:** Good.

## Plan

**General Care**

    **General Care:** Coordination, Communication, Documentation.

**Home Exercises / Patient Education**

    **Home Exercises:** HEP will be progressed according to patient's level of performance while under the supervision of PT and overall progress toward clincal and functional goals.  Patient education will be provided throughout the course of therapy to maximize results.

**Supervised Exercises**

    **Supervised Exercises:** Supervised exercise may include any of the following based on the patient's current needs:  aquatic therapy, cardio, open-chain strengthening, closed-chain strengthening, balance / proprioception, stretching.

**Modalities**

    **Treatment Modalities:** Treatment may include any of the following based on the patient's current needs:  thermotherapy, cryotherapy, electric stimulation, ultrasound, cold laser.

**Procedures**

    **Treatment Procedures:** Treatment may include any of the following based on the patient's current needs:  joint mobilization, manual stretching, massage. MFR, TPR, Graston, cupping.

**Treatment Plan Parameters**

**Visit Frequency:** 2 visits per week. **Duration:** 8 weeks. **Range of Visits:** For Pattern 4D: 3-36. Eighty percent of patients/clients who are classified into this pattern achieve their goals within the time frame noted.

**Treatment Plan Discussion**

**Plan of Care Discussion:** Discussed plan of care, goals and prognosis with patient.  Patient understands and agrees with the plan of care.

**Certification**

**Necessity and Skill Level:** I certify that these procedures are reasonable and medically necessary for the assessment, treatment, and improvement of the documented impairments and functional limitations.  These services require the expert knowledge / guidance of a licensed PT.

Electronically signed by:
License:
03/26/15 5:28 pm

Electronically signed by: Jennifer Mohns, PT
PT Lic. #: 19758
on 03/26/15 5:28 pm

**Plan of Care Approval for Sybil Levisohn**

Thank you for this referral.

We are required to obtain an approval of Sybil's plan of care.  You may approve the plan of care and make any changes to the plan of care by commenting below.  As always, please feel free to call us at (617) 262-0030 if you have any questions or concerns.

**Respectfully yours,**

Electronically signed by: Jennifer Mohns, PT

03/26/15 5:28 pm

**Plan of Care Approval**

☐   Approval of the plan of care as documented

☐   Approval of the plan of care with changes noted below

☐   Plan of care is not approved. Ask patient to return to my office.

**Changes to Plan of Care:**

Signature:

Thomas Gill, MD

Approval Date:      /      /



**Boston Sports Medicine Brookline**
54 Harvard St
Brookline, MA  02445

Phone: (617) 262-0030
Fax: (617) 396-3040

Progress Evaluation for
Sybil Levisohn
04/23/15
Case: Baker's Cyst
Therapist(s):
      Jennifer Mohns, PT

Referred by: Thomas Gill, MD
Phone: (617) 779-6500
Fax:  (617) 779-6555

Diagnosis  :Sprain of knee & leg NOS
ICD-9: 844.9

## Summary

Sybil Levisohn has been participating in physical therapy for 4 weeks. She has been making excellent progress towards PT goals since she underwent a cortisone injection and aspiration to the Baker's cyst. Sybil's physical therapy treatment has recently been including aquatic therapy which seems to provide her a way of pain-free strengthening. This injury started on 9/2/14 due to dancing. MRI reveals old meniscus injury c Baker's cyst. Clinically, she demonstrates R knee pain, Baker's cyst, postural dysfunction, gait abnormalities, as well as deficits in R knee flexibility, strength, and stability. This patient would benefit from skilled PT services in order to address the above concerns through manual therapy, stretching, strengthening, stability training, and modalities PRN. Patient to be seen 1-2x/week for 5 weeks; plan to re-evaluate in 1 month.

## Subjective

**Case History**

**Onset Description:** Patient reports L knee pain that started when she was dancing at a wedding on 9/2/2014. She reports that she had stiffness in the knee on that same day leading up to the incident. She reports that she had been on a significant hike a couple of weeks before and she thinks she may have aggravated the knee then. She went to see her PCP who was concerned about a blood clot which upon ultrasound a baker's cyst. She then went to see Dr. Gill who took images of her knee and found the cyst and normal wear/tear of the meniscus with underlying arthritis. She then participated in physical therapy. **Recent Symptom Trend:** condition unchanged. **Diagnostic Testing / Results:** ultrasound to L knee: Baker's cyst. **Precautions:** activity as tolerated.

**Current Complaints**

**Pain Intensity at Best:** 4/10: Moderate pain. **Pain Intensity at Worst:** 5/10: Moderate Pain. **Pain Location / Behavior:** entire the R knee joint and calf. **Aggravating Factors:** all weight bearing activities. **Easing Factors:** rest, massage, ultrasound.

**Medical History**

**Current Medications:** levothyroxine and advil. **General Medical History:** Pt denies any other significant PMH. **Prior Physical Therapy:** None.

**Treatment / Modality Screening**

**Adhesive / Latex Allergy Screen:** Patient denies any known allergies. **Incontinence Screen:** Pt denies any known bowel or bladder incontinence. **Cancer Screen:** Pt denies any known history of CA. **Open Wound Screen:** Patient denies any presence of open wounds. **Implanted Metal Screen:** Patient denies presence of implanted metal. **Pacemaker Screen:** Patient denies presence of implanted pacemaker.

**Current Functional Level**

**Standing:** 30 minutes. **Ambulation:** 30 minutes. **Stairs:** slight pain with ascending>descending.

**Footwear**

**Other::** sneakers.

**Related Habits**

**Lifestyle:** patient enjoys going for long walks.

**Vocational**

**Current Status:** retired.

**Pt Goals / Expectations for PT**

**Patient's Goals / Expectations:** reduce pain at R knee and calf, return to pain-free walking and stairs.

**Subjective**

**Reports:** Pt states she is having tightness/soreness in the back of her leg (middle of HS) which came on after her last session. She reports it has not stopped her from doing anything however.

**Objective**

---

**Functional Scales**

**Activity Pace:** Score 1: Performs activities at a slow pace. **LEFS - Lower Extremity Functional Scale:** Score 48-59: 60% to 74% of Maximum Function.

**Observation**

**Balance:** SLS for 11 on R side and 15 seconds on L side. **Posture and Alignment:** pes planus and genu valgum. **Single Leg Squat:** n/a. **Standing Double Leg Squat:** discomfort past 75 degrees. **Walking:** Unremarkable.

| | Result | Note |
|---|---|---|
| **Hip Screen** | | |
| ROM | WNL | |
| Strength | Abnormal | gluteal weakness |
| **Ankle / Foot Screen** | | |
| ROM | WNL | |
| Strength | Abnormal | gastroc weakness |
| **Knee AROM** | | |
| Knee Extension AROM | 0 degrees | |
| Knee Flexion AROM | 119 degrees | |
| **Knee PROM** | | |
| Knee Extension PROM | 0 degrees | |
| Knee Flexion PROM | 122 degrees | |
| **Hip Strength Testing** | | |
| Hip Extension | 4 /5 | |
| Hip Flexion | 4 /5 | |
| Hip Abduction | 4- /5 | |
| Hip Adduction | 4- /5 | |
| Hip Ext Rotation | 4- /5 | |
| Hip Internal Rotation | 4 /5 | |
| **Knee Strength Testing** | | |
| Knee Extension Strength | 4 /5 | |
| Knee Flexion Strength | 4- /5 | |
| **Knee** | | |
| ACL - Anterior Drawer | Negative | |
| PCL - Posterior Drawer | Negative | |
| MCL - Valgus Stress | Negative | |
| LCL - Varus Test | Negative | |
| Meniscus - McMurray | Negative | |
| Meniscus - Apley's Grind | Negative | |
| Patellar Subluxation - Apprehension | Negative | |
| PFS - Grind | Negative | |
| Distal ITB - Noble's Compression | Negative | |

**Flexibility Screening**

| | | |
|---|---|---|
| **Flexibility Screening** | Abnormal | R gastroc and HS |
| Palpation | | |
| **Alignment** | WNL | |
| **Tenderness** | Moderate | R gastroc and medial knee |
| **Tissue Integrity** | Spasm palpated | R gastroc and medial knee |

**Today's Treatment**

**Today's Treatment:** See procedures list below for today's treatment.  Patient education was conducted.

**Current HEP**

**As follows::** <>.

## Goals

| Item | Initial | Current | Goal | By Date | Progress | Achieved On |
|---|---|---|---|---|---|---|
| **1: Pain Intensity at Worst** | 8/10: Severe Pain. | 5/10: Moderate Pain. | 0/10: No Pain. | 5/29/15 | | |
| **2: Standing** | 10-15 minutes. | 30 minutes. | 60 minutes | 5/29/15 | | |
| **3: Stairs** | significant pain with ascending>descending. | slight pain with ascending>descending | WNL | 5/29/15 | | |
| **4: Ambulation** | 20 minutes | 30 minutes. | 90 minutes | 5/29/15 | | |
| **5: Activity Pace** | Score 1: Performs activities at a slow pace. | Score 1: Performs activities at a slow pace. | Score 3: Performs activities at customary pace | 5/29/15 | | |
| **6: LEFS - Lower Extremity Functional Scale** | Score 36-47: 45% to 59% of Maximum Function. | Score 48-59: 60% to 74% of Maximum Function. | Score 72-80: 90% to 100% of Maximum Function | 5/29/15 | | |
| **7: Walking** | decreased knee flexion and extension on the R side. | Unremarkable. | Unremarkable | 5/29/15 | | |
| **8: Knee Flexion PROM** | 118 degrees | 122 degrees | 140 degrees | 5/29/15 | | |
| **9: Hip Abduction** | 3+ /5 | 4- /5 | 5 /5 | 5/29/15 | | |
| **10: Hip Ext Rotation** | 3+ /5 | 4- /5 | 5 /5 | 5/29/15 | | |
| **11: Hip Adduction** | 4- /5 | 4- /5 | 5 /5 | 5/29/15 | | |
| **12: Knee Extension Strength** | 4- /5 | 4 /5 | 5 /5 | 5/29/15 | | |
| **13: Knee Flexion Strength** | 4- /5 | 4- /5 | 5 /5 | 5/29/15 | | |

## Assessment

**Assessment**

**Today's PT session:** Tolerated.  Pt able to walk at slightly increased speed on TM, but required cuing to reach terminal knee extension at end of stance phase and to decrease hip flexion during swing phase - both of which likely contributing to sore HS.

**Compliance**

**Attendance to PT:** Regular. **HEP Performance:** Good.

**Progress toward goals**

**Progress toward goals:** Satisfactory.

**PT Dx/Practice Pattern**

**PT Dx/Practice Pattern:** 4D Impairments/Connective Tissue Dysfunction.

**Clinical Impairments**

    **Clinical Impairments:** R knee pain, Baker's cyst, postural dysfunction, gait abnormalities, as well as deficits in R knee flexibility, strength, and stability.

**Functional Limitations**

    **Functional Limitations:** all weight bearing activities.

**Clinical Impression**

    **Clinical Impression:** good rehab prognosis.

**Precautions / Contraindications to Treatment**

    **Precautions / Contraindications:** None.

**Rehabilitation Potential**

    **Rehabilitation Potential:** Good.

## Plan

**General Care**

    **General Care:** Coordination, Communication, Documentation.

**Home Exercises / Patient Education**

    **Home Exercises:** HEP will be progressed according to patient's level of performance while under the supervision of PT and overall progress toward clincal and functional goals.  Patient education will be provided throughout the course of therapy to maximize results.

**Supervised Exercises**

    **Supervised Exercises:** Supervised exercise may include any of the following based on the patient's current needs:  aquatic therapy, cardio, open-chain strengthening, closed-chain strengthening, balance / proprioception, stretching.

**Modalities**

    **Treatment Modalities:** Treatment may include any of the following based on the patient's current needs:  thermotherapy, cryotherapy, electric stimulation, ultrasound, cold laser.

**Procedures**

    **Treatment Procedures:** Treatment may include any of the following based on the patient's current needs:  joint mobilization, manual stretching, massage. MFR, TPR, Graston, cupping.

**Treatment Plan Parameters**

    **Visit Frequency:** 2 visits per week. **Duration:** 8 weeks. **Range of Visits:** For Pattern 4D: 3-36. Eighty percent of patients/clients who are classified into this pattern achieve their goals within the time frame noted.

**Treatment Plan Discussion**

    **Plan of Care Discussion:** Discussed plan of care, goals and prognosis with patient.  Patient understands and agrees with the plan of care.

**Certification**

    **Necessity and Skill Level:** I certify that these procedures are reasonable and medically necessary for the assessment, treatment, and improvement of the documented impairments and functional limitations.  These services require the expert knowledge / guidance of a licensed PT.

**Plan**

    **Plan:** Continue as outlined.

Electronically signed by:
License:
04/27/15 1:43 pm

Electronically signed by: Jennifer Mohns, PT
PT Lic. #: 19758
on 04/27/15 1:43 pm

**Plan of Care Approval for Sybil Levisohn**

Thank you for this referral.

We are required to obtain an approval of Sybil's plan of care.  You may approve the plan of care and make any changes to the plan of care by commenting below.  As always, please feel free to call us at (617) 262-0030 if you have any questions or concerns.

**Respectfully yours,**

Electronically signed by: Jennifer Mohns, PT

04/27/15 1:43 pm

**Plan of Care Approval**

☐   Approval of the plan of care as documented

☐   Approval of the plan of care with changes noted below

☐   Plan of care is not approved. Ask patient to return to my office.

**Changes to Plan of Care:**

Signature:

Thomas Gill, MD

Approval Date:      /      /



**Boston Sports Medicine Watertown**

36 Arlington Street
at GymIt Health Club
Watertown, MA  02472-5001

Phone: (617) 926-2300
Fax: (617) 926-5886

Initial Evaluation for
Maria Murphy
10/05/11
Case: Post op L ACL
Therapist(s):
        Dr. Michael J. Velsmid PT

Referred by: Thomas Gill, MD
Phone: (617) 779-6500
Fax:  (617) 779-6555

Diagnosis  :Sprain cruciate lig knee
ICD-9: 844.2

## Summary

Pt is a 33 y/o female known to this clinic for pre-op rehab for her ACL/MCL injuries.  Pt had surgical repair with patellar tendon graft on 9/27/11.  She come is today ~1 wk post-op with the expected measurable impairments in ROM and strength with associated functional deficits in gait and transfers.  Pt will benefit from a supervised rehab protocol for ACL repair.

## Subjective

**Daily Note**

    **Please see evaluation for:** today.

**Scales**

| | | |
|---|---|---|
| **LE Functional Scale** | 0    - | |
| **Pain Frequency** | 1    - | |
| **Pain Rating Scale** | 8    - | |
| **Patellofemoral Joint Evaluation Scale** | 0    - | |
| **Stair Climbing Tolerance** | 1    - | |
| **Walking Tolerance** | 1    - | |

*Left Knee*

**Case History**

    **Date of Surgery:** 9/27/11. **Stated Reason for Referral:** Post operative rehabilitation. **Surgery (Knee):** Patellar tendon ACL Reconstruction with MCL repair. **SURGICAL PRECAUTIONS:** As Follows: None specified.

**Current Complaints**

    **Pain Intensity at Best:** 5/10: Moderate constant ache. **Pain Intensity at Worst:** 10/10: Worst Imaginable Pain. **Pain in response to the following activities::** Changing positions, bending the knee, walking. **Pain Frequency:** Constant. **Pain Localization:** Patient has no difficulty localizing pain in the center of the patella. **Pain Quality:** Sharp like and ice pick. **Tenderness:** Minimal.

**Medical History**

    **Current Medications:** None.  Was prescribed oxycodone and oxycontin, but it had no effect on pain, so d/c.  Now only using TYL PRN. **General Health:** Excellent. **Prior Physical Therapy:** Yes, in this calendar year.  Pre-op rehab and strengthening.

**Functional Level At Present**

    **Ambulation Tolerance:** Dependent on crutches and brace.  Very short distances. **Assistive Devices:** Bledsoe knee brace 0-90, Axillary crutches, CPM 0-90 overnight and most of the day.

**Other Complaints**

    **Patient also complains of:** Numbness in anterior shin.

**Prior Episodes**

    **Prior Treatment:** Brace, crutches, CPM, Meds, Cryocuff, ankle pumps.

**Vocational**

**Current Status:** Unable to work.  Will return on 10/10. **Work Tasks:** Lab tech, mostly sitting.

**Objective**

**Daily Note**

**Today's Treatment:** See procedures list below for today's treatment.  Patient education was conducted.

| *Left Leg* | *Left* | *Right* | *Note* |
|---|---|---|---|
| Girth Measurement | | | |
| **Mid-calf** | 38.0 cm | | |

| *Left Knee* | *Left* | *Right* | |
|---|---|---|---|
| Palpation | | | |
| **Temperature** | Warm | | |
| **Tenderness** | Moderate | | |
| **Tissue Integrity** | Swollen | | |
| Girth Measurement | | | |
| **15 cm. above joint line** | 58.0 cm | | |
| **At knee joint line** | 42.2 cm | | |
| Active ROM | | | |
| **Knee Flexion** | 80 degrees | | with heel slide |

**Ambulation**

**Ambulation Aids:** Axillary crutches. Brace:  Bledsoe 0-90.

**Integument**

**Observation:** Swelling. **Surgical Scars:** Surgical scars evident. **Wound Healing:** Well. No evidence of infection. scabbing over surgical incision. Steri strips in place. Sutures present, dry gauze dressing.

| | *Left* | *Right* | *Note* |
|---|---|---|---|
| Manual Muscle Test | | | |
| **Quadriceps** | 3- /5 | | |
| Pain at End Range | | | |
| **Extension** | Positive | | |
| **Flexion** | Positive | | |
| Passive ROM | | | |
| **Knee Extension** | -5 degrees | | |
| **Knee Flexion** | 95 degrees | | supine |
| ROM Screening | | | |
| **AROM Screening** | Abnormal | | |
| **PROM Screening** | Abnormal | | |
| Strength | | | |
| **Screening** | Abnormal | | |

**Transfers/Transitions**

**On/Off Trearment Table:** Provokes sx. Labored. Requires 3x normal time.  Uses UEs to lift the L LE.

**Assessment**

Assessment

Initial Evaluation for Maria Murphy
DOB: 03/17/1978

**Diagnosis:** Consistent with MD diagnosis. **PT Dx/Practice Pattern:** 4I mpairments/Bony or Soft Tissue Surgery. **Examination Response:** Examination aggravated symptoms. **Prognosis and Rehabilitation Potential:** During the episode of care, patient/client will achieve (1) the anticipated goals and expected outcomes of the interventions that are described in the plan of care and (2) the global outcomes for patients/ clients who are classified in this pattern. Excellent rehab potential. **Treatment Response:** Fair results with today's treatment.

**Plan**

## Plan

**Necessity and Skill Level::** I certify that these procedures are reasonable and medically necessary for the assessment, treatment, and improvement of the documented impairments and disabilities.  These services require the expertise of a skilled therapist.  These services require the skill of a licensed physical therapist.

### Treatment Plan Parameters

**Visit Frequency:** 2 visits per week. **Duration:** 8 weeks. **Range of Visits:** For Pattern 4I: 6-70. This range represents the lower and upper limits of the number of PT visits required to achieve anticipated goals and expected outcomes.  Eighty percent of patients/clients who are classified into this pattern will achieve the anticipated goals + expected outcomes within the range of visits during a continuous episode of care.  Frequency of visits and duration of the episode of care should be determined by the PT to maximize effectiveness of care and efficiency of service delivery.

### Treatment Plan Discussion

**Expected Ultimate Outcomes:** Complete restoration of function; Decrease the frequency, severity and duration of exacerbations; Independent HEP. **Plan of Care Discussion:** Discussed plan of care, goals and prognosis with patient.  Patient understands and agrees with the plan of care.

### Clin STGs

**Duration:** 4 weeks. **Girth Measurements:** Change in girth as stated in measurements. **Home Exercise:** Independent and compliant with prescribed HEP. **Manual Muscle Test:** Improve measured strength as stated under measurements. **Pain at End Range:** Improve pain in end range of all motions. **Range of Motion:** Improve measured range of motion as stated under measurements. **Symptoms:** Reported improvement in sx. **Tenderness:** Improve all described tenderness.

### Clin LTGs

**Duration:** 12 weeks. **Global Outcomes:** Over the specified duration of care the patient will demonstrate optimal joint mobility, muscle performance, and range of motion. **Home Exercise:** Independent, compliant, and able to self-progress HEP. **Manual Muscle Test:** Improve measured strength as stated under measurements. **Pain at End Range:** Eliminate pain at end range of all motions. **Range of Motion:** Improve measured range of motion as stated under measurements. **Symptoms:** Abolished sx. **Tenderness:** Eliminate all described tenderness.

### Pt to Call or E-Mail

**for any of the following reasons:** Upon any increase in symptoms; including  pain, swelling,  tingling, or numbness; If there is any problem with home exercises or home program; If there is any question about the treatment plan; If there is any question regarding our discussion of the nature of the problem.

### Functional LTGs

**Duration:** 12 weeks. **Functional Scales:** Normal grades on all functional scales documented. **Measured Function:** Normalize measured function as stated under observations and exam measures..

### Functional STGs

**Duration:** 4 weeks. **Functional Scales:** One grade increase in all functional scales documented. **Measured Function:** Improve measured function as stated under observations and exam measures..

### Treatment Plan

**General Care:** Coordination, Communication, Documentation. **Patient Education: Home Exercises:** Strengthening. Stretching. **Patient Education: Other Instructions:** Patient will be  instructed in injury prevention through activity modification. Patient will be weaned off of assistive devices. Patient will be instructed in edema reduction. **Supervised Exercises:** Strengthening Exercises. Stretching Exercises. **Treatment Modalities:** Cryotherapy. Electric Stimulation. Therapeutic Ultrasound. **Treatment Procedures:** Manual Stretching. Massage, MFR, Trigger Point Release.

Electronically signed by:
License:
10/05/11 4:58 pm

Electronically signed by: Dr. Michael J. Velsmid PT
PT Lic. #:10295
10/05/11 4:58 pm

**Plan of Care Approval for Maria Murphy**

Thank you for this referral.

We are required to obtain an approval of Maria's plan of care.  You may approve the plan of care and make any changes to the plan of care by commenting below.  As always, please feel free to call us at (617) 926-2300 if you have any questions or concerns.

**Respectfully yours,**
Electronically signed by: Dr. Michael J. Velsmid PT
10/05/11 4:58 pm

**Plan of Care Approval**

☐ Approval of the plan of care as documented

☐ Approval of the plan of care with changes noted below

☐ Plan of care is not approved. Ask patient to return to my office.

**Changes to Plan of Care:**

Signature:

Thomas Gill, MD

Approval Date:   /   /



**Boston Sports Medicine Watertown**
36 Arlington Street
at GymIt Health Club
Watertown, MA  02472-5001

Phone: (617) 926-2300
Fax: (617) 926-5886

Progress Evaluation for
Katherine Papaporfiriou
08/09/16
Case: post-op R shoulder 5/11/16
Therapist(s):
          Abigail Jamula, PT, DPT

Referred by: Thomas Gill (@ St. Elizabeth's)
Phone: (617) 779-6500
Fax:  (617) 779-6555

Diagnosis :Pain in right shoulder
ICD-9: M25.511

---

**Summary**

Katherine Papaporfiriou is progressing well with her post operative R RTC rehab and according to outlined MD protocol. She continues to have weakness, slight ROM deficits and decreased functional mobility/endurance with daily activities. She will benefit from continuing with PT treatment 1x/week for an additional 4 weeks with anticipated discharge to HEP at that time. She is aware and in agreement with the outlined PT POC and stated goals.

**Subjective**

**Current Complaints**

    **Pain Intensity at Best:** 0/10: No pain. **Pain Intensity at Worst:** 6/10: Moderate Pain.

**Current Functional Level**

    **Use of Arms Overhead:** Able, but c/o weakness/some pain. **Lying down:** Able to sleep through the night, but unable to maintain R s/l for >30min.

**Subjective**

    **Reports:** It gets sore, but I'm able to do more.

**Outcomes Scores Correlated to Medicare Impairment Rating**

| **Quick Disabilities of the Arm, Shoulder, and Hand (DASH) Modified for Medicare Impairment Ratings** | 45 - CK: 40 to 59% Impaired. Moderate disability. (40 - 59) | |
|---|---|---|

**Objective**

| | Result | Note |
|---|---|---|
| **Shoulder Active ROM** | | |
| **Shoulder Flexion Active Range of Motion** | 165 degrees | |
| **Shoulder Abduction AROM** | 165 degrees | painful arc |
| **Shoulder External Rotation AROM** | 85 degrees | at 90/90 |
| **Shoulder Internal Rotation AROM** | 80 degrees | at 90/90 |
| **Shoulder Strength Testing** | | |
| **Shoulder Abduction Strength** | 3+ /5 | |
| **Shoulder External Rotation Strength** | 3+ /5 | |
| **Shoulder Flexion Strength** | 4- /5 | |
| **Shoulder Internal Rotation Strength** | 4- /5 | |
| **Shoulder Functional Mobility Tests** | | |
| **Reach back of opposite shoulder** | Able | |

| **Reach top of head** | Able | |
|---|---|---|

**Today's Treatment**

**Today's Treatment:** Please refer to procedures listed above for today's treatment.  Patient education was conducted throughout session. Home exercise program will be progressed when applicable and appropriate throughout the patient's duration of treatment.

**Goals**

| Impairment Category | Carrying, Moving & Handling Objects |
|---|---|
| **Current Impairment Rating (G8984)** | 45% Impairment Level (CK: At least 40 percent but less than 60 percent impaired, limited or restricted) |
| **Goal Impairment Rating (G8985)** | 20% Impairment Level (CJ: At least 20 percent but less than 40 percent impaired, limited or restricted) |
| **Projected Goal Completion Date** | 9/9/2016 |
| **Rationale for impairment rating** | FLR impairment rating based on subjective reports, objective measurements, functional outcome scores, MD post surgical protocol/procedure and PT clinical judgement. |

| Item | Initial | Current | Goal | By Date | Progress | Achieved On |
|---|---|---|---|---|---|---|
| **1: Pain Intensity at Worst** | 9/10: Severe Pain. | 6/10: Moderate Pain. | 5/10: Moderate Pain. | 9/9/16 | Good | |
| **2: Pain Intensity at Best** | 5/10: Moderate Pain. | 0/10: No pain. | 0/10: No pain. | 9/9/16 | Goal met | 8/9/16 |
| **3: Use of Arms Overhead** | Completely unable. | Able, but c/o weakness/some pain | Able, pain free | 9/9/16 | Good | |
| **4: Lying down** | Pain/difficulty noted, unable to sleep flat in her bed. | Able to sleep through the night, but unable to maintain R s/l for >30min | Able, pain free. | 9/9/16 | Good | |
| **5: Quick Disabilities of the Arm, Shoulder, and Hand (DASH) Modified for Medicare Impairment Ratings** | 80 - CM: 80 to 99% Impaired.  Severe disability. (80 - 99) | 45 - CK: 40 to 59% Impaired.  Moderate disability. (40 - 59) | 20 - CJ: 20 to 39% Impaired.  Minimal to moderate disability. (20 - 39) | 9/9/16 | Good | |
| **6: Shoulder Flexion Active Range of Motion** | 0 degrees | 165 degrees | 180 degrees | 9/9/16 | Good | |
| **7: Shoulder Abduction AROM** | 0 degrees | 165 degrees | 180 degrees | 9/9/16 | Good | |
| **8: Shoulder External Rotation AROM** | 0 degrees | 85 degrees | 90 degrees | 9/9/16 | Good | |
| **9: Shoulder Internal Rotation AROM** | 0 degrees | 80 degrees | 90 degrees | 9/9/16 | Good | |
| **10: Shoulder Abduction Strength** | NT /5 | 3+ /5 | 5 /5 | 9/9/16 | Good | |
| **11: Shoulder External Rotation Strength** | NT /5 | 3+ /5 | 5 /5 | 9/9/16 | Good | |
| **12: Shoulder Flexion Strength** | NT /5 | 4- /5 | 5 /5 | 9/9/16 | Good | |
| **13: Shoulder Internal Rotation Strength** | NT /5 | 4- /5 | 5 /5 | 9/9/16 | Good | |
| **14: Reach back of opposite shoulder** | Unable | Able | Able | 9/9/16 | Goal met | 8/9/16 |
| **15: Reach small of back** | Unable | | Able | 9/9/16 | Goal met | 8/9/16 |

| 16: Reach top of head | Unable | Able | Able | 9/9/16 | Goal met | 8/9/16 |
|---|---|---|---|---|---|---|

## Assessment

**Assessment**

**Today's PT session:** Well tolerated. Initiated theraband IR/ER strengthening with good tolerance but significant c/o fatigue following. Applied MHP post session to continue to promote R UT relaxation/decreased tone. Patient in agreement with outlined PT POC of continuing with treatment 1x/week for 4 additional weeks. Her next f/u with MD is in October.

**Compliance**

**Attendance to PT:** Regular. **HEP Performance:** Good.

**Progress toward goals**

**Progress toward goals:** Satisfactory.

## Plan

**Plan**

**Plan:** Continue PT 1x/week for 4 weeks, progress towards independent HEP performance. Progress functional strengthening and mobility with regard to symptoms and/or MD instruction.

Electronically signed by:
License:
08/09/16 12:02 pm

Electronically signed by: Abigail Jamula, PT, DPT
PT Lic. #: 20686
on 08/09/16 12:02 pm

Progress Evaluation for Katherine Papaporfiriou
DOB: 03/19/1951

**Plan of Care Approval for Katherine Papaporfiriou**

Thank you for this referral.

We are required to obtain an approval of Katherine's plan of care.  You may approve the plan of care and make any changes to the plan of care by commenting below.  As always, please feel free to call us at (617) 926-2300 if you have any questions or concerns.

Respectfully yours,
Electronically signed by: Abigail Jamula, PT, DPT
08/09/16 12:02 pm

---

**Plan of Care Approval**

☐    Approval of the plan of care as documented

☐    Approval of the plan of care with changes noted below

☐    Plan of care is not approved. Ask patient to return to my office.

**Changes to Plan of Care:**

Signature:

Thomas Gill (@ St. Elizabeth's)

Approval Date:      /    /



**Boston Sports Medicine Somerville**
259 Elm Street
2nd Floor
Somerville, MA  02144

Phone: (617) 623-6300
Fax: (617) 623-4224

Progress Evaluation for
Lauren Presant
01/21/15
Case: sp L ACL repair
Therapist(s):
      Rebecca L. Fitzgerald, PT

Referred by: Thomas Gill, MD
Phone: (617) 779-6500
Fax:  (617) 779-6555

Diagnosis  :Sprain cruciate lig knee
ICD-9: 844.2

---

## Summary

Lauren has been seen for PT s/p L ACL reconstruction with BTB autograft 9/2/14. She reports con't pain and stiffness with end range flexion, difficulty with walking and stairs, and difficulty returning to light jogging. Presents with less peri-incision tenderness, improved joint effusion, con't end range pain with PROM, quad atrophy but improved motor control, improved hip/knee strength, and con't antalgic gait during walking and light jogging. Delay in rehab progress is likely due to prolonged time between original injury and surgery, causing a longer post-op rehab process and pt. not meeting expected post-op goals due to this delay, requiring con't care. Pt. will benefit from con't PT per post-op protocol to return to PLOF. Recommend progression to higher level activity when cleared by MD and she receives sports brace. Recommend weekly for 2 more months.

## Subjective

### Onset

**Onset Due To:** Playing indoor soccer, PF/inverted foot and fell laterally onto L buttock then to supine. **Date of Onset:** March 27, 2014. **Onset Speed:** Sudden. **Description:** Pt. had surgery and reports using CPM since surgery, 0-95 degrees.

### Case History

**Diagnostic Testing / Results:** MRI, May 2014. **Diagnostic Testing Review:** Pivot shift injury with kissing bone contusion in lateral joint compartment. Small cortical impaction fracture of the lateral femoral condyle. Complete anterior cruciate ligament tear with no evidence of meniscal tear. Intact collateral ligaments. **Date of Surgery:** 9/2/14. **Stated Reason for Referral:** Prepare pt pre-op for ACL reconstruction. **Surgery (Knee):** ACL Reconstruction with BTB autograft.

### Current Complaints

**Pain Intensity at Best:** 0/10: No pain. **Pain Intensity at Worst:** 5-6/10: Moderate Pain. **Pain in response to the following activities:** stairs. bending the knee. gym workouts. sitting with knee bent at work. **Pain Localization:** Patient has no difficulty localizing pain at site of injury. **Related Symptoms:** Locking/catching with stairs, squats, walking. **Sensation:** Denies any change in sensation.

### Medical History

**Prior Physical Therapy:** Yes, in this calendar year, pre-op.

### Athletic Function

**Prior Level of Function:** Pt very active.  Was Division 1 Water polo player in college and still competes. Ski, Zumba, indoor soccer. No activity since surgery.

### Functional Level At Present

**Ambulation Problems:** Unsteady gait, but no need for ambulation aids. **Ambulation Tolerance:** Able to walk without significant pain for 20-30 min. **Assistive Devices:** none. **Running Tolerance:** Unable to run at all per post-op restriction. **Stair Climbing Ability:** Ascends stairs with reciprocal gait and intermittent locking. Descends stairs leading with LLE. **Standing Tolerance:** Able to stand one to two hours without significant pain.

### Prior Episodes

**Prior Treatment:** Ice. Anti-inflammatory for swelling. Pre-op PT.

### Vocational

**Current Status:** Full Time. Works from home or at office, depending on Sx. Working from office more frequently now and notes pain with sitting at desk for prolonged time.

### Pt Goals / Expectations for PT

**Patient's Goals / Expectations:** Return to sport and PLOF.

## Objective

**Gait**

**Abnormality:** Amb with axillary crutches and brace. Slow speed. WBAT.

**Muscle Atrophy**

**Hip and Thigh:** Quadriceps.

| | Result | Note |
|---|---|---|
| **Patellofemoral Integrity** | | |
| **Patellar Mobility** | nt | |
| **Palpation** | | |
| **Crepitation with Movement** | Negative | |
| **Tenderness** | Minimal | peri-incision areas |
| **Tissue Integrity** | Swollen - IMPROVED | |

**Today's Treatment**

**Today's Treatment:** See procedures list below for today's treatment.  Patient education was conducted.

**Integument**

**Observation:** Normal color, temperature, and no sign of ecchymosis. **Surgical Scars:** WNL.

**Transfers/Transitions**

**Chair:** Weight shifted slightly to R. **On/Off Trearment Table:** Independent with all transfers.

| *Left Knee* | Left | Right | Note |
|---|---|---|---|
| **Active ROM** | | | |
| **Knee Extension** | 0 degrees | 0  degrees | |
| **Knee Flexion** | 129 degrees | 140  degrees | |
| **Knee PROM** | | | |
| **Knee Extension PROM** | 0 degrees | 0  degrees | |
| **Knee Flexion PROM** | 134* degrees | | |
| **Knee Strength Testing** | | | |
| **Knee Extension Strength** | 4+ /5 | 5 /5 | good endurance |
| **Knee Flexion Strength** | 4 /5 | 5 /5 | |
| **Girth Measurement** | | | |
| **10 cm. above joint line** | 41.0 cm | 44.5  cm | |
| **5 cm. above joint line** | 38.2 cm | 38.5  cm | |
| **At joint line** | 33.9 cm | 34.5  cm | |
| **5 cm. below joint line** | 33.7 cm | 36.0  cm | |
| **Mid-calf** | 32.0 cm | 29.7  cm | |
| **Balance Tests** | | | |
| **Single Leg Stance Eyes Open** | 60 seconds | | |
| **Strength** | | | |
| **Screening** | Abnormal | Normal | quad set: with glute compensation |

## Goals

| *Item* | *Initial* | *Current* | *Goal* | *By Date* | *Progress* | *Achieved On* |
|---|---|---|---|---|---|---|

| 2: Pain Intensity at Worst | 8/10: Severe Pain. | 5-6/10: Moderate Pain. | 2/10: Minimal Pain. | 2/28/15 | Slow | |
| 3: Pain in response to the following activitives | work activities. bending the knee. sitting without elevation. | stairs. bending the knee. gym workouts. sitting with knee bent at work. | none | 2/28/15 | Slow | |
| 5: Ambulation Problems | Unsteady gait, needs ambulation aids. | Unsteady gait, but no need for ambulation aids. | No problems | 2/28/15 | Good | |
| 6: Ambulation Tolerance | Only able to walk short distances with crutches. | Able to walk without significant pain for 20-30 min. | Able to walk without significant pain for over one hour. | 2/28/15 | Good | |
| 7: Assistive Devices | knee brace. axillary crutches. | none. | none | 2/28/15 | | 11/10/14 |
| 8: Stair Climbing Ability | Ascends or descends stairs with axillary crutches and step-to gait. | Ascends stairs with reciprocal gait and intermittent locking. Descends stairs leading with LLE. | Ascends or descends stairs without any pain, assistive device, or compensation | 2/28/15 | Slow | |
| 9: Running Tolerance | Unable to run at all without significant pain. | Unable to run at all per post-op restriction. | Able to run 20-30 min. before significant pain develops | 2/28/15 | None | |
| 11: Hip and Thigh | Quadriceps. | Quadriceps. | none | 2/28/15 | Slow | |
| 12: Tenderness | Severe | Minimal | Absent | 2/28/15 | | |
| 13: Tissue Integrity | Swollen | Swollen - IMPROVED | WNL | 2/28/15 | | |
| 15: Surgical Scars | Sutures and SteriStrips in place. Evidence of min drainage. | WNL | Surgical scars evident, completely healed | 2/28/15 | Goal met | 1/21/15 |
| 16: Chair | Weight Shifted completely to R. Must use UEs | Weight shifted slightly to R. | No deficit | 2/28/15 | Good | |
| 17: On/Off Trearment Table | Requires assistance with use of belt around heel to lift LLE. | Independent with all transfers. | No deficits | 2/28/15 | | 10/8/14 |
| *Left Knee* | | | | | | |
| 18: Knee Extension | -3 degrees | 0 degrees | 0 degrees | 2/28/15 | | 12/8/14 |
| 19: Knee Flexion | 70* degrees | 129 degrees | 140 degrees | 2/28/15 | | |
| 20: Knee Flexion PROM | 76* degrees | 134* degrees | 140 degrees | 2/28/15 | | |
| 21: Knee Extension Strength | 2- /5 | 4+ /5 | 5 /5 | 2/28/15 | | |
| 22: Knee Flexion Strength | 2- /5 | 4 /5 | 5 /5 | 2/28/15 | | |
| 23: 10 cm. above joint line | 45.4 cm | 41.0 cm | 44.5 cm | 2/28/15 | | |
| 24: 5 cm. above joint line | 41.6 cm | 38.2 cm | 38.5 cm | 2/28/15 | | 12/8/14 |
| 25: At joint line | 39.8 cm | 33.9 cm | 34.5 cm | 2/28/15 | Goal met | 1/21/15 |
| 26: Screening | Abnormal | Abnormal | Normal | 2/28/15 | | |

**Assessment**

Assessment

**Clinician's assessment of progress:** Adequate although overall con't limited progress per post-op timeline. Con't ROM deficits and quad atrophy will benefit from con't rehab. Pt. con't to have significant limitations with jogging, stairs, and walking that will benefit from con't care. **Compliance:** Regular attendance. Good compliance with home exercise program. **Diagnosis and Impression:** Exam finds ongoing quad atrophy, limited ROM, and functional limitations that may be delayed for this stage post-op. Delay may be due to prolonged time between time of injury and surgical repair, causing a delay in post-op timeline. **Examination Response:** Good tolerance to examination. **Patient's perception of progress:** Patient perceives adequate improvement. **Prognosis and Rehabilitation Potential:** Good rehab potential. **Treatment Response:** Good symptom relief with today's treatment.

PT Dx/Practice Pattern

**PT Dx/Practice Pattern:** 4I Impairments/Bony or Soft Tissue Surgery.

**Plan**

General Care

**General Care:** Coordination, Communication, Documentation.

Home Exercises / Patient Education

**Home Exercises:** AAROM, isometrics, AROM as tolerated, hip strengthening Patient education was performed.

Supervised Exercises

**Supervised Exercises:** Hip/knee strength and stretching therex. Balance/proprioception.

Modalities

**Treatment Modalities:** Russian and Interferential Electric Stimulation.

Procedures

**Treatment Procedures:** PROM.

Treatment Plan Parameters

**Visit Frequency:** 2 visits per week. **Duration:** 4-6 months. **Range of Visits:** For Pattern 4I: 6-70. The lower and upper limits of the # of PT visits required to achieve goals and expected outcomes.  80% percent of patients who are classified into this pattern fall into this range.

Treatment Plan Discussion

**Expected Ultimate Outcomes:** Complete restoration of function; Decrease the frequency, severity and duration of exacerbations; Independent HEP. **Plan of Care Discussion:** Discussed plan of care, goals and prognosis with patient.  Patient understands and agrees with the plan of care.

Certification

**Necessity and Skill Level:** I certify that these procedures are reasonable and medically necessary for the assessment, treatment, and improvement of the documented impairments and disabilities.  These services require the expert.

Pt to Call or E-Mail

**for any of the following reasons:** Upon any increase in symptoms; including  pain, swelling,  tingling, or numbness; If there is any problem with home exercises or home program; If there is any question about the treatment plan.

Continuing Treatment Plan

**Continue as documented at last evaluation.:** Increase home exercise program. Progress to higher level tasks when able to tolerate and when cleared by MD. **Duration:** 2 months. **Frequency:** 1 visit per week.

Electronically signed by:
License:
01/22/15 7:14 am

Electronically signed by: Rebecca L. Fitzgerald, PT
PT Lic. #: 19109
on 01/22/15 7:14 am

**Plan of Care Approval for Lauren Presant**

Thank you for this referral.

We are required to obtain an approval of Lauren's plan of care.  You may approve the plan of care and make any changes to the plan of care by commenting below.  As always, please feel free to call us at (617) 623-6300 if you have any questions or concerns.

**Respectfully yours,**

Electronically signed by: Rebecca L. Fitzgerald, PT

01/22/15 7:14 am

---

**Plan of Care Approval**

☐    Approval of the plan of care as documented

☐    Approval of the plan of care with changes noted below

☐    Plan of care is not approved. Ask patient to return to my office.

**Changes to Plan of Care:**

Signature:

Thomas Gill, MD

Approval Date:      /     /



**Boston Sports Medicine Allston**
1 Braintree Street
1st Floor
Allston, MA  02134-1956

Phone: (617) 787-8700
Fax: (617) 787-8106

Initial Evaluation for
Andrea Sesko
10/03/07
Case: L femoral neck stress fx
Therapist(s):
                    Dr. Heather Jones, PT

Referred by: Thomas Gill, MD
Phone: **(617) 779-6500**
Fax:  (617) 779-6555

Diagnosis  :Stress fracture bone NEC
ICD-9: 733.95

---

## Summary

Andrea presents to physical therapy with impairments and functional limitations consistent with L hip stress fracture. At present, she exhibits significant weakness throughout her L hip secondary to TTWB status, with only minor ROM deficits. She is an excellent candidate for aquatic therapy consisting of hip strengthening and gait training. Once pt. reaches FWB status, treatment focus will be more functional strengthening, with eventual progression to return to sport.

## Subjective

### Daily Note

**Please see evaluation for:** today.

### Ambulation Function

**Ambulation Tolerance:** Able to walk without significant pain for 30 min. **Weight Bearing Status:** TTWB.

### Stair Climbing Function

**Stair Climbing Ability:** Ascends and descends 12 stairs with reciprocal gait.

### Functional Level At Present

**Stair Climbing Ability:** Ascends or descends stairs without any pain, however pt. reports that she does not use stairs because she is apprehensive.

### Scales

| Vocational Tolerance | 4        -  | |
|---|---|---|

### Functional Level Prior to Injury:

**Stair Climbing Ability:** No limitation in climbing stairs.

*Left Hip*

### Case History

**Diagnostic Testing:** MRI. X-rays. **Diagnostic Testing Review:** MRI results reportedly indicate femoral neck stress fx. X-rays were negative. **Approx Weeks Since Onset:** 6-7. **Onset Due To:** Sports or Recreational Injury. Pt. is a runner, and in August of this year she was training for a race and running 2x/week. She reports that she increased her mileage too quickly and her hip began to hurt. Pt. ran through the pain for a while, but then took a week off. When she ran again, the pain was worse. At that time, she saw MD. She is currently TTWB with axillary crutches. **Onset Speed:** Gradual. **Recent Symptom Trend:** Condition improving. Pt. reports that her pain decreased dramatically as soon as she started using crutches.

### Current Complaints

**Pain Intensity at Best:** 0/10: No pain. **Pain Intensity at Worst:** 2/10: Minimal Pain. **Pain in response to the following activities::** prolonged sitting, weightbearing. **Pain Frequency:** Intermittent, Daily. **Pain Localization:** Patient has no difficulty localizing pain. **Pain Quality:** Dull, achy. **Stiffness in response to the following activities::** sitting.

### Medical History

**Current Medications:** Analgesics: Tylenol occasionally. **General Health:** Excellent. **Prior Physical Therapy:** Yes, prior to this calendar year. Ankle sprains, tibial lengthening surgery. **Surgery (Knee):** tibial lengthening, age 10.

**Functional Level At Present**
    **Assistive Devices:** axillary crutches, TTWB.
**Related Habits**
    **Lifestyle:** Patient is physically active. Running, tennis, golf, skiing, regular gym workouts. **Reported Smoking:** None.
**Vocational**
    **Current Status:** Full Time orthopedic surgery resident. Pt. reports that she will begin her trauma surgery rotation in 2 weeks, and is very concerned about being on crutches.

**Objective**

**Gait**
    **Ambulation Aids:** Axillary crutch(es).
**Psych/Soc**
    **Affect:** pleasant.
**Structural/Posture**
    **Body Type:** Height/weight proportional.

| *Left Hip* | Left | Right | Note |
|---|---|---|---|
| **Manual Muscle Test** | | | |
| **Gluteus Maximus** | 3+ /5 | | |
| **Gluteus Medius** | 3+ /5 | | |
| **Hip Adductors** | 3+ /5 | | |
| **Iliopsoas** | 3+ /5 | | |
| **Pain at End Range** | | | |
| **Internal Rotation** | Positive | | |
| **Passive ROM** | | | |
| **Hip Extension** | 15 degrees | | |
| **Hip External Rotation, hip flexed 90** | 70 degrees | | |
| **Hip Flexion** | 120 degrees | | |
| **Hip Internal Rotation, hip flexed 90** | 45 degrees | | pain at end range |

| *Right Hip* | Right | Left | |
|---|---|---|---|
| **Manual Muscle Test** | | | |
| **Gluteus Maximus** | 4+ /5 | | |
| **Gluteus Medius** | 4+ /5 | | |
| **Hip Adductors** | 5 /5 | | |
| **Iliopsoas** | 5 /5 | | |
| **Passive ROM** | | | |
| **Hip Extension** | 25 degrees | | |
| **Hip External Rotation, hip flexed 90** | 80 degrees | | |
| **Hip Flexion** | 120 degrees | | |
| **Hip Internal Rotation, hip flexed 90** | 70 degrees | | |

| *Left Knee* | Left | Right | |
|---|---|---|---|
| **Manual Muscle Test** | | | |
| **Hamstrings** | 4 /5 | | |
| **Quadriceps** | 5 /5 | | |

| *Right Knee* | Right | Left | |
|---|---|---|---|
| **Hamstrings** | 5 /5 | | |
| **Quadriceps** | 5 /5 | | |

Initial Evaluation for Andrea Sesko
DOB: 11/14/1979

## Assessment

**Assessment**

**Diagnosis:** Consistent with MD diagnosis. **PT Dx/Practice Pattern:** 4D Impairments/Connective Tissue Dysfunction. **Examination Response:** Good tolerance to examination. **Prognosis and Rehabilitation Potential:** During the episode of care, patient/client will achieve (1) the anticipated goals and expected outcomes of the interventions that are described in the plan of care and (2) the global outcomes for patients/ clients who are classified in this pattern. Excellent rehab potential.

## Plan

**Plan**

**Immediate Visit Frequency:** 2 visits per week. **Necessity::** I certify that these procedures are reasonable and medically necessary for the assessment, treatment, and improvement of the documented impairments and disabilities.  These services require the expertise of a skilled therapist.

**Treatment Plan Parameters**

**Duration:** 8 weeks. **Range of Visits:** For Pattern 4D: 3-36. This range represents the lower and upper limits of the number of PT visits required to achieve anticipated goals and expected outcomes.  Eighty percent of patients/clients who are classified into this pattern will achieve the anticipated goals + expected outcomes within the range of visits during a continuous episode of care. Frequency of visits and duration of the episode of care should be determined by the PT to maximize effectiveness of care and efficiency of service delivery.

**Treatment Plan Discussion**

**Expected Ultimate Outcomes:** Complete restoration of function. **Plan of Care Discussion:** Discussed plan of care, goals and prognosis with patient.  Patient understands and agrees to plan of care.

**Clin LTGs**

**Manual Muscle Test:** Improve measured strength by an average of 1 grade. Improve measured strength as stated in Exam. **Pain at End Range:** Improve pain at end range of all motions. Eliminate pain at end range of all motions. **Range of Motion:** Improve measured range of motion as stated in Exam.

**Pt to Call or E-Mail**

**for any of the following reasons:** Upon any increase in symptoms; including  pain, swelling,  tingling, or numbness. If there is any problem with home exercises or home program. If there is any question about the treatment plan. If there is any question regarding our discussion of the nature of the problem.

**Functional LTGs**

**Functional Scales:** Normal grades on all functional scales documented.

**Treatment Plan**

**General Care:** Coordination, Communication, Documentation. **Patient Education: Home Exercises:** Provide patient handout. **Supervised Exercises:** Strengthening Exercise for Lower Extremties. Stretching Exercise for Lower Extremities. Aquatic Therapy.

Electronically signed by:
License:
10/03/07 6:21 pm

Electronically signed by: Dr. Heather Jones, PT
PT Lic. #:
10/03/07 6:21 pm

**Plan of Care Approval for Andrea Sesko**

Thank you for this referral.

We are required to obtain an approval of Andrea's plan of care.  You may approve the plan of care and make any changes to the plan of care by commenting below.  As always, please feel free to call us at (617) 787-8700 if you have any questions or concerns.

**Respectfully yours,**

Electronically signed by: Dr. Heather Jones, PT

10/03/07 6:21 pm

**Plan of Care Approval**

☐    Approval of the plan of care as documented

☐    Approval of the plan of care with changes noted below

☐    Plan of care is not approved. Ask patient to return to my office.

**Changes to Plan of Care:**

Signature:

Thomas Gill, MD

Approval Date:      /    /



**Boston Sports Medicine Allston**
1 Braintree Street
1st Floor
Allston, MA  02134-1956

Phone: (617) 787-8700
Fax: (617) 787-8106

Progress Evaluation for
Andrea Sesko
11/19/07
Case: L femoral neck stress fx
Therapist(s):
        Dr. Heather Jones, PT

Referred by: Thomas Gill, MD
Phone: (617) 779-6500
Fax:  (617) 779-6555

Diagnosis :Stress fracture bone NEC
ICD-9: 733.95

---

## Summary

Andrea has been seen for 6 visits of physical therapy, with steady progress toward clinical and functional goals. Progress has been somewhat limited by sporadic attendance secondary to pt's changing work schedule. She remains limited in her ability to stand and walk for prolonged periods at work secondary to weakness and capsular tightness. Pt. will now be able to attend therapy consistently twice per week, and I anticipate that with 4 additional weeks of treatment, she will reach remaining PT goals.

## Subjective

**Daily Note**
    **Please see evaluation for:** today.
**Stair Climbing Function**
    **Stair Climbing Ability:** New LTG: Ascends and descends 12 stairs with reciprocal gait, painfree.

**Scales**
    **Vocational Tolerance**

| 4 | - | |
|---|---|---|

*Left Hip*
**Current Complaints**
    **Pain Intensity at Best:** 0/10: No pain. **Pain Intensity at Worst:** 2/10: Minimal Pain. Pain is worst when pt. is on feet for prolonged periods at work, when she is wearing a heavy lead vest. **Pain in response to the following activities::** prolonged standing with heavy lead vest, walking while carrying heavy objects, transfering pts.
**Functional Level At Present**
    **Ambulation Tolerance:** Able to walk without significant pain for over one hour. **Assistive Devices:** None. Pt. is now FWB with no assistive device. **Stair Climbing Ability:** Ascends or descends stairs with minimal pain. Pt. reports that her hip becomes more sore after she has used the stairs. **Standing Tolerance:** Able to stand one to two hours without significant pain.

## Objective

**Ambulation**
    **Ambulation Aids:** None. **Weight Bearing Status:** FWB.
**Balance**
    **Within base of support on floor:** Stands on affected side for 15 seconds.

| *Left Hip* | *Left* | *Right* | *Note* |
|---|---|---|---|
| **Manual Muscle Test** | | | |
| **Gluteus Maximus** | 4+ /5 | | |
| **Gluteus Medius** | 4- /5 | | |
| **Hip Adductors** | 4 /5 | | |

| | | | |
|---|---|---|---|
| Iliopsoas | 4- /5 | | |
| **Passive ROM** | | | |
| Hip Extension | 20 degrees | | |
| Hip External Rotation, hip flexed 90 | 80 degrees | | |
| Hip Internal Rotation, hip flexed 90 | 50 degrees | | pain at end range |
| *Left Knee* | *Left* | *Right* | |
| **Manual Muscle Test** | | | |
| Hamstrings | 4+ /5 | | |

## Assessment

**Assessment**

**Clinician's assessment of progress:** Adequate. **Compliance:** Good compliance with home exercise program. **Patient's perception of progress:** Patient perceives adequate improvement.

## Plan

**Plan**

**Necessity::** I certify that these procedures are reasonable and medically necessary for the assessment, treatment, and improvement of the documented impairments and disabilities.  These services require the expertise of a skilled therapist.

**Treatment Plan Parameters**

**Continue Per Prior Treatment Plan:** Will notify referring physician with any change in plan.

**Goals Achieved**

**LE Functional Complaints:** Walking Tolerance.

**Treatment Plan Discussion**

**Plan of Care Discussion:** Discussed plan of care, goals and prognosis with patient.  Patient understands and agrees to plan of care.

**Progress made toward these goals**

**Clinical Goals:** Range of Motion. Strength.

**Treatment Plan Continuation**

**Continue Exercise Program Per Prior Treatment Plan:** Stretching Exercise. Stabilization Exercise.

Electronically signed by:
License:
11/19/07 11:12 am

Electronically signed by: Dr. Heather Jones, PT
PT Lic. #:
on 11/19/07 11:12 am

**Plan of Care Approval for Andrea Sesko**

Thank you for this referral.

We are required to obtain an approval of Andrea's plan of care.  You may approve the plan of care and make any changes to the plan of care by commenting below.  As always, please feel free to call us at (617) 787-8700 if you have any questions or concerns.

**Respectfully yours,**

Electronically signed by: Dr. Heather Jones, PT

11/19/07 11:12 am

**Plan of Care Approval**

☐    Approval of the plan of care as documented

☐    Approval of the plan of care with changes noted below

☐    Plan of care is not approved. Ask patient to return to my office.

**Changes to Plan of Care:**

Signature:

Thomas Gill, MD

Approval Date:      /      /

ANNEX 6



DOMAINS    WEBSITE    CLOUD    HOSTING    SERVERS    EMAIL    SECURITY    WHOIS    SUPPORT    LOGIN    0

Enter Domain or IP    🔍 WHOIS

# bostonsportsmedicine.com

Updated 1 second ago 🔄

## Domain Information

| | |
|---|---|
| Domain: | bostonsportsmedicine.com |
| Registrar: | Network Solutions, LLC |
| Registered On: | 2014-03-18 |
| Expires On: | 2022-03-18 |
| Updated On: | 2021-06-07 |
| Status: | clientDeleteProhibited clientTransferProhibited clientUpdateProhibited |
| Name Servers: | andy.ns.cloudflare.com dina.ns.cloudflare.com |

## Registrant Contact

| | |
|---|---|
| Name: | boston sports medicine and research institute |
| Organization: | boston sports medicine and research institute |
| Street: | 8 HAWTHORNE PL STE 110 |
| City: | BOSTON |
| State: | MA |
| Postal Code: | 02114-2335 |
| Country: | US |
| Phone: | 617 726 7797 |
| Email: | tgill@partners.org |

## Administrative Contact

| | |
|---|---|
| Name: | boston sports medicine and research institute |
| Organization: | boston sports medicine and research institute |
| Street: | 8 HAWTHORNE PL STE 110 |
| City: | BOSTON |
| State: | MA |
| Postal Code: | 02114-2335 |
| Country: | US |
| Phone: | 617 726 7797 |

### Interested in similar domains?

| | |
|---|---|
| bostonsportmedicine.com | Buy Now |
| bostonfootballmedicine.com | Buy Now |
| bostonsportsmedicinecentre.com | Buy Now |
| bostonsoccermedicine.com | Buy Now |
| bostonsportsmedicine.net | Buy Now |
| bostonsportmedicine.net | Buy Now |

## .space

~~$24.88~~ $0.88

BUY NOW

*Offer ends 30th June 2021

On Sale!



.ICU @ $3.48 ~~$8.88~~

●●●●●●●●●●●●●●●

| Email: | tgill@partners.org |

### Technical Contact

| Name: | boston sports medicine and research institute |
| Organization: | boston sports medicine and research institute |
| Street: | 8 HAWTHORNE PL STE 110 |
| City: | BOSTON |
| State: | MA |
| Postal Code: | 02114-2335 |
| Country: | US |
| Phone: | 617 726 7797 |
| Email: | tgill@partners.org |


Introducing
WORDPRESS HOSTING
$3.58 /mo
VIEW MORE

### Raw Whois Data

```
Domain Name: BOSTONSPORTSMEDICINE.COM
Registry Domain ID: 1850990661_DOMAIN_COM-VRSN
Registrar WHOIS Server: whois.networksolutions.com
Registrar URL: http://networksolutions.com
Updated Date: 2021-06-07T17:42:38Z
Creation Date: 2014-03-18T18:10:46Z
Registrar Registration Expiration Date: 2022-03-18T18:10:46Z
Registrar: Network Solutions, LLC
Registrar IANA ID: 2
Reseller:
Domain Status: clientDeleteProhibited https://icann.org/epp#clientDeleteProh
Domain Status: clientTransferProhibited https://icann.org/epp#clientTransfer
Domain Status: clientUpdateProhibited https://icann.org/epp#clientUpdateProh
Registry Registrant ID:
Registrant Name: boston sports medicine and research institute
Registrant Organization: boston sports medicine and research institute
Registrant Street: 8 HAWTHORNE PL STE 110
Registrant City: BOSTON
Registrant State/Province: MA
Registrant Postal Code: 02114-2335
Registrant Country: US
Registrant Phone: 617 726 7797
Registrant Phone Ext:
Registrant Fax:
Registrant Fax Ext:
Registrant Email: tgill@partners.org
Registry Admin ID:
Admin Name: boston sports medicine and research institute
Admin Organization: boston sports medicine and research institute
Admin Street: 8 HAWTHORNE PL STE 110
Admin City: BOSTON
Admin State/Province: MA
Admin Postal Code: 02114-2335
Admin Country: US
Admin Phone: 617 726 7797
Admin Phone Ext:
Admin Fax:
Admin Fax Ext:
Admin Email: tgill@partners.org
Registry Tech ID:
Tech Name: boston sports medicine and research institute
Tech Organization: boston sports medicine and research institute
Tech Street: 8 HAWTHORNE PL STE 110
Tech City: BOSTON
Tech State/Province: MA
Tech Postal Code: 02114-2335
Tech Country: US
Tech Phone: 617 726 7797
Tech Phone Ext:
Tech Fax:
Tech Fax Ext:
Tech Email: tgill@partners.org
Name Server: ANDY.NS.CLOUDFLARE.COM
Name Server: DINA.NS.CLOUDFLARE.COM
DNSSEC: unsigned
```

Registrar Abuse Contact Email: abuse@web.com
Registrar Abuse Contact Phone: +1.8777228662
URL of the ICANN WHOIS Data Problem Reporting System: http://wdprs.internic.
>>> Last update of WHOIS database: 2021-06-09T14:15:40Z <<<

For more information on Whois status codes, please visit https://www.icann.o


The data in Networksolutions.com's WHOIS database is provided to you by
Networksolutions.com for information purposes only, that is, to assist you in
obtaining information about or related to a domain name registration
record. Networksolutions.com makes this information available "as is," and
does not guarantee its accuracy. By submitting a WHOIS query, you
agree that you will use this data only for lawful purposes and that,
under no circumstances will you use this data to: (1) allow, enable,
or otherwise support the transmission of mass unsolicited, commercial
advertising or solicitations via direct mail, electronic mail, or by
telephone; or (2) enable high volume, automated, electronic processes
that apply to Networksolutions.com (or its systems). The compilation,
repackaging, dissemination or other use of this data is expressly
prohibited without the prior written consent of Networksolutions.com.
Networksolutions.com reserves the right to modify these terms at any time.
By submitting this query, you agree to abide by these terms.

For more information on Whois status codes, please visit
https://www.icann.org/resources/pages/epp-status-codes-2014-06-16-en.

### related domain names

networksolutions.com    web.com    icann.org    cloudflare.com    networksolutionsprivateregistration.com    internic.net

**Whois**
Identify for everyone

Leading provider of web presence
solutions that empower you to establish
and grow your online presence.

Learn more About Us

| Login | or | Create an Account |

Follow Us

| **Domains** | **Hosting & Products** | **Infrastructure** |
| --- | --- | --- |
| Register Domain Name | Linux Hosting | Datacenter Details |
| Transfer Domain Name | Windows Hosting | Hosting Security |
| View Domain Pricing | WordPress Hosting | 24 x 7 Servers Monitoring |
| Whois Lookup | Linux Reseller Hosting | Backup and Recovery |
| Name Suggestion Tool | Windows Reseller Hosting | |
| Free with Every Domain | Dedicated Servers | **Support** |
| Domain Offers | Cloud Hosting | View Knowledge Base |
| | Website Builder | Contact Support |
| | Business Email | Report Abuse |
| | Enterprise Email | About Whois |
| | Google Workspace | |
| | SSL Certificates | |
| | Sitelock | |
| | CodeGuard | |

Copyright © Whois.com. All rights reserved | Legal Agreement | Privacy Policy

ANNEX 7



# BAY STATE IP

One Boston Place, 201 Washington St, Suite 2600 Boston, MA 02108
617.439.3200 (phone) | 617.507.0757 (facsimile) | www.baystatepatent.com
*Patents • Trademarks • Copyrights*

### PRIVILEGED AND CONFIDENTIAL COMMUNICATION
### IN FURTHERANCE OF SETTLEMENT PURPOSES ONLY

July 6, 2015

### VIA CERTIFIED MAIL

Boston Sports Medicine And Research Institute, LLC
Attn: Dr. Thomas J. Gill, IV, M.D.
40 Allied Drive, Suite 110
Dedham, MA 02026

**Re:** __Unauthorized Use of the "Boston Sports Medicine" Mark__

Dear Dr. Gill:

Please be advised, that this law firm represents Boston Sports Medicine, Inc. ("Boston Sports Medicine") in connection with its Intellectual Property concerns, including prosecution of intellectual property and related litigation matters. As you should know, Boston Sports Medicine is the owner of a well-known mark for "Boston Sports Medicine" relating to the dynamic and ever-evolving field of physical therapy and the training surrounding physical therapy, along with providing immediate, individual and quality care by experienced licensed physical therapists using the most current equipment and techniques. A copy of our client's United States Federal Registration for the mark "Boston Sports Medicine" is enclosed as Exhibit **A**. Boston Sports Medicine has invested heavily in the advertising and promotion of its mark, and in doing so has established source identification and substantial good will in the same over many years of existence. Additional information regarding Boston Sports Medicine is available through Boston Sports Medicine's main website, http://www.bostonsportsmed.com.

It has come to our client's attention that you are operating a business offering personal and group training services under the name of Boston Sports Medicine and Research Institute, LLC, and have registered the identical and confusingly similar domain name www.bostonsportsmedicine.com to advertise your services. Upon information and belief, it appears that you began operating under the Boston Sports Medicine and Research Institute, LLC name and trademark since January 15, 2014, well after our client's trademark acquired distinctiveness for services that are identical to the services offered under our client's trademark. Your company and domain name incorporate our client's trademark and/or are confusingly similar to the Boston Sports Medicine trademark. Our client has not authorized nor consented to your use of the Boston Sports Medicine name and domain name. It appears that you use the Boston Sports Medicine and Research Institute and the corresponding domain name in order to, among other things, advertise and promote your company's services which are similar in nature to those provided by our client to its customers.

Such conduct and continued use of the Boston Sports Medicine trademark, without our client's consent and authorization, may constitute trademark infringement, cybersquatting, unfair competition, false advertising, false designation of origin, and dilution, all of which are violations of federal law and state law. The Federal Trademark Act provides numerous remedies for the misuse of a trademark or trade name including preliminary and permanent injunctive relief, money damages, the infringer's profits, an award of attorney's fees and costs, and up to three times the amount of actual damages.

Therefore, we must request on behalf of our client, that you and any of your other affiliates immediately discontinue the advertising and promotion of services and description under Boston Sports Medicine And Research Institute, or any other similar mark of our client, in the United States, for personal and group training services. If you agree to these requests, we believe this matter may be resolved amicably. However, should you fail to comply, Boston Sports Medicine will take all appropriate actions to protect and enforce its valuable trademark rights.

Accordingly, we are hereby providing you with formal notice of our client's rights and further demand on its behalf that you immediately take the following actions:

- Cease and desist from all use of the Boston Sports Medicine and Research Institute trademark for goods and/or services in any manner that suggests or implies any connection or affiliation between you and our client;

- Refrain from and/or cease and desist from any manufacture, use, distribution, display or sale of any products or services bearing or used in connection with the Boston Sports Medicine trademark;

- Immediately cease and refrain from further registering any domain names corporate names, trade names, and/or product names that consist of, in whole or in part, the Boston Sports Medicine name or mark, the Boston Sports Medicine trademark, and/or any marks confusingly similar thereto; and

- Immediately transfer and assign any domain names that consist of, in whole or in part, Boston Sports Medicine name or mark, the Boston Sports Medicine trademark, and/or any marks confusingly similar thereto, including without limitation the www.bostonsportsmedicine.com domain name.

Furthermore, we demand that you provide written confirmation that you have taken the aforementioned actions and that, in the future, you will refrain from making any similar use of the Boston Sports Medicine trademark. Such written confirmation must be received no later than July 15, 2015. Provided we receive your immediate cooperation, our client may waive any claim for additional damages. If you refuse to comply with these demands, our client is prepared to take the necessary legal measures to prevent any further misuse of its valuable trademark, and to recover all damages to which it may be entitled.

This letter is not intended to be a complete recitation of our client's rights. Boston Sports Medicine reserves all rights, including but not limited to, the right to modify and amend the claims contained herein, and to assert other claims that may not have been asserted herein.

We look forward to your timely response.

Sincerely,

Adam J. Bruno
George S. MacInnis
Bay State IP, LLC
One Boston Place, Suite 2600
201 Washington St.
Boston, MA 02108
(617) 439-3200
abruno@baystatepatent.com


Enclosure

# EXHIBIT A



**United States Patent and Trademark Office**

Home | Site Index | Search | FAQ | Glossary | Guides | Contacts | eBusiness | eBiz alerts | News | Help

# Trademarks > Trademark Electronic Search System (TESS)

*TESS was last updated on Mon Jun 29 03:21:45 EDT 2015*

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP |

Logout   Please logout when you are done to release system resources allocated for you.

# Record 1 out of 1

| TSDR | ASSIGN Status | TTAB Status |   *( Use the "Back" button of the Internet Browser to return to TESS)*



| | |
|---|---|
| **Word Mark** | **BOSTON SPORTS MEDICINE** |
| **Goods and Services** | IC 044. US 100 101. G & S: Medical, physical rehabilitation and physical therapy services. FIRST USE: 20030630. FIRST USE IN COMMERCE: 20030630 |
| **Mark Drawing Code** | (3) DESIGN PLUS WORDS, LETTERS, AND/OR NUMBERS |
| **Design Search Code** | 02.01.02 - Men depicted as shadows or silhouettes of men; Silhouettes of men |
| | 02.01.19 - Athletes (men); Golfer; Men, athletes, strongmen; Strongmen |
| | 02.09.19 - Diving, humans; Humans, including men, women and children, depicted playing games or engaged in other sports; Playing games or sports, humans |
| | 21.03.01 - Balls including playground balls, beach balls, billiard balls, tennis balls, bingo balls and lottery balls; Beach balls; Billiard balls; Bingo balls; Lottery balls; Paddle balls; Playground balls; Table tennis balls; Tennis balls |
| **Serial Number** | 86335888 |
| **Filing Date** | July 14, 2014 |
| **Current Basis** | 1A |
| **Original Filing Basis** | 1A |
| **Published for Opposition** | March 17, 2015 |
| **Registration Number** | 4746612 |
| **Registration Date** | June 2, 2015 |
| **Owner** | (REGISTRANT) Boston Sports Medicine CORPORATION MASSACHUSETTS P.O. Box 322 1 Braintree Street Alston MASSACHUSETTS 02134 |
| **Attorney of Record** | ADAM J. BRUNO |
| **Disclaimer** | NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "SPORTS MEDICINE" APART FROM THE MARK AS SHOWN |

| | |
|---|---|
| **Description of Mark** | The color(s) red, black and teal is/are claimed as a feature of the mark. The mark consists of an athlete kicking a ball and with the words "Boston Sports Medicine" located in front of the athlete, the athlete is black, the words "BOSTON" and "MEDICINE" are teal, and the word "SPORTS" is red. |
| **Type of Mark** | SERVICE MARK |
| **Register** | PRINCIPAL-2(F)-IN PART |
| **Live/Dead Indicator** | LIVE |
| **Distinctiveness Limitation Statement** | As to "BOSTON SPORTS MEDICINE" |

TESS HOME | NEW USER | STRUCTURED | FREE FORM | Browse Dict | SEARCH OG | Top | HELP

|.HOME | SITE INDEX| SEARCH | eBUSINESS | HELP | PRIVACY POLICY

ANNEX 8



**MANION GAYNOR & MANNING LLP**

21 Custom House Street
Boston, MA 02110

617 670 8800 *main*
617 670 8801 *fax*
www.mgmlaw.com

Larry K. DeMeo
Attorney at Law
Direct Dial: 617 670 8573
Direct Fax: 617 670 8773
E-mail: ldemeo@mgmlaw.com
Admitted In: MA, USPTO

July 27, 2015

**Via First Class and E-Mail**

Adam J. Bruno
Bay State IP
One Boston Place
201 Washington Street, Suite 2600
Boston, MA  02108

> RE:   Boston Sports Medicine, Inc./Boston Sports Medicine and Research Institute,
> LLC

Dear Mr. Bruno:

Boston Sports Medicine and Research Institute, LLC ("BSMRI") has asked me to review and respond to your letter dated July 6, 2015.  In that letter, you suggest that BSMRI's alleged use of its name in commerce "may" constitute "trademark infringement, cybersquatting, unfair competition, false advertising, false designation of origin, and dilution…" with respect to U.S. Trademark Serial No. 86335888 ("the asserted mark").  After reviewing the basis of your concerns as outlined in your letter, I can assure you with confidence that BSMRI does not infringe Boston Sports Medicine's ("BSM") trademark, that its alleged use of the domain www.bostonsportsmedicine.com does not constitute cybersquatting, and BSMRI's conduct does not violate any other of BSM's rights.

1.  Trademark Infringement

There is simply no likelihood that BSMRI's use of its name will cause confusion, mistake, or deception among consumers in the marketplace.  The asserted mark is a stylized design which "consists of an athlete kicking a ball and the words Boston Sports Medicine located in front of the athlete, the athlete is black, the words BOSTON and MEDICINE are teal, and the word SPORTS is red."  BSMRI does not employ any design similar to BSM's, and there is, therefore, no likelihood of consumers becoming confused as to the source of the services.

In addition to the fact that BSMRI employs no similar design, substantial differences exist in the services offered by BSM and BSMRI.  While BSMRI offers advanced orthopedic and surgical care and research from licensed medical doctors, BSM offers only physical therapy and post-surgical rehabilitation, not administered by physicians.  As such, there is no risk that sophisticated consumers carefully choosing medical care will mistake BSM and BSMRI.  This



Mr. Adam J. Bruno
July 27, 2015
Page 2

explains, in part, why there is no evidence of any consumer ever confusing BSM and BSMRI at any time.

Even if there were actual confusion, or even a risk of confusion, BSMRI would not infringe the asserted mark, however, because the literal elements of the mark are highly descriptive and suggestive of the services offered. They are, therefore, very weak.

The weakness of the mark was specifically noted by the U.S. Patent and Trademark Office during its examination of the mark. In the first office action on the merits of the application for the asserted mark, the PTO noted that the term SPORTS MEDICINE is merely descriptive of the services offered and BOSTON is primarily geographically descriptive. As a result, BSM specifically disclaimed the right to use SPORTS MEDICINE apart from the mark as shown. While BSM did not specifically disclaim the term BOSTON SPORTS MEDICINE, claiming that the term had acquired distinctiveness under 15 U.S.C. § 1052(f) based on its assertion of substantially exclusive and continuous use in commerce for at least five years, that claim was not—because it cannot be—supported by any affidavit or actual evidence.[1]  As such, any assertion of infringement based on the literal elements of the mark will fail.

2. Cybersquatting

Under the provisions of the Uniform Domain Name Dispute Resolution Policy and Procedure ("UDRP"), in order to prevent BSMRI from using its domain name, BSM would have to show: (a) BSMRI's registered domain is confusingly similar to BSM's service mark; (b) BSMRI has no rights or legitimate interest in the domain name; and (c) BSMRI registered and used the domain names in bad faith.

BSM's assertion of possible cybersquatting fails all three of these elements. First, BSM's registered mark is to a stylized design with weak literal elements and therefore consumers will not confuse the domain name with the mark. Second, BSMRI has a legitimate interest in the domain name because it is a functioning business and its domain is reflective of its true business name. Third, BSMRI did not register the name in a bad faith attempt to extract a fee from BSM or any other business; rather it registered the domain for actual use with its legitimate business.

As BSMRI is not infringing BSM's trademark and is not cybersquatting its domain name, there is likewise no basis for the concerns expressed in your letter regarding unfair competition, false advertising, false designation of origin, or dilution. Therefore, and for all of the reasons

---

[1] A 37 C.F.R. § 2.20 declaration signed by the *applicant* is generally required to support a finding of acquired distinctiveness, and an affidavit of counsel giving his opinion as to acquired distinctiveness is of "no probative value whatsoever". *In re Gray, Inc.*, 3 U.S.P.Q.2d 1558 (1987). Moreover, even if an affidavit from the applicant were in the record, a mere conclusory affidavit without the factual basis for the declarant's belief is unpersuasive. *In re Chem Dynamics Inc.*, 839 F.2d 1569, 1571 (Fed. Cir. 1988).



Mr. Adam J. Bruno
July 27, 2015
Page 3

outlined above, BSMRI will not fulfill your request to discontinue advertising and promotion of its services using its legal name.

Sincerely,

Larry K. DeMeo

ANNEX 9









https://www.bostonsportsmedicine.com/about/our-staff.html

## ABOUT US

OUR MISSION

OUR STAFF

NEWS AND PRESS

CONTACT AND DIRECTIONS

GIVING TO BOSTON SPORTS
MEDICINE AND RESEARCH
INSTITUTE

## Our Staff

### Thomas J. Gill, MD

Director, Boston Sports Medicine and Research Institute

Professor of Orthopedic Surgery, Tufts Medical School

Chairman of Orthopedic Surgery, Steward Healthcare Network

### Brian Petrone, PA-C

Physician Assistant

bpetrone@partners.org

### Sheryl Hassett, RN

Registered Nurse

SHASSETT@partners.org



https://www.bostonsportsmedicine.com/patients/Surgical-Information.html

**REHABILITATION PROTOCOLS**

**INJURY PREVENTION TIPS**

Email:   abates@nebh.org

Please contact Amanda for any questions regarding:

- Surgical Scheduling
- Post-op appointment scheduling
- Medical Clearance
- Insurance Verification
- Prior Authorization

**Nicole Chea- Administrative Assistant**
Phone: 781-251-3535
Email:   Nchea@partners.org

Please contact Nicole for any questions regarding:

- Academic meeting/travel
- Medical Equipment/DME
- Work Comp inquires
- Medical Records
- Viscosupplementation
- Vision Scope
- Deposition/Narrative request

**Sheryl Hassett- Registered Nurse**
Phone: 781-251-3535
Email:   Shassett@partners.org

Please contact Sheryl for any questions regarding:

- Post-op Recovery/Rehabilitation
- Physical Therapy
- Disability paperwork
- Medications/pain management

**Billing Information: DBI Billing**

ANNEX 10



**BAY STATE IP**

One Boston Place, 201 Washington St, Suite 2600 | Boston, MA 02108
617.439.3200 (phone) | 617.507.0757 (facsimile) | www.baystatepatent.com
*Patents • Trademarks • Copyrights*

### *PRIVILEGED AND CONFIDENTIAL COMMUNICATION IN FURTHERANCE OF SETTLEMENT PURPOSES ONLY*

September 29, 2015

### *VIA CERTIFIED MAIL AND ELECTRONIC MAIL*

Larry K. DeMeo
Manion Gaynor & Manning LLP
21 Custom House Street
Boston, MA 02110

**Re:**   **Continued and Willful Unauthorized Use of the "Boston Sports Medicine" Mark**

Dear Mr. DeMeo:

This firm is in receipt of your letter dated July 27, 2015 and we thank you for addressing our correspondence. However, substantively, Boston Sports Medicine, Inc. ("BSM") reasserts that the use of the term "Boston Sports Medicine and Research Institute" ("the BSMRI name") by your clients Boston Sports Medicine and Research Institute ("BSMRI") constitutes, at very least but in no manner limited to, trademark infringement, cybersquatting, unfair competition, false advertising, false designation of origin and dilution of our client's registrations. This rings particularly true in light of your clients' flagrant and continued use of the term "Boston Sports Medicine" alone with no additional terms on their web site at the domain www.bostonsportsmedicine.com. Herein BSM, addresses the continued illicit activities of BSMRI.

Initially and of highest import, with regards to BSMRI's assertion that no likelihood of consumer confusion can exist, it has recently come to the attention of BSM that consumer confusion does exit and has existed for some time now. As BSM will illustrate herein, BSM possesses tangible evidence of actual consumer confusion.

The "touchstone of liability under § 1114" of the Lanham Act is whether the alleged infringement is likely to cause confusion among consumers regarding the goods' origin.

1

15 U.S.C. § 1114(1)(a) (2009); *Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.*, 502 F.3d 504, 515 (6th Cir. 2007). Courts typically use some variation of the *Polaroid* test to determine whether likelihood of confusion has occurred. In *Polaroid*, Judge Friendly articulated an eight factor test for likelihood of confusion; one of these factors is actual consumer confusion. *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961).

The First Circuit uses the following eight factors to determine whether there is a likelihood of confusion: 1. Similarity of marks; 2. Similarity of Goods; 3. The relationship between the parties' channels of trade; 4. The relationship between the parties' advertising; 5. Classes of prospective purchasers; 6. **Evidence of actual confusion**; 7. The defendant's intent in adopting the mark; and 8. The strength of the plaintiff's mark." *Pignons S. A. de Mecanique de Precision v. Polaroid Corp.*, 657 F.2d 482, 487 (1st Cir. 1981) (Emphasis added).

Often, the sixth factor of the Pignons test, "evidence of actual confusion" is the best evidence of possible future confusion. *Goya Foods Inc. v. Orion Distributors, Inc.*, 916 F.Supp.2d 177, 184 (2012). Evidence of actual confusion is often considered the most persuasive evidence of likelihood of confusion because past confusion is frequently a strong indicator of future confusion." *Dorpan, S.L. v. Hotel Melia, Inc.*, 738 F.3d 55, 69 (2013). In *Pignons* the court held that absent evidence of actual confusion, "when the marks have been in the same market, side by side, for a substantial period of time, there is a strong presumption that there is little likelihood of confusion." *Pignons* at 490. Three to four years of coexistence has been held to be a "substantial" period of time. *Id.* Likelihood of confusion can be established without any evidence of actual confusion. *Venture Tape Corp. v. McGills Glass* Warehouse, 540 F.3d 56, 88 (1st Cir. 2008).

The *Polaroid* Factors include: "(1) the strength of the plaintiff's mark; (2) the degree of similarity between the two marks; (3) the proximity of the products; (4) the likelihood that the owner will bridge the gap; **(5) evidence of actual confusion**; (6) defendant's good faith in adopting the mark; (7) the quality of defendant's product; and (8) the sophistication of the buyers." *Polaroid Corp.* at 495 (internal citations omitted) (Emphasis added).

As you should know, in the same manner as shown in *Polaroid Corp*, the modern standard additionally places great weight on actual confusion as follows: in determining likelihood of confusion under Section 2(d), a (13) factor test is employed, specifically: (1) the similarity or dissimilarity of the marks in their entireties as to appearance, sound, connotation, and commercial impression; (2) the similarity or dissimilarity and nature of the goods or services as described in an application or registration or in connection with which a prior mark is in use; (3) the similarity of dissimilarity of established, likely-to-continue trade channels; (4) the conditions under which, and buyers to whom, sales are made, that is, "impulse" vs. careful, sophisticated purchasing; (5) the fame of the prior mark; (6) the number and nature of similar marks in use on similar goods; (7) **the nature and extent of any actual confusion**; ... . *In re E.I. DuPont de Memours & Co.*, 476 F.2d 1357 (C.C.P.A. 1973)(Emphasis added).

2

"Courts have often emphasized the strong influence of <u>actual confusion</u> evidence on their likelihood of confusion determinations, often calling this factor the most important of all. The Fourth Circuit calls evidence of actual confusion "often dispositive," the Ninth Circuit has concluded that it is "persuasive proof that future confusion is likely" and the Seventh and Fifth Circuits have opined that "very little proof of actual confusion would be necessary to prove likelihood of confusion." If there are documented instances of actual confusion where the marks have been simultaneously used in the marketplace for only a short time, courts view such evidence as strongly supporting likelihood of confusion." Jerome Gilson & Anne Gilson Lalonde, 5-5 Gilson on Trademarks § 5.04 (2006) (internal citations omitted) (Emphasis added).

While the importance of each factor depends upon the facts of the case, **evidence of actual confusion "is often paramount."** *Lyons P'ship, L.P. v. Morris Costumes, Inc.*, 243 F.3d 789, 804 (4th Cir. 2001). This evidence can be introduced in several ways, one of which is through the testimony of employees relating interactions with confused customers. 4 MCCARTHY ON TRADEMARKS & UNFAIR COMPETITION § 23:15 (4th ed. 2009) ("MCCARTHY").

In line with the legal standard provided herein, BSM possesses numerous cases of actual consumer confusion that meet the proper evidentiary level. Some examples of evidence of actual confusion include patients mistaking BSM for BSMRI when contacting BSM's office to making appointments. Others include patients contacting BSM's social media accounts.

In addition to the confusion regularly experienced by patients, insurance company representatives, doctors, and other individuals seeking patient records and information have confused BSMRI with BSM. Plainly, these are all sophisticated consumers who, as you stated in your letter, carefully choose their medical care, and yet these astute individuals evince confusion due to the similarity in the marks and the services. BSM possesses recorded evidence of confusion of consumers as recently as September of 2015. Furthermore, in addition to the evidence of actual confusion occurring, it is clear that actual confusion will continue to occur as consumers will either mistake, or be deceived by, the existence of two identical companies in the marketplace.

BSMRI negatively asserts that BSM's mark includes a stylized design, however, when determining whether likelihood of confusion exists, the literal elements of a mark trump design considerations. "Consumers are generally more inclined to focus on the first word, prefix or syllable in any trademark or service mark. *See Palm Bay Imps., Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*, 396 F. 3d 1369, 1372, 73 USPQ2d 1689, 1692 (Fed. Cir. 2005); *see also Mattel Inc. v. Funline Merch. Co.*, 81 USPQ2d 1372, 1374-75 (TTAB 2006); *Presto Prods., Inc. v. Nice-Pak Prods., Inc.*, 9 USPQ2d 1895, 1897 (TTAB 1988) ("it is often the first part of a mark which is most likely to be impressed upon the mind of a purchaser and remembered" when making purchasing decisions)." One of the first factors in determining whether a likelihood of confusion exists involves a review of a mark in light of the cited registration to analyze the "similarity or dissimilarity of the marks in their entireties as to appearance, sound, connotation, and commercial impression".

*In re Martin's Famous Pastry Shoppe, Inc.,* 223 U.S.P.Q. 1289, 1289 (Fed. Cir. 1984). This test is coupled with the precedent that an addition, subtraction, or substitution of words or letters may be sufficient to make the marks dissimilar in appearance, depending on the commercial impression given to the relevant public. *Recot Inc. v. Becton,* 50 U.S.P.Q.2d 1439 (TTAB 1999). An addition of words may be sufficient to make the marks dissimilar in appearance, depending on the overall commercial impression given to the relevant public. T.M.E.P. 1207.01(b). An applicant must show that the differences between the two marks significantly change the overall commercial impression made by the applicant's mark. *In re Electrolyte Labs. Inc.,* 16 U.S.P.Q.2d 1239, 1240 (Fed. Cir. 1990).

Comparing the BSMRI name with the BSM registered mark, in line with the above standard, as the first three elements of BSMRI's name mimic the entirety of BSM's mark, there is no question that the BSMRI name creates confusion with the BSM registered mark. Moreover the addition of the generic words "and RESEARCH INSTITUTE" fails to qualify as sufficient to make the marks dissimilar in appearance and fail to change the overall commercial impression of the mark.

First, when inspecting the BSMRI name, it must be inspected for its similarity to the cited BSM registration in appearance, sound, and connotation. The appearance of the BSMRI mark as a whole is very similar to the registered BSM mark. Although the BSMRI has the addition of the terms "Research (R) Institute (I)," the exact same terms "Boston Sports Medicine" is used and both marks, as a whole, are substantially similar.

Second, the sound inference of BSMRI's mark is substantially similar to the BSM mark. Consumers are generally more inclined to focus on the first part of a mark when identifying a service and making a consumer decision. *See Mattel Inc. v. Funline Merch. Co.,* 81 USPQ2d 1372, 1374-75 (TTAB 2006); *Presto Prods., Inc. v. Nice-Pak Prods., Inc.,* 9 USPQ2d 1895, 1897 (TTAB 1988) ("it is often the first part of a mark which is most likely to be impressed upon the mind of a purchaser and remembered" when making purchasing decisions)."

Herein, the term "Boston Sports Medicine" which is the first term of both marks, is what will be impressed into the consumer's mind. American consumers naturally read from left to right and would encounter the first portion of BSMRI, the "Boston Sports Medicine" before they would encounter anything else. Thus, a consumer viewing BSMRI's goods and services on display with the "Boston Sports Medicine" mark would confuse those with BSMRI goods and services because they would focus on the "Boston Sports Medicine" portion of the mark.

Furthermore, BSMRI asserts that the services offered by BSMRI and BSM are substantially different, however, both medical groups partake in physical therapy and post-surgical rehabilitation and recovery, as well as preoperative services. These services are advertised on the BSMRI website for patients.

The goods or services need not be identical, rather, they need only be related in some manner, or the conditions surrounding their marketing are such that they would be

encountered by the same purchasers under circumstances that would give rise to the mistaken belief that the goods and/or services come from a common source. *In re Total Quality Group, Inc.*, 51 USPQ2d 1474, 1476 (TTAB 1999); TMEP §1207.01(a)(i); *see, e.g., On-line Careline Inc. v. Am. Online Inc.*, 229 F.3d 1080, 1086-87, 56 USPQ2d 1471, 1475-76 (Fed. Cir. 2000); *In re Martin's Famous Pastry Shoppe, Inc.*, 748 F.2d 1565, 1566-68, 223 USPQ 1289, 1290 (Fed. Cir. 1984).

"Relatedness means, in this context, that the goods or services of applicant and the registrant are related in some manner or some circumstance surrounding the marketing such that they are likely to be encountered by the relevant public under circumstances that will give rise to the mistaken belief that they originate from or in some way are associated with or sponsored by the same producer." *In re Sloppy Joe's Int'l Inc.*, 43 U.S.P.Q. 2d 1350, 1356 (TTAB 1996).

When determining whether there is a likelihood of confusion, all circumstances surrounding the sale of the goods and/or services are considered. *Industrial Nucleonics Corp. v. Hinde,* 475 F.2d 1197, 177 USPQ 386 (C.C.P.A. 1973). The relevant circumstances include the degree of similarity between the goods and/or services and the marketing channels.  In the present case, the identical nature of the services that are associated with BMSRI and BMS respectively warrant a conclusion **that there is and there will continue to be confusion in the marketplace and with consumers.**

Finally, in conjunction with the above evidence of actual consumer confusion, there are indications on BSMRI's web site that BSMRI intentionally and willfully utilizes the terminology "Boston Sports Medicine" alone, without the terms "Research Institute." Such illicit infringing activity, particularly in conjunction with the identical nature of the services of BSM and BSMRI cannot be tolerated.  Furthermore, upon searching "Boston Sports Medicine" using search engines like Google™, Bing™, etc., BSMRI uses the highlight tag "Boston Sports Medicine" and omits "Research Institute."  Again, this is a direct infringement on the BSM trademark and also contributes to the likelihood of consumers becoming confused. These, and not to mention BSMRI's domain name all are contributing factors in causing actual consumer confusion.

Therefore, consistent with our original plea, we must request on behalf of our client, that your client and any of their affiliates immediately discontinue the advertising and promotion of services and description under Boston Sports Medicine And Research Institute, or any other similar mark of our client, in the United States, for personal and group training services.  If your client agrees to these requests, we believe this matter may be resolved amicably.  However, should your client fail to comply, Boston Sports Medicine will take all appropriate actions to protect and enforce its valuable trademark rights.

Accordingly, our original letter provided formal notice of our client's rights and here we once again demand that your client immediately take the following actions:

- Cease and desist from all use of the Boston Sports Medicine and Research Institute trademark for goods and/or services in any manner that suggests or implies any connection or affiliation between you and our client;

- Refrain from and/or cease and desist from any manufacture, use, distribution, display or sale of any products or services bearing or used in connection with the Boston Sports Medicine trademark;

- Immediately cease and refrain from further registering any domain names corporate names, trade names, and/or product names that consist of, in whole or in part, the Boston Sports Medicine name or mark, the Boston Sports Medicine trademark, and/or any marks confusingly similar thereto; and

- Immediately transfer and assign any domain names that consist of, in whole or in part, Boston Sports Medicine name or mark, the Boston Sports Medicine trademark, and/or any marks confusingly similar thereto, including without limitation the www.bostonsportsmedicine.com domain name.

Furthermore, we demand that your client provide written confirmation that they have taken the aforementioned actions and that, in the future, your client will refrain from making any similar use of the Boston Sports Medicine trademark. Such written confirmation must be received no later than October 15, 2015. Provided we receive your client's immediate cooperation, our client may waive any claim for additional damages. If your client refuses to comply with these demands, our client is prepared to take the necessary legal measures to prevent any further misuse of its valuable trademark, and to recover all damages to which it may be entitled.

This letter is not intended to be a complete recitation of our client's rights. Boston Sports Medicine reserves all rights, including but not limited to, the right to modify and amend the claims contained herein, and to assert other claims that may not have been asserted herein.

We look forward to your timely response.

Sincerely,

Adam J. Bruno
George S. MacInnis
Bay State IP, LLC
One Boston Place, Suite 2600
201 Washington St.
Boston, MA 02108
(617) 439-3200
abruno@baystatepatent.com

6

ANNEX 11



**MANION GAYNOR & MANNING LLP**

125 High Street
Boston, MA 02110

617 670 8800 *main*
617 670 8801 *fax*
www.mgmlaw.com

**Larry K. DeMeo**
Attorney at Law
Direct Dial: 617 670 8573
Direct Fax: 617 670 8773
E-mail: ldemeo@mgmlaw.com
Admitted In: MA, USPTO

November 12, 2015

**VIA FIRST CLASS AND ELECTRONIC MAIL**

Adam J. Bruno
Bay State IP, LLC
One Boston Place, Suite 2600
201 Washington St.
Boston, MA 02108

RE:   Boston Sports Medicine Mark

Dear Mr. Bruno:

Thank you for your patience while I was on trial, I appreciate the courtesy.  I have now had an opportunity to review your letter of September 29 and discuss it with my client.

Your letter has not changed my opinion that there is no infringement and that the mark is very weak and would probably be invalidated.  Moreover, to the extent the mark could be considered valid and enforceable against my client, I remain unconvinced that there is sufficient evidence of actual confusion to establish infringement.  While your letter asserts that your client has evidence of actual confusion, it is noteworthy that none was included in your letter. If you will provide that evidence, I will be happy to review and evaluate it.

Nevertheless, although my client is well within his rights to continue to use its name and its web address, rather than engage in an unnecessary and avoidable litigation, it may be worthwhile for you and I to engage in an informal discussion on our clients' behalf to see if there may be a mutually beneficial business solution to the dispute.  To that end, please let me know if your client would be willing to consider such a solution and, if so, let me know when you may be available for a phone call.

Sincerely,

Larry K. DeMeo

LKD/je
#1477815

ANNEX 12

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

BOSTON SPORTS MEDICINE, INC.,

          Plaintiff,

v.

BOSTON SPORTS MEDICINE &
RESEARCH INSTITUTE , LLC,

       Defendant.

Civil Action No.:

## PLAINTIFF, BOSTON SPORTS MEDICINE, INC.'S
## COMPLAINT AND JURY DEMAND

NOW COMES the plaintiff, Boston Sports Medicine, Inc., and files this Complaint against the Defendant, Boston Sports Medicine & Research Institute, LLC, alleging as follows:

## NATURE OF THE ACTION

1.     This action arises under the Trademark Act of 1946, 15 U.S.C. §§ 1051 *et seq*., as amended (the "Lanham Act"), and the laws of the Commonwealth of Massachusetts. Plaintiff owns the BOSTON SPORTS MEDICINE service mark for use in connection with a variety of goods and services in the field of rehabilitation and physical therapy. Defendant is improperly using Plaintiff's service mark and domain name to confuse consumers. Defendant's activities are likely to cause consumer confusion unless enjoined.

1

## PARTIES

2.      Plaintiff Boston Sports Medicine, Inc., (hereinafter "Boston Sports Medicine") is a corporation organized under the laws of the Commonwealth of Massachusetts with a principal office located in Boston, Massachusetts that does business at, among other locations,  1 Braintree Street in Allston, Massachusetts 02134, under the name of Boston Sports Medicine.

3.      Defendant, Boston Sports Medicine & Research Institute, LLC, (hereinafter "Defendant"), is a limited liability company organized under the laws of the Commonwealth of Massachusetts, on January 15, 2014, with a principal office indicated in the corporate documents located at 8 Hawthorne Place, Suite 110, Boston, Massachusetts 02114, and a principal office indicated on its website of 40 Allied Drive, Dedham, Massachusetts 02026.

## JURISDICTION AND VENUE

4.      Jurisdiction in this Court is proper as this Complaint poses federal questions arising under particular federal statutes, including the Federal Trademark Act (the "Lanham Act") as amended in 15 U.S.C., §§ 1051 *et seq.*, and the Unfair Competition Act under 15 U.S.C., §§ 1125 *et seq.*  This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C., §§1331 and 1338, and 15 U.S.C., § 1121.

5.      To the extent this Complaint contains claims for relief under the laws of the Commonwealth of Massachusetts, those claims are specifically authorized to be brought in this Court under the supplemental jurisdiction provision of 28 U.S.C., § 1367 and under 28 U.S.C., § 1338.

6. The Court has personal jurisdiction over Defendant as they are conducting business within the Commonwealth of Massachusetts by, among other things, contracting to offer and offering services in the Commonwealth.

7. Venue is proper in the Commonwealth of Massachusetts and in this District pursuant to 28 U.S.C., § 1391 because a substantial part of the events or omissions giving rise to this action occurred in this District and Defendant is incorporated in the Commonwealth and within this judicial District.

**FACTS**

8. Boston Sports Medicine was founded in 1999, as the result of years of planning, training, and education by its owner Dr. Michael J. Velsmid ("Dr. Velsmid").

9. Boston Sports Medicine, was incorporated on January 1, 2001, as Allston-Brighton Physical Therapy, Inc. The company operated as Boston Sports Medicine from January of 2001 and filed an amendment to change its name to Boston Sports Medicine, Inc., with the Secretary of State on November 19, 2003.

10. Boston Sports Medicine has many well-known clinics with locations in several areas of Massachusetts, including Boston, Brookline, Marblehead, Somerville, and Watertown.

11. Boston Sports Medicine specializes in sports, dance, orthopedic, and post-surgical physical and aquatic therapy.

12. Dr. Velsmid holds the degrees of Doctor of Physical Therapy from MGH Institute of Health Professions, Master of Science in Exercise Science from the University

of Massachusetts, Amherst, and Master of Science in Physical Therapy from Simmons College.

13.    Dr. Velsmid started his career as a physical therapist at the Department of Veterans Affairs in 1995.

14.    Dr. Velsmid specializes in sports and outpatient orthopedics and has extensive experience in rehabilitation of high-level competitive athletes.

15.    Since starting Boston Sports Medicine, Dr. Velsmid and his team of clinicians have provided exceptional physical therapy care.

16.    Dr. Velsmid's first location for Boston Sports Medicine was at 556 Cambridge Street, Allston, Massachusetts which subsequently moved to 1 Braintree Street, Allston, Massachusetts.  By the opening of this first location Dr. Velsmid had carefully researched and chosen his clinic name "BOSTON SPORTS MEDICINE".

17.    Dr. Velsmid designed an accompanying logo for his clinics.

18.    On October 19, 2004, Boston Sports Medicine, obtained a Massachusetts trademark registration for the mark "Boston Sports Medicine" for physical therapy, muscular therapy, and massage therapy medical care.  A true and accurate copy of Boston Sports Medicine's mark Massachusetts registration is attached hereto as Exhibit A.

19.    The state trademark was renewed on September 3, 2014.  A true and accurate copy of Boston Sports Medicine's mark Massachusetts renewal registration is attached hereto as Exhibit B.  On July 14, 2014, Boston Sports Medicine, Inc. of which Dr. Velsmid is the Manager, filed an application for registration of the service mark "Boston Sports Medicine" with the United States Patent and Trademark Office ("USPTO").

4

20.      On June 2, 2015, the USPTO granted registration of "Boston Sports Medicine" on the Principal Register, with registration number 4,746,612 for medical, physical rehabilitation and physical therapy services, in Class 044 (hereinafter referred to as the "Boston Sports Medicine Mark").  A true and accurate copy of the Boston Sports Medicine's mark and registration is attached hereto as Exhibit C.

21.      Boston Sports Medicine has continuously used the Boston Sports Medicine Mark in connection with and to identify its services, in order to distinguish its services from the services offered by other companies.

22.      The result of Boston Sports Medicine's continuous use of the Boston Sports Medicine Mark is that it conveys an immediate idea of the Boston Sports Medicine clinics that have been created, and the high quality of service Boston Sports Medicine provides, such that the Boston Sports Medicine Mark has acquired secondary meaning.

23.      Boston Sports Medicine has made a substantial investment in the creation of the Boston Sports Medicine Mark and in the promotion and protection of the Boston Sports Medicine Mark, and considers the Mark among its most important and valuable assets.

24.      Boston Sports Medicine has the exclusive right, among other things, to exploit commercially the Boston Sports Medicine Mark and to bar use by any third parties of any confusingly similar marks or trade names.

25.      Through extensive use, continuous promotion, and prominent recognition by noteworthy publications, the Boston Sports Medicine Mark has come to be associated with Boston Sports Medicine and to identify Boston Sports Medicine as the

source of the goods and services offered in connection with the Boston Sports Medicine Mark.

26.     Those who define the market and potential market have come to recognize the Boston Sports Medicine Mark for the medical, physical rehabilitation and physical therapy services offered by Boston Sports Medicine.

27.     Boston Sports Medicine's use and promotion of the Boston Sports Medicine Mark has proven enormously successful as Boston Sports Medicine has created a loyal and growing following, together with a sterling medical reputation as exhibited by sources such as SportsMD, online customer reviews on Google, Yelp and other similar websites, and patients recognizing Boston Sports Medicine and highly recommending its services to others.

**DISCOVERY THAT DEFENDANT, BOSTON SPORTS MEDICINE & RESEARCH INSTITUTE, LLC, IS INFRINGING ON THE BOSTON SPORTS MEDICINE MARK AND IS UNFAIRLY COMPETING WITH BOSTON SPORTS MEDICINE**

28.     In or around June of 2014, Dr. Velsmid and the clinic director of Boston Sports Medicine, Dr. Erin Looney discovered that Dr. Thomas J. Gill, M.D. ("Gill") had opened Boston Sports Medicine & Research Institute, in Boston, Massachusetts.  Dr. Velsmid and Dr. Looney immediately realized that Boston Sports Medicine & Research Institute was a virtually identical clinic to Boston Sports Medicine, and thus an entity that infringes upon the Boston Sports Medicine Mark and unfairly competes with Boston Sports Medicine by using a confusingly similar name in the area where Boston Sports Medicine is known and uses the Boston Sports Medicine Mark.

6

29.     In or around June of 2014, Dr. Looney informed Dr. Velsmid that Boston Sports Medicine, received a fax intended for the "Boston Sports Medicine & Research Institute".

30.     The "Boston Sports Medicine & Research Institute" name is strikingly similar and nearly identical to the Boston Sports Medicine Mark and incorporates the Boston Sports Medicine Mark in the entirety.  There is little material difference in the sight, sound, and meaning between the trade names.

31.     After further investigation, in or around June of 2014, Dr. Velsmid discovered that Boston Sports Medicine & Research Institute had also registered the domain name www.bostonsportsmedicine.com to advertise its services.

32.     In or around February 2015, while browsing the Boston Sports Medicine & Research Institute's website, Dr. Velsmid recognized that both clinics offer physical therapy services. Specifically, the Boston Sports Medicine & Research Institute website possessed a "Physical Therapy" tab highlighting different physical therapy protocols.   A true and accurate copy of the Boston Sports Medicine & Research Institute website, showing the "Physical Therapy" tab, in February 2015 is attached hereto as Exhibit D.

33.     Further, upon clicking the "Physical Therapy" tab, Dr. Velsmid was directed to another specific Physical Therapy webpage, wherein physical therapy services were advertised.  A true and accurate copy of the Boston Sports Medicine & Research Institute Physical Therapy webpage in February 2015 is attached hereto as Exhibit E.

34.     Having learned of the extent of the Boston Sports Medicine & Research Institute infringement on the Boston Sports Medicine Mark, along with the actual customer confusion caused by Defendant's infringement, (discussed herein below), Boston Sports Medicine served a Cease and Desist letter upon Boston Sports Medicine & Research Institute and Gill on July 6, 2015.  A true and accurate copy of this July 6, 2015 letter is attached hereto as <u>Exhibit F</u>.

35.     This initial Cease and Desist letter expressly informed and furnished formal notice to Defendant that Boston Sports Medicine was a registered word mark that Defendant was infringing.  The letter additionally highlighted the customer confusion that the name Boston Sports Medicine & Research Institute will cause, and placed Defendant on notice of Boston Sports Medicine's intention to enforce the Boston Sports Medicine Mark.

36.     This initial Cease and Desist letter additionally requested that Defendant provide written assurances by July 15, 2015 that Defendant cease and desist from using the name Boston Sports Medicine and to immediately transfer and assign any domain names that consist of the Boston Sports Medicine Mark, including, without limitation, the <u>www.bostonsportsmedicine.com</u> domain name.

37.     On July 27, 2015, Defendant responded to the initial Cease and Desist letter. A true and accurate copy of this July 27, 2015 response letter is attached hereto as <u>Exhibit G.</u>

38.     Defendant stated in its response that the use of the Boston Sports Medicine & Research Institute name will not cause confusion, mistake, or deception among consumers in the marketplace.  See Exhibit G.

8

39.     Defendant also asserted that they did not offer similar services as Boston Sports Medicine and that a sophisticated consumer carefully choosing medical care would not mistake Boston Sports Medicine and Boston Sports Medicine & Research Institute. See Exhibit G.

40.     After receiving the response from Boston Sports Medicine & Research Institute, Dr. Velsmid continued to receive phone calls from confused consumers.

41.     On or around August of 2015, "JrEagleGirlsHockey" (@jr_eagle_girls on Twitter) mistakenly sent a "tweet" to the Twitter handle of Boston Sports Medicine, (@BostonSportsMed) thanking Dr. Gill for helping a patient recover from an injury. Additionally, several other individuals favorited this Tweet and "re-tweeted" it ("kaleigh donnelly", "Gayle Norcross", "Jake peters") thanking Dr. Gill.   A true and accurate copy of a screenshot of the Tweet to the Twitter handle of Boston Sports Medicine, is attached hereto as Exhibit H.

42.     On or about August of 2015, while once again browsing the Boston Sports Medicine & Research Institute website, Dr. Velsmid noticed that the "Physical Therapy" tab was removed from the website and replaced with a "Rehab Protocols" tab.  The new tab illustrated the exact same list of protocols as the "Physical Therapy" tab but was now renamed to "Rehab Protocols."   Furthermore, despite the curious removal of the tab, Defendant continues to offer physical therapy services as evidenced by their "Important Contact Information."  A true and accurate copy of the Boston Sports Medicine & Research Institute website on August 2015, is attached hereto as Exhibit I.

43.     Boston Sports Medicine sent Defendant a second Cease and Desist letter on September 29, 2015, that reiterated the demand that Defendant discontinue its

infringing and deceptive conduct. This second Cease and Desist letter also informed Defendant of the specific instances of consumer confusion.  A true and accurate copy of this September 29, 2015 Cease and Desist letter is attached hereto as Exhibit J.

44.     Boston Sports Medicine also reasserted that, although Defendant claimed that the services offered by the two companies were substantially different, both Boston Sports Medicine and Defendant offer physical therapy and post-surgical rehabilitation and recovery, as well as preoperative services.

45.     On October 1, 2015 Dr. Velsmid was notified by patient Juan Gali ("Gali") that Gali had been referred to Dr. Velsmid by another patient, David Serpa ("Serpa"), and that upon trying to contact Dr. Velsmid, Gali experienced difficulty trying to locate Dr. Velsmid because he was confused with Boston Sports Medicine & Research Institute.  Gali needed to re-contact Serpa in order to gain clarification on which Boston Sports Medicine to contact.  See Affidavit of Dr. Velsmid at ¶ 5, attached hereto as Exhibit K.

46.     On November 5, 2015, Dr. Velsmid was also notified by one of his employees, Michelle Perry ("Perry") that while attending a conference, Perry was approached by a representative of DONJOY/DJO Global who believed they were affiliated with Boston Sports Medicine & Research Institute.  Perry clarified that she in fact was associated with Boston Sports Medicine and not Boston Sports Medicine & Research Institute.  Perry then reported this incident to Dr. Velsmid.  See Affidavit of Dr. Velsmid at ¶ 6, attached hereto as Exhibit K.

47.     Defendant responded to the second Cease and Desist letter on November 12, 2015.

48.     Defendant reasserted that there was no evidence of actual confusion and that consumers are not likely to be confused.  A true and accurate copy of this November 12, 2015 Cease and Desist letter is attached hereto as Exhibit L.

49.     The inquiries Dr. Velsmid received regarding Boston Sports Medicine & Research Institute make it clear that public confusion has already arisen as to whether Boston Sports Medicine & Research Institute is affiliated with or sponsored by Boston Sports Medicine.

50.     To the extent that these and other prospective customers for whom Boston Sports Medicine and Boston Sports Medicine & Research Institute compete in the same market and the same area mistakenly believe that Boston Sports Medicine & Research Institute is authorized, licensed, endorsed, or sponsored by Boston Sports Medicine, and owing to the confusion created by offering virtually identical services, there is a grave risk of tarnishment to the Boston Sports Medicine Mark and Boston Sports Medicine itself.

51.     The services offered by Defendant are identical to the services offered under the Boston Sports Medicine Mark, both clinics offer physical therapy and rehabilitation services.

52.     Defendant was never authorized, licensed, or granted permission to use the Boston Sports Medicine Mark in connection with medical, physical rehabilitation and physical therapy services.

53.     Defendant's use of the Boston Sports Medicine Mark has already caused, presently causes, and is likely to continue to cause further confusion among consumers

11

and to deceive consumers as to the source, quality, and nature of Defendant's goods and services.

54.    Now with express knowledge as to Boston Sports Medicine's trademark rights, Defendant continues to use the confusing name "Boston Sports Medicine & Research Institute" they selected in an attempt to cause confusion in the marketplace and capitalize on the goodwill and reputation that has been developed by and is associated with "Boston Sports Medicine."

55.    Defendant's misappropriation of Boston Sport Medicine's name, its infringement of the Boston Sports Medicine Mark, and its unfair competition, has caused and continues to cause significant damages and irreparable harm to Boston Sports Medicine.

## COUNT I

### (Federal Trademark Infringement—15 U.S.C., §§ 1114 et seq.)

56.    Boston Sports Medicine incorporates and re-alleges by reference the above paragraphs 1 through 55 as if expressly set forth herein.

57.    Boston Sports Medicine is the legal owner of the Boston Sports Medicine Mark, has not abandoned the Boston Sports Medicine Mark since its first use, and has been, and continues to be, in continuous use in interstate and intrastate commerce.

58.    Defendant's unauthorized use, reproduction, copying or colorable imitations of the Boston Sports Medicine Mark, as explained above, and as done by

Boston Sports Medicine & Research Institute, has caused and is likely to continue to cause confusion, mistake, and/or deception among consumers as to the source, quality, and/or nature of Defendant's goods and services.

59.     Defendant's use, reproduction, copying or colorable imitation of the Boston Sports Medicine Mark also likely creates the misconception among consumers that Boston Sports Medicine somehow ratifies or authorizes Defendant's infringing use of the Boston Sports Medicine Mark and/or that Boston Sports Medicine is affiliated in some manner with Defendant's business, when such is not the case.

60.     Boston Sports Medicine did not give and has not given Defendant permission to use the Boston Sports Medicine Mark and Boston Sports Medicine, as owner of the Boston Sports Medicine Mark, objects to Defendant's past, and continued, infringing use of the Boston Sports Medicine Mark and/or any confusingly similar derivations thereof.

61.     While Boston Sports Medicine has notified Defendant on several occasions that its use of the Boston Sports Medicine Mark and/or any confusingly similar derivations thereof is unauthorized, Defendant continues to use and extensively exploit, for its own commercial advantage, the Boston Sports Medicine Mark, to the detriment of Boston Sports Medicine as well as the consuming public.

62.     Because Defendant's continued use of the Boston Sports Medicine Mark, and/or any confusingly similar derivations thereof, prevents Boston Sports Medicine from exercising exclusive control over its intellectual property rights and because Defendant's continued use of the Boston Sports Medicine Mark, and/or any confusingly similar derivations thereof, is likely to continue to cause confusion,

mistake, and/or deception as to the source, affiliation, or sponsorship of the goods and services that Defendant advertises, promotes, and/or sells through its infringing use of the Boston Sports Medicine Mark, Boston Sports Medicine lacks an adequate remedy at law.

63.     Unless temporary, preliminary and permanent injunctions are issued enjoining Defendant from any continuing or future infringing use of the Boston Sports Medicine Mark, Boston Sports Medicine will continue to sustain irreparable damage. Defendant has already proven it is a willful infringer who has complete disregard of the intellectual property rights of Boston Sports Medicine.

64.     Pursuant to 15 U.S.C., § 1116(a), Boston Sports Medicine is entitled to an order enjoining Defendant from using the Boston Sports Medicine Mark to advertise, market, and/or sell Defendant's goods or services.

65.     As a direct and proximate cause of Defendant's infringing conduct, Boston Sports Medicine has been damaged and will continue to be damaged. Pursuant to 15 U.S.C., § 1117(a), Boston Sports Medicine is entitled to an order requiring Defendant to account to it for any and all profits and other ill-gotten gains Defendant derived from its unauthorized and infringing use of the Boston Sports Medicine Mark, as detailed herein, and to an order awarding all damages sustained by Boston Sports Medicine by reason of Defendant's infringing conduct.

66.     As evidenced by, *inter alia*, Defendant's refusal to cease further use of the Boston Sports Medicine Mark after receiving notice of Boston Sports Medicine's objections to Defendant's infringement of the Boston Sports Medicine Mark, Defendant's conduct was and continues to be intentional and in conscious disregard of

Boston Sports Medicine's rights. Boston Sports Medicine, therefore, is entitled to an award of treble damages and/or enhanced profits from Defendant.

## COUNT II

### (Federal Unfair Competition and False Advertising—15 U.S.C., § 1125(a))

67.     Boston Sports Medicine incorporates and re-alleges by reference the above paragraphs 1 through 66 as if expressly set forth herein.

68.     Boston Sports Medicine is the legal owner of the Boston Sports Medicine Mark, has not abandoned the Boston Sports Medicine Mark since its first use, and the Boston Sports Medicine Mark has been, and remains in continuous use.

69.     Despite knowledge of Boston Sports Medicine's ownership interests in the Boston Sports Medicine Mark, Defendant has made, and continues to make, use in commerce of the Boston Sports Medicine Mark and/or any confusingly similar derivations thereof without Boston Sports Medicine's permission.

70.     Defendant's unauthorized use of the Boston Sports Medicine Mark creates a false association between Defendant and Boston Sports Medicine.

71.     Defendant's unauthorized infringing use of the Boston Sports Medicine Mark and/or any confusingly similar derivations thereof also tends to cause confusion, mistake, and/or deception among consumers as to the source, quality, and nature of Defendant's goods and services.

72.     Defendant has engaged in fraudulent business practices, false advertising, and unfair competition by using the Boston Sports Medicine Mark and/or any confusingly similar derivations thereof, associated goodwill, and other intangible

15

rights of Boston Sports Medicine without permission in an attempt to pass off Defendant's goods as coming from, being sponsored by, and/or affiliated with Boston Sports Medicine, when such is not the case.

73.     Defendant's use of the Boston Sports Medicine Mark and/or any confusingly similar derivations thereof, goodwill, and other intangible rights of Boston Sports Medicine is in direct violation of 15 U.S.C., § 1125(a) et seq., and represents false advertising and false designation of source entitling Boston Sports Medicine to all remedies available under the law.

74.     As a direct and proximate result of the foregoing conduct, Boston Sports Medicine is entitled to damages against Defendant, in an amount according to proof at trial, to a temporary, preliminary, and permanent injunction, and to any and all other relief the Court deems just and proper under the law.

## COUNT III

### (Unfair Methods of Competition / Deceptive Acts and Practices—M.G.L. c. 93A, §§ 2 and 11)

75.     Boston Sports Medicine incorporates and re-alleges by reference the above paragraphs 1 through 74 as if expressly set forth herein.

76.     Defendant is engaged in the conduct of trade or commerce within the meaning of M.G.L. c. 93A.

77.     The foregoing conduct by Defendant constitutes a pattern of unfair, deceptive, and fraudulent acts and practices within the meaning of M.G.L. c. 93A in that:

16

a.      Boston Sports Medicine is the legal owner of the Boston Sports
Medicine Mark, has not abandoned the Boston Sports Medicine Mark since its first
use, and the Boston Sports Medicine Mark has been, and continues to be, in continuous
use.   Despite knowledge of Boston Sports Medicine's ownership interests in the
Boston Sports Medicine Mark, Defendant has made, and intentionally continued to
make, use in commerce of the Boston Sports Medicine Mark without Boston Sports
Medicine's permission.

b.      Boston Sports Medicine never granted Defendant permission to use the
Boston Sports Medicine Mark or any similar marks or to engage in the offending
activities. After discovering Defendant's infringing use of the Boston Sports Medicine
Mark, Boston Sports Medicine demanded that Defendant cease further use of the
Boston Sports Medicine Mark. Defendant has refused to cease further use and
continues, to this day, to misappropriate Boston Sports Medicine's rights in the Boston
Sports Medicine Mark.

c.      Defendant has engaged in a pattern of unfair, deceptive, and fraudulent
acts to enrich itself by misappropriating Boston Sports Medicine's exclusive rights to
the Boston Sports Medicine Mark and using it for its own benefit.

d.      Defendant has engaged in fraudulent business practices, false
advertising, and unfair competition by using the Boston Sports Medicine Mark,
associated goodwill, and other intangible rights of Boston Sports Medicine, including
but not limited to an improper attempt to pass off Defendant's services as coming from,
being sponsored by, and/or affiliated with Boston Sports Medicine.

78.     Defendant's unauthorized use and intentional infringement of the Boston Sports Medicine Mark, as explained above, creates a false association between Defendant and Boston Sports Medicine and is likely to cause confusion, mistake, and/or deception among consumers as to the source, quality, and/or nature of Defendant's goods and services.

79.     Boston Sports Medicine has been damaged and will continue to be damaged by Defendant's unlawful, unfair, and fraudulent and deceptive business practices as alleged herein.

80.     Boston Sports Medicine is entitled to a preliminary and permanent injunction enjoining Defendant from using the Boston Sports Medicine Mark to advertise, market, and/or sell Defendant's goods or services.  Defendant has profited from its activities and, unless its conduct is enjoined, Boston Sports Medicine will continue to suffer irreparable harm that cannot be adequately calculated or compensated by monetary damages. Accordingly, injunctive relief is proper pursuant to M.G.L. c. 93A, § 11.

81.     As a direct and proximate result of Defendant's conduct, Boston Sports Medicine has been harmed and is entitled to damages against Defendant in an amount according to proof at trial and to any and all other relief the Court deems just and proper under the law.

82.     Boston Sports Medicine is informed and believes, and thereon alleges, that Defendant's conduct was intentional, willful, wanton, malicious, and in conscious disregard of Boston Sports Medicine's rights, thereby justifying an award of three

times its damages, together with reasonable attorneys' fees, pursuant to M.G.L. c. 93A, § 11.

## COUNT IV

### (Trademark Infringement Under M.G.L. c. 110H)

83.    Boston Sports Medicine incorporates and re-alleges by reference the above paragraphs 1 through 82 as if expressly set forth herein.

84.    Boston Sports Medicine owns and enjoys common law trademark rights which are superior to any rights Defendant may claim to any similar mark.

85.    As such, the Boston Sports Medicine Mark is entitled to protection under M.G.L. c. 110H, § 13.

86.    Defendant's unauthorized use of the Boston Sports Medicine Mark in Massachusetts was intended to cause confusion, or to cause mistake, or to deceive as to affiliation, connection, or association of Defendant with Boston Sports Medicine as to the origin, sponsorship, or approval of Defendant's goods.

87.    Defendant's infringement of the Boston Sports Medicine Mark has been willful, wanton, reckless, and done with full knowledge and disregard of Boston Sports Medicine's prior use and rights in its Mark.

88.    Defendant's unauthorized use of a mark confusingly similar to the Boston Sports Medicine Mark in Massachusetts has caused and will continue to cause substantial and irreparable injury to Boston Sports Medicine's business reputation unless Defendant's use of the Boston Sports Medicine Mark is enjoined by this Court.

89.     Boston Sports Medicine is entitled to injunctive relief to enjoin Defendant's further use of the Boston Sports Medicine Mark under M.G.L. c. 110H, § 3.

## COUNT V

### (Massachusetts Common Law Trademark Infringement)

90.     Boston Sports Medicine incorporates and re-alleges by reference the above paragraphs 1 through 89 as if expressly set forth herein.

91.     The Boston Sports Medicine Mark is the proprietary property of Boston Sports Medicine, which possesses certain common law trademark rights and protections in the Boston Sports Medicine Mark under the common law of the Commonwealth of Massachusetts.

92.     Defendant's unauthorized use and intentional infringement of the Boston Sports Medicine Mark, as explained above is likely to cause confusion, mistake, and/or deception among consumers as to the source, quality, and/or nature of Defendant's goods and services, thereby, committing common law trademark infringement.

93.     Defendant has engaged in unfair competition by using a mark confusingly similar to the Boston Sports Medicine Mark, associated goodwill, and other intangible rights of Boston Sports Medicine without permission in an attempt to pass off Defendant's services as coming from, being sponsored by, and/or affiliated with Boston Sports Medicine.

94.     Defendant's acts and conduct as set forth herein constitutes unfair

competition, willful, unfair, and deceptive acts or practices within the Commonwealth of Massachusetts and violation of Massachusetts common law.

95.     Boston Sports Medicine never gave Defendant permission to use the Boston Sports Medicine Mark or any similar marks or engage in the offending activities. After discovering Defendant's infringing use of the Boston Sports Medicine Mark and/or any confusingly similar derivations thereof, Boston Sports Medicine demanded that Defendant cease further use of the Boston Sports Medicine Mark. Defendant, however, has refused to cease further use and continues, to this day, to misappropriate Boston Sports Medicine's rights in the Boston Sports Medicine Mark.

96.     Boston Sports Medicine has been damaged and will continue to be damaged by Defendant's infringing activities.

97.     As a direct and proximate result of the foregoing conduct, Boston Sports Medicine is entitled to damages against Defendant in an amount that is subject to proof at trial, to a preliminary and permanent injunction, and to any and all other relief the Court deems just and proper under the law.

98.     Boston Sports Medicine is informed and believes, and thereon alleges, that Defendant's conduct was willful, wanton, malicious, and in conscious disregard of Boston Sports Medicine's rights, thereby justifying an award of punitive and/or exemplary damages in an amount according to proof at trial.

## COUNT VI

### (Massachusetts Common Law Unfair Competition)

99.     Boston Sports Medicine incorporates and re-alleges by reference the above paragraphs 1 through 98 as if expressly set forth herein.

100.    Boston Sports Medicine is the legal owner of the Boston Sports Medicine Mark, has not abandoned the Boston Sports Medicine Mark since its first use, and the Boston Sports Medicine Mark has been, and continues to be, in continuous use. Despite knowledge of Boston Sports Medicine's ownership interests in the Boston Sports Medicine Mark, Defendant has made, and intentionally continues to make, use in commerce of the Boston Sports Medicine Mark without Boston Sports Medicine's permission.

101.    Defendant has engaged in a pattern of unfair, deceptive, and fraudulent acts to enrich itself by misappropriating Boston Sports Medicine's rights to the Boston Sports Medicine Mark and using them for its own benefit.

102.    Defendant's unauthorized use of the Boston Sports Medicine Mark creates a false association between Defendant and Boston Sports Medicine. Defendant's unauthorized use of the Boston Sports Medicine Mark also tends to cause confusion, mistake, and/or deception among consumers as to the source, quality, and nature of Defendant's goods and services.

103.    Defendant has engaged in fraudulent business practices, false advertising, and unfair competition by using the Boston Sports Medicine Mark and associated goodwill, without permission in an attempt to pass off Defendant's goods as coming from, being sponsored by, and/or affiliated with Boston Sports Medicine.

104.    Boston Sports Medicine has been damaged and will continue to be damaged by Defendant's unlawful, unfair, and/or fraudulent business practices and misleading advertising as alleged herein. Boston Sports Medicine, therefore, is entitled to a preliminary and permanent injunction enjoining Defendant from using the Boston Sports Medicine Mark to advertise, market, and/or sell Defendant's goods and services.

105.    As a direct and proximate result of the foregoing conduct, Boston Sports Medicine has been harmed and is entitled to damages against Defendant in an amount according to proof at trial and to any and all other relief the Court deems just and proper under the law.

106.    Boston Sports Medicine is informed and believes, and thereon alleges, that Defendant's conduct was willful, wanton, malicious, and in conscious disregard of Boston Sports Medicine's rights, thereby justifying an award of punitive and/or exemplary damages in an amount according to proof at trial.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully requests this Honorable Court enter judgment in its favor and against Defendant as to all Counts, together with the following relief:

A.    For a preliminary and permanent injunction that enjoins Defendant and its agents, affiliates, parent companies, subsidiaries, servants, employees, and all persons acting in privity or in concert with them, from, directly or indirectly:

(i)    Using the Boston Sports Medicine Mark or trade name in connection with Defendant's services, marketing, advertising, or

promotional materials, or otherwise in connection with Defendant's business;

(ii)      Using confusingly similar variations of the Boston Sports Medicine Mark or trade name, specifically including but not limited to "Boston Sports Medicine & Research Institute," causing a likelihood of confusion, deception, and/or mistake as to the source, nature, and/or quality of Defendant's goods or services;

(iii)     Otherwise infringing upon the Boston Sports Medicine Mark or trade name; and

(iv)     Continuing to perform in any manner whatsoever any of the acts complained of in this Complaint.

B.      For an Order directing Defendant to file with this Court and serve on Boston Sports Medicine, within 10 days after service of an injunction, a written report, signed under oath, setting forth, in detail, the manner and form by which Defendant has complied with the injunction.

C.      For an Order that Defendant pays to Boston Sports Medicine compensatory damages for the injuries sustained by Boston Sports Medicine in consequence of the unlawful acts alleged herein and that such damages be trebled pursuant to 15 U.S.C., § 1117, M.G.L. c. 93A, and any other applicable law because of the willful and knowing unlawful acts as alleged herein.

D.      For an Order requiring Defendant to account for and pay over to Boston Sports Medicine all gains, profits, and advantages derived by them from the willful and

knowing unlawful activities alleged herein pursuant to 15 U.S.C., § 1117, M.G.L. c.

110H, and any other applicable law.

     E.     For an Order awarding Boston Sports Medicine its costs and attorneys'

fees incurred in prosecuting this action.

     F.     For an Order awarding Boston Sports Medicine pre- and post-judgment

interest.

     G.     For an Award awarding Boston Sports Medicine such further relief as

the Court deems just and proper.

## JURY DEMAND

     Boston Sports Medicine hereby demands a trial by jury as to all claims or

issues so triable.

BOSTON SPORTS MEDICINE, INC.,
By its attorneys,

*/s/ Douglas F. Hartman*
_____
Douglas F. Hartman, BBO# 642823
HARTMAN LEONE
One Boston Place
201 Washington Street, 26th Floor
Boston, Massachusetts 02108
P: 617-807-0091
F: 617-507-8334
dhartman@hartmanleone.com